Linda SUCHANEK, Richard McManus, Carol Carr, Paula Gladstone, Edna Avakian, Charles Cardillo, Ben Capps, Deborah Debenedetto, and Carol J. Ritchie, Plaintiffs,

v.

STURM FOODS, INC., and Treehouse Foods, Inc., Defendants.

### Case No. 11–CV–565–NJR–PMF

United States District Court, S.D. Illinois.

Signed November 3, 2015

Randy L. Gori, D. Todd Mathews, Megan Myers, Gori Julian and Associates P.C., Edwardsville, IL, Peter H. Burke, Joseph Allen Schreiber, William Todd Harvey, Burke Harvey LLC, Birmingham, AL, B.J. Wade, Skouteris & Magee, PLLC, Memphis, TN, Michael H. Maizes, Maizes & Maizes LLP, Bronx, NY, for Plaintiffs.

Aaron J. Weinzierl, Craig S. Fochler, Jaclyne D. Wallace, Rebecca R. Hanson, Foley & Lardner, Chicago, IL, Patrick G. Walker, Farris Bobango Branan, PLC, Memphis, TN, for Defendants.

### MEMORANDUM AND ORDER

ROSENSTENGEL, District Judge:

Defendants, Sturm Foods, Inc., and its parent company Treehouse Foods, Inc., manufactured single-serve coffee cups for use in Keurig machines and marketed them under the name Grove Square Coffee ("GSC"). The eight named Plaintiffs each purchased GSC, but were extremely unsatisfied with their purchase. They claim that Defendants packaged, marketed, distributed, and sold GSC as premium, ground coffee. In truth, GSC was actually more than 95% instant coffee. The named Plaintiffs claim they would not have purchased GSC, or would have paid less for it, had they known it was actually instant coffee. They brought suit against Defendants for violating the consumer protection statutes and unjust enrichment laws of Alabama, California, Illinois, New Jersey, New York, North Carolina, South Carolina, and Tennessee.

District Judge G. Patrick Murphy denied Plaintiffs' original motion for class certification and granted summary judgment for Defendants on each of the named Plaintiffs' individual claims. Plaintiffs appealed to the Seventh Circuit Court of Appeals; the Seventh Circuit reversed Judge Murphy's decisions and remanded the matter for further proceedings. Upon remand, the case was reassigned to the undersigned because Judge Murphy retired while the case was on appeal. Plaintiffs have renewed their motion for class certification, which is presently before the Court. Also before the Court are five related motions filed by the parties seeking to exclude expert reports and testimony and arguments deemed improper. The Court will first consider the motions to exclude, as these rulings may affect the analysis of the motion to certify the class.

## MOTIONS TO EXCLUDE

The Court has divided the motions to exclude into two categories: non-*Daubert* motions and *Daubert* motions. The non-*Daubert* motions challenge the admissibility of expert testimony based on purported procedural deficiencies, while the *Daubert* motions challenge the substance of the expert testimony as unreliable or irrelevant.

### I. DAUBERT MOTIONS

District courts have a "gatekeeping" obligation to ensure that expert testimony is both relevant and reliable. FED. R. EVID. 702; *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (2993); *Lees v. Carthage College*, 714 F.3d 516, 521 (7th Cir.2013). Essentially, the district court must ask three questions before admitting expert testimony: is the expert qualified, is the expert's methodology reliable, and will the expert's testimony assist the trier of fact in understanding the evidence or determining a fact in issue. *Myers v. Illinois Cent. R. Co.*, 629 F.3d 639, 644 (7th Cir.2010). In determining relevance and reliability, the party offering the expert testimony bears the burden of proof. *Brown v. Burlington N. Santa Fe Ry. Co.*, 765 F.3d 765, 772 (7th Cir.2014) (citing *Lewis v. CIT-*

*GO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir.2009)).

The Court did not conduct a hearing on the *Daubert* motions because the record is adequate to decide the motions without one. Additionally, the parties did not indicate that a hearing was necessary or set forth what missing information a hearing would supply. *See Niam v. Ashcroft*, 354 F.3d 652, 660 (7th Cir.2004) ("[A] *Daubert* hearing is [not] always required."); *Kirstein v. Parks Corp.*, 159 F.3d 1065, 1067 (7th Cir.1998) (no automatic entitlement to a *Daubert* hearing because the Seventh Circuit has "not required that the *Daubert* inquiry take any specific form"); *Target Market Publishing, Inc. v. ADVO, Inc.*, 136 F.3d 1139, 1143 n. 3 (7th Cir.1998) ("[T]he Supreme Court did not suggest in either *Daubert* or *General Electric* that district courts would be required to conduct *in limine* hearings concerning every rejected proffer of expert testimony.").

### A. Defendants' Motion re: Bobby Calder (Doc. 196)[1]

Bobby Calder is a professor at Northwestern University, and he teaches graduate and post-graduate level courses in consumer behavior and marketing strategies. He has published numerous articles in research journals and has been a consultant to a number of widely-recognizable companies, including Aetna, Coca-Cola, GE, GM, and Kraft. Calder was hired by Plaintiffs to address whether GSC's packaging was likely to mislead reasonable consumers, which is the question common to all class members. *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 755 (7th Cir.2014). Plaintiffs submitted Calder's opinions to show that the issue of liability is capable of resolution on a class-wide basis and predominates over the class members' individual issues.

Defendants claim that Calder's report and testimony must be excluded (Doc. 197). Calder's report contains two sets of opinions (*See* Doc. 101-8). The first set of opinions is based on his review of GSC packaging, Sturm's marketing documents, and consumer complaints. Calder concluded, in short, that

1. Plaintiffs' response brief is at Doc. 206. Defen- dants' reply brief is at Doc. 216.

A reasonable consumer would have been led to falsely believe that [GSC] contained regular ground coffee for brewing in a Keurig machine .... Usage of the word "instant" on the package in a non-prominent way would not have been sufficient to prevent consumers being misled and deceived .... (and) Sturm's plan for marketing the [GSC] product was at its heart intended to distract consumers from realizing that the product quality or standard was instant coffee and not regular ground coffee for brewing.

(Doc. 101-8, pp. 4, 5, 7).

■ Defendants argue that these opinions must be excluded because they are not based on evidence of actual consumer perceptions, like a survey (Doc. 197, pp. 10–11). The Court disagrees. A consumer survey is not the only acceptable evidence of consumer deception. *See Muha v. Encore Receivable Mgmt., Inc.*, 558 F.3d 623, 628 (7th Cir.2009) (explaining that the "best evidence" that a statement is misleading is "a responsible survey," but testimony from consumers can also suffice); *Durkin v. Equifax Check Servs., Inc.*, 406 F.3d 410, 415 (7th Cir.2005) (explaining that the need for evidence to show a collection letter is confusing "might be met through the use of a carefully designed and conducted consumer survey. Also, we have suggested that an appropriate expert witness might suffice."); *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1261 (11th Cir.2004) (requiring plaintiff to present evidence of deception "in the form of consumer surveys, market research, expert testimony, or other evidence.")

■ Calder had plenty of other evidence regarding consumer deception. First, he had Defendants' own market research. This research showed Keurig users did not want instant coffee, so Defendants avoided using the word "instant" on the label. Defendants also conducted product testing to see if consumers noticed the physical differences between GSC cups and regular K-cups that signaled GSC was instant coffee (*see* Doc. 101-1, p. 4; Doc. 101-7; Doc. 219). Next, and

most importantly, Calder had hundreds of consumer complaints. In those complaints, customers said they felt disappointed, dissatisfied, displeased, disgusted, swindled, robbed, cheated, ripped off, duped, and misled (Doc. 221). [2] Others said GSC was a hoax, deceptive, an absolute fraud, a rip off, a sad joke, a gross misrepresentation, a clearly substandard instant coffee disguised as a Keurig K-cup, and a waste of money (*Id.*). The Court simply does not see why Calder needed a survey to measure the perceptions of potential GSC purchasers when he had oodles of complaints explicitly stating what consumers thought. Thus, the fact that Calder's first set of opinions were not based on a consumer survey does not make them inadmissible.

Defendants also claim that Calder's opinions are based upon an erroneous understanding of the relevant facts and his irrelevant personal feelings. For example, he didn't know some "Keurig products" contain instant coffee (e.g., vanilla flavored mocha) and no filter (e.g., ciders, hot chocolate), and he ignores that some Plaintiffs knew what "soluble" meant. To the extent that Defendants want to quibble with Calder's understanding of the facts or the materials that he reviewed, those are matters for cross-examination because they go more to the weight and credibility of his opinions, rather than their admissibility.

Calder's second set of opinions is based on a consumer study that he designed and conducted. For his study, Professor Calder interviewed twenty-three randomly recruited individuals in Chicago who owned and used Keurig machines (Doc. 101-8). The results of his study were consistent with his first set of opinions (*Id.* at p. 23). The participants "overwhelmingly identity [sic] the single-serve brands with the quality of ground roasted coffees, not instant coffees." (Doc. 101-8, p. 9). Consistent with that idea, the participants expected GSC "to be a traditional ground coffee filtered from roasted beans that did not contain instant coffee (*Id.* at p. 15). After a product demonstration,[3] the par-

---

**2.** More customer complaints are located at Doc. 100-12, Doc. 101-2, and Doc. 101-9.

**3.** The GSC cup and a Green Mountain cup were opened, the insides of the cups were exposed,

ticipants "changed their minds dramatically," and said GSC was more similar to instant coffee than ground roasted coffee (*Id.* at pp. 18, 23). Qualitative results also showed the participants "for the most part realized that they had been misled." (*Id.* at pp. 18, 23).

Defendants argue that Calder's opinions based on his consumer study must be stricken because the study deviated from accepted scientific principles for a valid consumer survey (Doc. 197). Defendants hired Gary Ford, Ph.D., a professor emeritus of marketing at American University, to critique Calder's methodology. Ford identified a number of purported deficiencies in Calder's study and discussed each one in a rebuttal report (Doc. 107-4). Based on Ford's report, Defendants argue that Calder used an improper universe, an unrepresentative sample from the universe, and ambiguous, imprecise, and biased questions (*Id.*). Defendants further argue that Calder failed to include a control group, failed to replicate the store environment, and failed to use a double-blind format (*Id.*).

It does not seem that Professor Calder's second set of opinions are *critical* to class certification. *Am. Honda Motor Co. v. Allen,* 600 F.3d 813, 815–16 (7th Cir.2010) ("We hold that when an expert's report or testimony is critical to class certification … a district court must conclusively rule on any challenge to the expert's qualifications or submissions prior to ruling on a class certification motion.") It seems that the consumer complaints and Defendants' own internal documents, along with Professor Calder's first set of opinions, supply all the needed proof as to whether the common issue of liability is capable of resolution on a class-wide basis and predominates over the class members' individual issues. While Calder's study is not *critical,* it is nevertheless important. Thus, the Court will undertake the *Daubert* analysis to put this issue to bed.

Consumer survey evidence must comply with principles of professional survey research in order to be admissible. *Evory v. RJM Acquisitions Funding L.L.C.,* 505 F.3d 769, 776 (7th Cir.2007). *See also* Shari Seidman Diamond, *Reference Guide on Survey Research, in* FED. JUDICIAL CTR., REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, p. 364 (3d ed. 2011) (provided by Defendants at Doc. 107-2). "While there will be occasions when the proffered survey is so flawed as to be completely unhelpful to the trier of fact and therefore inadmissible, such situations will be rare[.]" *PBM Products, LLC v. Mead Johnson & Co.,* 639 F.3d 111, 123 (4th Cir.2011) (citing *AHP Subsidiary Holding Co. v. Stuart Hale Co.,* 1 F.3d 611, 618 (7th Cir. 1993)). "Usually, objections based on flaws in the survey's methodology are properly addressed by the trier of fact." *PBM Products, LLC,* 639 F.3d at 123; *accord Citizens Fin. Group, Inc. v. Citizens Nat'l Bank,* 383 F.3d 110, 121 (3d Cir.2004); *Clicks Billiards, Inc. v. Sixshooters Inc.,* 251 F.3d 1252, 1262–63 (9th Cir.2001); *AHP Subsidiary Holding Co.,* 1 F.3d at 618.

While Calder's survey may not be perfect, and Defendants undoubtedly would have done things differently, the survey is not so fundamentally flawed that it is inadmissible. Calder's universe—individuals who currently own and actively use a Keurig machine—is a sufficiently close approximation of the consumers who would potentially purchase GSC.[4] In other words, it is self-evident that the vast majority of people who were likely to buy GSC were those who owned and actively used a Keurig machine. To the extent Calder's chosen universe was deficient, it goes to the weight of the survey, not its admissibility.

Calder's use of a convenience sample of only twenty-three participants in the Chicago-area also does not doom his survey because convenience samples are "routinely" relied on in surveys conducted by experts in

and the products were poured onto white paper (Doc. 101-8, p. 15).

4. A "universe" is "that segment of the population whose perceptions and state of mind are relevant to the issues in the case." J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION

§ 32:159 (4th ed. 2003). "In survey research, the 'universe' for a survey often is referred to as the 'target population.' " E. Deborah Jay, *Ten Truths of False Advertising Surveys,* 103 TRADEMARK REP. 1116, 1121 (2013) (citing ROBERT M. GROVES, ET. AL, SURVEY METHODOLOGY 69 (2009)).

marketing and in deceptive advertising cases. Diamond, *Reference Guide on Survey Research*, p. 361, 382 (available at Doc. 107-2). And those surveys "are admitted into evidence based on the argument that nonprobability sampling is used widely in marketing research and that 'results of these studies are used by major American companies in making decisions of considerable consequence.'" *Id.* (citations omitted). Case in point: Defendants' own market research was comprised of interviews with only seven consumers (*see* Doc. 219).

The Court also does not believe that Calder biased participants by displaying a GSC cup and a Green Mountain cup simultaneously at the beginning of the study. Contrary to Defendants' assertion, Calder did not ask participants whether the cups—"both the Green Mountain K-Cups and the Grove Square K-Cups"—were more similar to ground coffee or instant coffee (Doc. 197, p. 17). Instead, Calder asked the question about single-serve coffee cups *in general*.[5] Even if Defendants had accurately represented Calder's question, their argument is still insufficient because it does not make clear how the simple presence of the Green Mountain cup injected an impermissible bias into the study.

Furthermore, the form of Calder's questions is not so flawed that the study is inherently unreliable. To the extent Calder's questions elicited ambiguous responses, participants *immediately* explained their responses, which in the Court's opinion eliminated any ambiguities (*see* Doc. 101-8, p. 39). And while many of Calder's questions were close-ended, that does not automatically render a study inadmissible. *See* Diamond, *Reference Guide on Survey Research*, pp. 391–94. In fact, close-ended questions are particularly useful "for assessing choices between well-identified options or obtaining rating on a clear set of alternatives." *Id.* at p. 394. Additionally, the absence of a "no opinion" op-

tion does not significantly compromise the study because participants were still able to indicate neutrality.[6] The absence of a "don't know" option also does not doom the study because participants were encouraged to offer commentary during their interview. Despite the lack of a "don't know" option, participants commented on their uncertainty in a number of instances (*see* Doc. 101-8, pp. 54, 58, 68). Calder also told the participants that if they were unsure about a question, they should ask him for an explanation.

The lack of an external control group also does not make Calder's study inadmissible. His study was designed with a before and after format in which each participant served as his or her own control. The weaknesses of conducting a study in that format go to the weight of Calder's study, not its admissibility. Likewise, the failure to conduct a double-blind study does not make Calder's study wholly inadmissible; it simply limits the reliability of it.

Finally, the study is not inadmissible because Calder failed to replicate real-world conditions when he pointed out and read aloud six sections of the GSC package that Plaintiffs consider to be deceptive. Professor Calder explained that the entire purpose of his study was to examine whether consumers were misled by information on the GSC package, so it was necessary to ensure that the participants saw that information (Doc. 107-1, pp. 37–38). That approach is certainly used by other experts in conducting consumer surveys. *See* Diamond, *Reference Guide on Survey Research*, p. 397 (available at Doc. 107-2) ("Some surveys attempt to reduce the impact of preexisting impressions on respondent's answers by ... direct[ing] respondent's attention to the mark at issue (e.g., 'these stripes on the package'). Such efforts are likely to be only partially successful."); Mike Rappeport, *Response to Survey Methodology*

---

**5.** The Questionnaire indicates that Calder said "To get started, look at the products in front of you. On one side are brands of ground coffee from roasted beans used to make freshly brewed coffee. On the other side are brands of instant coffee. In the middle are brands of single serve coffee tubs. Thinking about the brands in the middle, which of the other two are they more similar to?" (Doc. 101-8, p. 39).

**6.** For example, participants were asked to answer questions by circling the number that represented their expectations on a scale from 1—"not at all expected" to 10—"very much expected." (*See* Doc. 101-8, p. 45). In the Court's experience, circling five on a scale of one to ten indicates neutrality.

*Articles*, 96 TRADEMARK REP. 769, 774–75 (2006) ("[F]or statements on packages ... frequently it is proper to 'focus' the respondent on that aspect or aspects of the product packaging ... the plaintiff thinks is offending .... [O]ne could reasonably argue that it is only fair to the defendant to make sure the respondent sees what the defendant said, because after all, if the defendant didn't think it would help the consumer to see it, why did they put it on the package?") Any deficiency in Calder's approach goes to the weight of the study, not its admissibility.

In sum, Defendants' arguments do not demonstrate that any of the alleged issues with Professor Calder's study are significant enough, even when considered in their totality, to warrant exclusion of the study. The issues identified by Defendants more appropriately go to the weight of the study than to its admissibility. For this reason, Defendants' motion to exclude the expert report and corresponding testimony of Professor Bobby Calder is denied.

## B. Defendants' Motion re: Candace Preston (Doc. 194)[7]

Candace Preston is the damages expert hired by Plaintiffs. In her original report, she opined that there were two potential models for calculating damages in this case: Wholesale Damages and Retail Damages (Doc. 101-12). The "Wholesale Damages" model reflects the revenue Defendants earned selling GSC at wholesale prices to retailers (*Id.*). The "Retail Damages" model reflects the amount of money consumers spent purchasing GSC (*Id.*).

█ Defendants argue that Ms. Preston's opinions should be excluded because her calculations do not fit Plaintiffs' theory of liability or the facts of this case, and they are contrary to law (Doc. 194, pp. 13–14, 14–15). It seems to the Court that these arguments do not bear on the relevance and reliability of Ms. Preston's opinions, but rather go to the issue of predominance under Rule 23(b)(3). Therefore these arguments are not a good fit for a *Daubert* motion, and they are more appropriately considered with respect to the

motion for class certification. They will be addressed later in this order.

Defendants also argue that Ms. Preston's opinions regarding the Wholesale and Retail Damages models should be stricken because they are based on an unreliable assumption that "if the product [GSC] had been marketed truthfully, consumers would not have purchased the product at all" (Doc. 195, pp. 16–17 (citing Doc. 101-12)). Ms. Preston claimed this assumption was supported by the analysis and conclusions reached by Bobby Calder and customer complaints (Doc. 101-12), which Defendants claim is not true (Doc. 195). Defendants contend that Professor Calder's report actually contradicts Ms. Preston's assumption and cite to a cherry-picked passage from that report, which states "very few consumers would have purchased the product at its price point if it had disclosed that it was instant coffee." (Doc. 195, p. 16 (citing Doc. 101-8, p. 23)). But Defendants ignored another passage opining that consumers "did not believe that the product was instant coffee when they bought it and would not have bought it if they did," which utterly supports Ms. Preston's assumption (*see* Doc. 101-8, p. 7). Defendants also contend that Ms. Preston's assumption is contradicted by favorable consumer comments (Doc. 195, p. 17). This argument is laughable. Ten positive reviews do not somehow negate the hundreds, if not thousands, of bad (sometimes scathing) reviews, particularly when there is evidence that Defendants had their employees write fake, positive reviews (*see* Doc. 101-1, p. 28). In the Court's opinion, the overall and intended spirit of Professor Calder's report and the consumer complaints very clearly support Ms. Preston's assumptions. Defendants' overly-technical nitpicking is not sufficient to convince the Court that Preston's report is unreliable.

Defendants' Motion To Strike Expert Witness Reports of Candace Preston and to Exclude Her Expert Testimony (Doc. 195) is denied.

## C. Plaintiffs' Motion re: Neal

7. Plaintiffs' response brief is at Doc. 201. Defendants' reply brief is at Doc. 215.

### Roese (Doc. 203)[8]

Neal Roese is a professor at Northwestern University. He is a social psychologist with expertise on judgment and decision-making. Roese was hired by Defendants to address the psychology of purchasing decisions. Specifically, he determined that there was no uniform or typical consumer decision process across consumers who have purchased GSC; instead, there were significant variations (Doc. 116-1). Defendants used Roese's report in opposing class certification to show that factual distinctions between the claims of the named Plaintiffs meant there was a lack of typicality and that individual issues predominate.

Plaintiffs claim that Roese's report and testimony should be excluded because it is nothing more than a recitation of passages from the named Plaintiffs' depositions that were cherry-picked to reach a predetermined outcome (*Id.* at pp. 2–4). Plaintiffs further claim that the named Plaintiffs' deposition testimony regarding their individual purchase decisions is irrelevant to the objective inquiry of whether a reasonable consumer was likely to be misled (Doc. 203, p. 4). The Court disagrees.

Roese began his report by explaining the steps involved in the consumer buying process: attention, interpretation, and attitude (Doc. 116-1). He then used the named Plaintiffs' deposition testimony to illustrate the variability between them at each mental step, which ultimately meant they had different reasons for purchasing GSC (*Id.*). Plaintiffs seem to suggest that he should have interviewed prospective or actual GSC purchasers rather than relying on the named Plaintiffs' depositions (*see* Doc. 203, p. 2). The Court does not see what difference that makes. Regardless of what he read or who he talked to, Roese was going to reach the conclusion that there was a significant variation in consumers' decision-making process when it came to purchasing GSC. No two people are the same, so it is axiomatic that no two people would make a purchase decision in the same exact manner for the same exact rea-

sons. While people may reach the same ultimate decision to buy a product, the factors that went into making that decision are as varied as people themselves.

As far as the relevance of Roese's report, it is undoubtedly relevant to this case; it's just not particularly helpful for the purposes for which Defendants submitted it. Defendants believe that Roese's report tends to show a lack of typicality and that individual issues predominate. For the reasons explained later in this Order, based on the case law of this Circuit, the Court disagrees. In other words, Roese's report is not unreliable or irrelevant under *Daubert*, it just doesn't help Defendants' accomplish anything with respect to class certification. But that does not mean that his report must be excluded and stricken from the record. The Court simply chooses to afford it little to no weight on the matters relevant to class certification. Plaintiffs' motion to exclude the expert report and corresponding testimony of Professor Neal Roese is denied.

## II. NON-DAUBERT MOTIONS

### A. Defendants' Motion re: Robert Klein (Doc. 193) [9]

Robert Klein was hired by Keurig, Inc. as an expert witness in its lawsuit against Sturm Foods for violations of the Lanham Act. *Keurig, Inc. v. Sturm Foods, Inc.*, Case No. 10-cv-841-SLR (D. Del.). After conducting four market research surveys, Klein concluded, in pertinent part, that few potential purchasers of GSC understood that it contained instant coffee (Doc. 115-4). He further concluded that after learning GSC contained instant coffee, consumers' interest in purchasing GSC fell significantly, which demonstrated the materiality of this information to their purchase decision (*Id.*).

In this matter, Plaintiffs had to identify all class certification experts by August 30, 2012, and all other experts by February 14, 2013. Plaintiffs did not identify Robert Klein as an expert witness or tender his report to Defendants before either of those dates. They made no mention of Klein until March 26,

---

8. Defendants' response brief is at Doc. 222. Plaintiffs did not file a reply brief.

9. Plaintiffs' response brief is at Doc. 202. Defendants did not file a reply brief.

2013, when they submitted his report in support of their brief opposing Defendants' original *Daubert* motion regarding Bobby Calder (*see* Docs. 115-4, 115-5). Plaintiffs referred to Klein's reports again in opposing Defendants' motions for summary judgment (*see* Doc. 141-12). Additionally, the Seventh Circuit explicitly referenced Klein's reports in their opinion. *See Suchanek v. Sturm Foods*, 764 F.3d 750, 753 (7th Cir.2014). According to Plaintiffs, the Seventh Circuit's mention of Klein's reports is what prompted them to ask him "to opine on the relevance of his findings submitted in the other litigation to the claims asserted here" (Doc. 202, p. 3). Klein then prepared a declaration in which he asserts that his findings in the *Keurig* case are relevant to this matter (Doc. 187-2). Plaintiffs submitted that declaration in support of their amended motion for class certification.

Defendants argue that Klein's reports, his declaration, and any corresponding testimony should be excluded in connection with the motion for class certification and trial because Klein was not retained as an expert in this case, and his documents were submitted long after the deadline for expert disclosures (Doc. 193). The Court agrees.

Klein cannot serve as an expert witness because Plaintiffs did not disclose him as an expert before the deadlines had passed. Consequently, Plaintiffs are not allowed to use his expert report to supply evidence on for the motion for class certification unless the failure was substantially justified or is harmless. FED. R. CIV. P. 37(c)(1). But Plaintiffs do not offer any reason for failing to disclose Klein as an expert (*see* Doc. 202). In fact, they continue to maintain that they have no desire to designate him as an expert (*Id.*). They claim that Klein's reports are simply "additional anecdotal evidence on the issue of consumer confusion" (*Id.* at p. 4). Plaintiffs do not, however, adequately explain or set forth any legal authority (such as a Federal Rule of Evidence or case law) demonstrating how Klein's findings can be treated as any-

thing other than undisclosed expert opinions. As best the Court can tell, Plaintiffs seem to believe that because Klein's reports were previously submitted to the Court for other (presumably permissible) purposes, those reports are somehow now generally available for any and all purposes. That is not so. *See, e.g., Matter of James Wilson Associates*, 965 F.2d 160, 173 (7th Cir.1992) ("The fact that inadmissible evidence is the (permissible) premise of the expert's opinion does not make that evidence admissible for other purposes, purposes independent of the opinion.").

Accordingly, Defendants' motion to strike the reports and declaration of Robert Klein (Doc. 193) is granted.

### B. Defendants' Motion to Strike Improper Arguments and Evidence from Plaintiffs' Reply Brief (Doc. 210)[10]

Defendants ask the Court to strike various arguments from Plaintiffs' motion for class certification and their reply brief (Doc. 210). First, Defendants claim that any arguments related to the supplemental report of Candace Preston should be stricken (*Id.*). Again, Candace Preston is the damages expert hired by Plaintiffs. Magistrate Judge Philip Frazier barred Plaintiffs from using Ms. Preston's supplemental report for purposes of their original class certification motion because it was submitted after the applicable deadline (Doc. 201 citing Doc. 103).[11] Consequently, Defendants argue that Plaintiffs should also be barred from using it for their amended motion for class certification (Doc. 210, p. 3). The Court disagrees.

After this case came back on remand, the parties chose to submit new briefs on the issue of class certification in order to align their arguments with the Seventh Circuit's opinion. The parties did not make any requests regarding evidentiary restrictions, and the Court imposed none. The Court sees no reason why it should not consider all of the available and properly submitted evi-

---

10. Plaintiffs' response brief is at Doc. 223. Defendants' reply brief is at Doc. 224.

11. All expert reports on the issue of class certification were due by August 30, 2012 (Doc. 210, p. 2). Candace Preston's original report was served

on Defendants on August 29, 2012 (*Id.*). She was deposed on September 28, 2012, and her supplemental report was served on Defendants on November 16, 2012 (*Id.*).

dence in the record, including evidence that came into being after the deadlines applicable to the original motion for class certification.

Second, Defendants argue that Ms. Preston's declaration that was submitted as part of Plaintiffs' reply brief should be stricken (Doc. 210).[12] Defendants claim that Ms. Preston's declaration contains an opinion that GSC had zero value, which is a new and previously undisclosed opinion that is untimely and prejudicial to them (Doc. 210). This argument is a non-starter. Ms. Preston never explicitly stated in her declaration that she was of the opinion that GSC was worthless (*see* Doc. 201-2). To the extent that her declaration can be read to stand for that opinion, it is hardly new—it has been implicit in her reports from the get-go. Ms. Preston explained that, for her original report, she was asked to assume that if GSC had been marketed truthfully, consumers would not have purchased it (Doc. 201-2, p. 3). Operating on that assumption, Ms. Preston opined that one potential measure of damages was the amount of money consumers spent purchasing GSC ("Retail Damages" model) (Doc. 101-12). In other words, class members would receive a full refund for their purchase of GSC. A full refund model is based on the notion that consumers received no benefit from the product and therefore the product was valueless. *See, e.g., Rikos v. Procter & Gamble Co.*, 799 F.3d 497, 524 (6th Cir.2015); *In re Scotts EZ Seed*, 304 F.R.D. 397, 412 (S.D.N.Y.2015).

Defendants next attack Ms. Preston's opinion that she can calculate the actual value of GSC from the cost of the ingredients in a GSC pod or the price of a cup of comparable instant coffee (Doc. 210). Again, Defendants claim this opinion was previously undisclosed and should be stricken because it is untimely and its admission would be prejudicial to them (*Id.*). In the Court's opinion, however, Ms. Preston's failure to present this opinion earlier is substantially justified.

As previously mentioned, the Retail Damages model in Ms. Preston's original report was based on the notion that a full refund was the proper measure of damages. During the first round of class certification briefing, Defendants did not file a *Daubert* motion or otherwise challenge Ms. Preston's report or the full-refund model. Things changed once the Seventh Circuit issued its opinion suggesting that the proper measure of damages is a partial refund. *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 760 (7th Cir.2014) ("[F]or example, plaintiff's damages might be computed by taking the difference between the actual value of the package she purchased (instant coffee) and the inflated price she paid (thinking the cups contained real coffee grounds).") Now, for the first time in the course of this litigation, Defendants take exception to the full-refund model of damages and argue that Ms. Preston's original and supplemental report do not provide any method for calculating a partial refund. As the Court sees it, if Defendants are going to mount a new challenge to Ms. Preston's original report years after it was submitted and supplemented, it is only fair to give her a chance to respond. What's good for the goose is good for the gander.

Defendants also argue that Ms. Preston's opinion that she can calculate the GSC's value from the cost of its ingredients or the price of a cup of comparable instant coffee is speculative and unreliable. The Court is doubtful that the value of the ingredients in an individual serving of GSC can be used as the measure of its actual value to consumers. And Plaintiffs do not cite to any case law or other legal authority showing that this is an acceptable way to calculate a product's actual value. Much like Neal Roese's report, however, the Court does not see why that means Ms. Preston's declaration, or a portion of it, must be excluded and stricken from the record. The Court simply chooses to reject that opinion for purposes of class certification.

On the other hand, using the cost of other instant coffees seems to the Court to be a perfectly acceptable method for determining the actual value of GSC. Defendants quibble that this fails to take into account any value associated with the K-cup brewing system or that the Starbucks VIA product was sold at a higher price than GSC (Doc. 210, p. 6). But

---

**12.** Candace Preston's declaration is at Doc. 201-2.

the Court is unconvinced that either of these things make Ms. Preston's opinion so unreliable that it must be excluded. As the Seventh Circuit noted during oral arguments, it simply makes no sense that a Keurig machine would be any more convenient for making instant coffee than, say, a microwave or a hot water spigot.[13] And if Starbucks VIA is truly a comparable product, then its price would be factored into Ms. Preston's computation of the cost of an equivalent instant coffee. Simply put, there is enough evidence in the record to satisfy the Court that consumers paid an inappropriately high premium for GSC. Ms. Preston will be given an opportunity to identify and isolate that premium. If, after further discovery, she is unable to do so, Plaintiffs will not be able to proceed on their theory that class members are entitled to a partial refund.

Finally, Defendants take issue with Plaintiffs' argument in their reply brief that individual issues relating to reliance do not predominate because reliance can be presumed on a class-wide basis (Doc. 210, p. 6). Defendants claim this argument is "new" and should be stricken (*Id.*). This portion of Plaintiffs' reply brief, however, was prompted by Defendants' argument in their response brief. Accordingly, it was appropriate for Plaintiffs to make this argument for the first time as a rebuttal argument in their reply brief. *See Cent. States, Se. & Sw. Areas Pension Fund v. White*, 258 F.3d 636, 640 n. 2 (7th Cir.2001); *Matter of Wildman*, 859 F.2d 553, 556 n. 4 (7th Cir.1988). Defendants also claim that Plaintiffs' argument regarding a presumption of reliance is wrong as a matter of law (Doc. 210, p. 6). This assertion goes to the merits of the argument, and ultimately the merits of the motion for class certification. Therefore, it will be addressed later in this order with respect to the motion for class certification.

In sum, all of Defendants' arguments are meritless, and their Motion to Strike Improper Argument and Evidence from Plaintiffs' Reply (Doc. 210) is denied.

## MOTION FOR CLASS CERTIFICATION

### I. PROPOSED CLASS DEFINITION

Plaintiffs seek certification of a class, or subclasses by state, of:

> All persons or consumers that during the Class Period, from September of 2010, up through the date the case is certified and notice is disseminated, who purchased Defendants' Grove Square Coffee ("GSC") products in Alabama, California, Illinois, New Jersey, New York, North Carolina, South Carolina, and Tennessee. Excluded from the Class are: (a) Defendants' Board members or executive-level officers, including its attorneys; (b) persons or entities who purchased the GSC primarily for resale; (c) retailers or re-sellers of the GSC; (d) governmental entities, including this Court; and (e) any consumer that already received a refund from Defendants. The named Plaintiffs assert claims under their respective state's consumer protection laws and also assert claims for unjust enrichment and injunctive relief.

(Doc. 186, p. 18).

Since filing their motion for class certification, Plaintiffs have agreed that certain modifications to the class definition are necessary. Specifically, they agreed that class members are no longer seeking injunctive relief and that online purchasers of GSC should be excluded from the class. The analysis that follows is based on a proposed class definition incorporating those modifications.

The analysis that follows also considers only whether class certification is appropriate with respect to Plaintiffs' consumer fraud claims and does not consider certification on the unjust enrichment claims. That is because Plaintiffs' motion for class certification focuses almost exclusively on the consumer fraud claims (*see* Doc. 186). In fact, they mention the words "unjust enrichment" only a handful of times. Plaintiffs do not address how any of the class certification requirements, such as commonality, typicality, and

---

**13.** One of the participants in Bobby Calder's study expressed the same sentiment (*see* Doc. 101-8, p. 82). She said "It's kind of like why bother to have a Keurig with Grove Square? Add the water and call it a day. You're paying for the separate tubs. I could just take a spoon and drop it in if that's all the Grove Square is." (*Id.*).

adequacy, are satisfied with respect to the unjust enrichment claim. Plaintiffs also do not set out the elements of unjust enrichment under the common law of each of the eight states at issue or comparatively analyze those laws to show that the laws are substantially similar and/or that the variances are manageable. Simply put, to the extent that Plaintiffs are seeking certification of an unjust enrichment claim, it is denied because the parties did not sufficiently address class treatment of that claim.

## II. LEGAL STANDARD FOR CLASS CERTIFICATION

■■■ A plaintiff seeking to certify a class must satisfy the four requirements of Federal Rule of Civil Procedure 23(a): numerosity, commonality, typicality, and adequacy of representation. *See, e.g., Harper v. Sheriff of Cook County,* 581 F.3d 511, 513 (7th Cir. 2009). In addition to meeting the threshold requirements of Rule 23(a), a plaintiff also must satisfy the requirements of at least one subsection of Rule 23(b). Here, Plaintiffs seek to certify a class under Rule 23(b)(3), and therefore they must show that "questions of law or fact common to the class members predominate over any questions affecting individual members" and that a "class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3); *Messner v. Northshore Univ. HealthSystem,* 669 F.3d 802, 811 (7th Cir.2012). Finally, the Seventh Circuit has "long recognized an implicit requirement under Rule 23" that a class must be ascertainable, meaning "the class must be defined clearly and that membership be defined by objective criteria." *Mullins v. Direct Digital, LLC,* 795 F.3d 654, 657 (7th Cir. 2015).

■■■ "Plaintiffs bear the burden of showing that a proposed class satisfies the Rule 23 requirements, but they need not make that showing to a degree of absolute certainty." *Messner,* 669 F.3d at 811 (internal citation omitted). "It is sufficient if each disputed requirement has been proven by a preponderance of evidence." *Messner,* 669 F.3d at 811 (citing *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.,* 546 F.3d 196, 202 (2d Cir.2008)).

## III. RULE 23(A) REQUIREMENTS

### A. Numerosity

The first requirement of Rule 23(a) is that the proposed class "be so numerous that joinder of all members is impracticable." FED. R. CIV. P. 23(a)(1). It is undisputed that tens of thousands of units of GSC were sold during the class period and therefore numerosity is satisfied (*see* Doc. 192).

### B. Commonality

■■■ The second requirement of Rule 23(a) is that there is at least one question of law or fact common to the class. FED. R. CIV. P. 23(a)(2). The Seventh Circuit determined that commonality was satisfied: "The question whether the GSC packaging was likely to mislead a reasonable consumer is common to the claims of every class member." *Suchanek v. Sturm Foods, Inc.,* 764 F.3d 750, 755 (7th Cir.2014).

■■■ Defendants argue that the Seventh Circuit got it wrong (Doc. 192). But that argument can be disregarded entirely because, even if Defendants are correct, it is not this Court's place to correct that error. *See Trinidad v. McCaughtry,* 17 Fed.Appx. 394, 396 (7th Cir.2001) ("There is even an institution in the judicial hierarchy charged with the duty of correcting error by a United States Court of Appeals—but that institution is not the United States District Court . . . .") The mandate rule requires this Court to adhere to the rulings of the Seventh Circuit on remand. *Kovacs v. United States,* 739 F.3d 1020, 1024 (7th Cir.2014) ("The lower court is bound, through the mandate rule, to the resolution of any points that the higher court has addressed." (citing *United States v. Morris,* 259 F.3d 894, 898 (7th Cir.2001))); *see also Waid v. Merrill Area Pub. Sch.,* 130 F.3d 1268, 1272 (7th Cir.1997) ("The most elementary application of [the law of the case doctrine] is that when a court of appeals has reversed a final judgment and remanded the case, the district court is required to comply with the express or implied rulings of the appellate court.") (citations omitted). Therefore, commonality is satisfied.

Plaintiffs argue that there are four additional common questions (Doc. 186, p.21–23). The first is whether Defendants' conduct was willful. By Plaintiffs' own admission, however, intent "is not a required element of liability under any of the eight consumer protection statutes" (Doc. 186, p. 21).[14] Instead, it is only relevant under the statutes of Alabama, South Carolina, and Tennessee and only with respect to the imposition of damages (those states provide that treble damages can be awarded if the defendant's conduct was willful or knowing) (Doc. 186, pp. 21, 22). Because intent is a relevant, but not necessary, component to the consumer fraud claims under the laws of three states, it is not an issue that is common across all class members, nor does it seem likely to "generate [an] answer apt to drive the resolution of the litigation." *Suchanek*, 764 F.3d at 756 (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 131 S.Ct. 2541, 2551, 180 L.Ed.2d 374 (2011)).

Two of the other common questions proposed by Plaintiffs include whether Defendants committed fraud by omission and whether Defendants engaged in fraudulent concealment. In the section of their brief addressing commonality, Plaintiffs do very little in the way of explaining how these questions are central to the validity of the claims of every single class member or how they would drive the resolution of the litigation (*see* Doc. 186, pp. 22–23). Instead, Plaintiffs simply repeat the relevant facts and make the unadorned assertion that these issues are common questions (*see* Doc. 186, pp. 22, 23). Elsewhere in their brief, however, Plaintiffs offer some clues as to why these questions matter (Doc. 186, pp. 44, 45). Plaintiffs believe that if Defendants are guilty of fraud by omission or concealment, then reliance/causation can be presumed on a class-wide basis, and individual proof from each class member is not needed (*Id.*). But Plaintiffs have not presented sufficient argument or authority to show that all eight states

permit reliance/causation to be proven on a class-wide basis or that it would be appropriate in this particular case (*see* Doc. 186, p. 45). *See also* 1 JOSEPH M. MCLAUGHLIN, MCLAUGHLIN ON CLASS ACTIONS § 5:55 (11th ed. 2014) (discussing that class-wide reliance can only be presumed in very limited circumstances). Therefore, the Court cannot say that these questions are common across all class members or likely to "generate [an] answer apt to drive the resolution of the litigation."

 Finally, Plaintiffs simply claim that another common question is "whether the changing of the label from 'soluble' to 'instant' cured the deceptive nature of the packaging" (Doc. 186, p. 23). Plaintiffs say nothing more. "[S]tating blankly what one's argument *is* and actually *arguing* a position are different things." *Raghunathan v. Holder*, 604 F.3d 371, 378 (7th Cir.2010) (emphasis in original). "[I]t is not the obligation of this court to research and construct the legal arguments open to parties." *United States v. Holm*, 326 F.3d 872, 877 (7th Cir.2003). Without more, the Court cannot conclude that this question is common to every single member of the class.

In sum, commonality is satisfied because the question whether the GSC packaging was likely to mislead a reasonable consumer is common to the claims of every class member.

## C. Typicality

 The third requirement of Rule 23(a) is that the claims or defenses of the representative parties are typical of the claims or defenses of the class. FED. R. CIV. P. 23(a)(3). The typicality requirement is meant to ensure that there is "enough congruence between the named representative's claim and that of the unnamed members of the class to justify allowing the named party to litigate on behalf of the group." *Spano v. The Boeing Co.*, 633 F.3d 574, 586 (7th Cir. 2011). In other words, the named representative's claims must have "the same essential

---

**14.** During the course of its own research, the Court discovered that intent is also relevant under the Illinois Consumer Fraud and Deceptive Business Practices Act ("CFA"), *see* 815 ILL. COMP. STAT. 505/2, *et seq.* That statute requires the plaintiff to show that the defendant intended consum-

ers to rely on the concealment, suppressions, or omission of a material fact. *Rickher v. Home Depot, Inc.*, 535 F.3d 661, 665 (7th Cir.2008) (citing *White v. DaimlerChrysler Corp.*, 368 Ill. App.3d 278, 305 Ill.Dec. 737, 856 N.E.2d 542, 546 (2006)).

characteristics as the claims of the class at large." *Oshana v. Coca–Cola Co.*, 472 F.3d 506, 514 (7th Cir.2006) (quoting *De La Fuente v. Stokely–Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir.1983)). It is well-established that typicality is satisfied if the named representative's claim "arises from the same event or practice or course of conduct that gives rise to the claims of other class members and . . . [the] claims are based on the same legal theory." *Oshana*, 472 F.3d at 514(citing *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir.1992)); *De La Fuente*, 713 F.2d at 232.

On appeal, the Seventh Circuit did not explicitly take up the issue of typicality, but the opinion includes commentary that strongly suggests typicality is satisfied. Specifically, the Seventh Circuit stated that "the Plaintiffs' claims and those of the class they would like to represent all derive from a single course of conduct by Sturm: the marketing and packaging of GSC." *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir.2014). The Seventh Circuit further stated "[t]he same legal standards govern every class member's claim; [Defendant] admits in its brief that '[a]ll of the applicable state consumer protection laws require proof that a statement is either (1) literally false, or (2) likely to mislead (either through a statement or material omission) a reasonable consumer.'" *Id.*

Despite this commentary from the Court of Appeals and Defendants own concessions, Defendants nevertheless argue that typicality is not satisfied (Doc. 192). They urge the Court to focus on the injury and "how the named plaintiffs were injured [versus] how the other class members were injured" (Doc. 192, p. 32). Defendants argue that typicality is not satisfied because the class members "bought GSC for different reasons and formed their beliefs about it for different reasons" (*Id.*). For example, "[s]ome Plaintiffs bought GSC because a retailer placed it on a shelf near the Keurig K-cups. Others bought GSC because they wanted to try something new. Still others bought GSC because of its low price." (Doc. 192, p. 32).

▬▬ What Defendants are essentially saying is that typicality is not satisfied unless the class members all had the same percep-

tions and knowledge about GSC and the same preferences and reasons for purchasing GSC. This argument goes too far. The standard for typicality does not require the facts underlying every claim to be identical. *De La Fuente*, 713 F.2d at 232 ("The typicality requirement may be satisfied even if there are factual distinctions between the claims of the named plaintiffs and those of other class members.") (citations omitted); 1 JOSEPH M. MCLAUGHLIN, MCLAUGHLIN ON CLASS ACTIONS § 4:17 (11th ed. 2014) ("[M]inor factual differences between the claim of the putative representative and class members ordinarily will not defeat a finding of typicality, as the requirement does not require perfect overlap of circumstances."). In fact, when it comes to consumer fraud class actions, individual differences are to be expected. *See also* MCLAUGHLIN ON CLASS ACTIONS § 5:54 ("[I]n most contexts individuals choose consumer goods or services based on disparate knowledge and varied beliefs and reasons."); WILLIAM RUBENSTEIN, NEWBERG ON CLASS ACTIONS § 3:36 (5th ed. 2013) ("In consumer fraud cases, the proposed class representative's claims are generally held to be typical of the class members' claims if the allegations can be traced to the same overall fraud, even if class members' specific claims are factually distinct.")

▬▬ Here, as previously mentioned, the class members were all exposed to the exact same course of conduct by Defendants: the marketing and packaging of GSC. *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir.2014). *See also In re IKO Roofing Shingle Products Liability Litigation*, 757 F.3d 599, 602 (7th Cir.2014)("In a suit alleging a defect common to all instances of a consumer product . . . the conduct does not differ."). Additionally, the claims of the named representative and the other class members have the same essence: they were duped into believing they were purchasing ground coffee, and they would not have purchased GSC (or paid as much as they did) had they known it was actually instant coffee. Variations among the named representatives in their perception of the GSC packaging or their motivation for ultimately purchasing GSC simply means their claims are not completely *identi-*

*cal.* It does not mean their claims are *atypical* of the class. *See also In re IKO Roofing Shingle Products Liab. Litig.*, 757 F.3d 599, 601 (7th Cir.2014) (reversing because district court mistakenly held class could not be certified because different plaintiffs had different experiences with sub-standard roofing tiles); *Butler v. Sears, Roebuck, and Co.*, 727 F.3d 796, 798, 800 (7th Cir.2013) (affirming certification of single class of consumers who purchased washing machines that accumulated mold even though class members did not all own same exact model and "different models [were] differently defective."); *Pella Corp. v. Saltzman*, 606 F.3d 391, 392 (7th Cir.2010) (affirming certification of class of consumers who purchased windows with a design defect even though consumers' experiences with defective windows may have been caused by many individual variances such as specific conditions and improper installation); *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir.1992) (finding typicality in an action by former students alleging two beauty schools had made fraudulent claims about the education they provided even though the plaintiffs spent varying amounts of time at the school and some left "satisfied"). Typicality is satisfied.

### D. Adequacy

The fourth and final requirement of Rule 23(a) is that the named plaintiffs and proposed class counsel must fairly and adequately protect the interests of the class. FED. R. CIV. P. 23(a)(4). Defendants do not challenge the adequacy of class counsel (*see* Doc. 192), and the Court has no reason to believe they are not qualified. Therefore, the Court will only analyze whether the named Plaintiffs are adequate representatives.

Once again, the Seventh Circuit did not explicitly take up the issue of adequacy of representation, but the opinion includes commentary which strongly suggests adequacy is satisfied. The Court of Appeals stated, "[I]t is apparent that this is not a case where few, if any, of the putative class members share the named representative's grievance against the defendant. If it were, things would be different [because a] person whose claim is idiosyncratic or possibly unique is an unsuitable class representative." *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 758 (7th Cir.2014) (citations omitted).

Defendants nevertheless argue that the named Plaintiffs are not suitable class representatives (Doc. 192, p. 33). They point out that the named Plaintiffs ascribe different causes to their mistaken beliefs about GSC and had different reasons for purchasing GSC (*Id.*). "In other words, they do not agree on what would cause the packaging to create the impression GSC is all ground coffee. (*Id.*). Thus, according to Defendants, the named Plaintiffs are antagonistic to each other on causation, reliance, and the materiality of information on the packaging (*Id.*). The Court disagrees.

█ The adequacy requirement is satisfied when the named representatives have "a sufficient interest in the outcome of the case to ensure vigorous advocacy" and "[do] not have interests antagonistic to those of the class." *Saltzman v. Pella Corp.*, 257 F.R.D. 471, 480 (N.D.Ill.2009) *aff'd*, 606 F.3d 391 (7th Cir.2010). *See also Uhl v. Thoroughbred Tech. & Telecommunications, Inc.*, 309 F.3d 978, 985 (7th Cir.2002) ("A class may not satisfy the requirements of Rule 23(a)(4) if the class representative does not possess the same interest and suffer the same injury as the class members.") (internal quotation marks and citation omitted); *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir.1992) ("A class is not fairly and adequately represented if class members have antagonistic or conflicting claims.").

The named Plaintiffs all claim that the overall GSC packaging was deceptive in that it created, and/or failed to correct, the misimpression that the product was premium, ground coffee. The named Plaintiffs also claim they would not have purchased the product (or paid as much as they did) had they known it was actually instant coffee. They are not alone in their claims. The evidence in the record illustrates that hundreds, if not thousands, of other consumers held the same mistaken belief and were equally disappointed upon learning the true nature of the product.

The Court fails to see how or why it makes a difference whether some of the named Plaintiffs were misled solely by affirmative misrepresentations in statements, images, and descriptions set forth on the packaging as opposed to a material omission or some combination of affirmative misrepresentations and omissions. They all have the same interest in proving the GSC packaging was unfair or deceptive because all of their claims stand or fall on the issue of whether a reasonable consumer was likely to be misled by the overall packaging, not any one particular attribute or omission. Additionally, they all suffered the same injury—they paid an inflated price for instant coffee or paid for a product they would not have bought at all had they known it was instant coffee. Defendants provide little to no explanation as to how these differences could create misaligned incentives among class members and the class representatives. And the Court cannot think of a reason for anticipating antagonism based on these differences. *See* 1 JOSEPH M. McLAUGHLIN, McLAUGHLIN ON CLASS ACTIONS § 4:30 (11th ed. 2014) ("Likely differences in the ways in which individual class members will prove causation and damages generally 'does not affect the alignment of their interests' so as to cause conflict."); 6A FED. PROC., L. ED. § 12:119 ("Where the central question common to all of the class members goes to the heart of the controversy, it outweighs other minor variations respecting individual interests in the class."). Adequacy is satisfied. [15]

## IV. RULE 23(B)(3) REQUIREMENTS

Plaintiffs seek to certify a class under Rule 23(b)(3), and therefore must show that "questions of law or fact common to the class members predominate over any questions affecting individual members" and that a "class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3); *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir.2012). "The matters perti-

nent to these findings include: (A) the class members' interests in individually controlling the prosecution ... of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." FED. R. CIV. P. 23(b)(3).

In determining whether predominance and superiority are satisfied, the Court must first ask whether the plaintiff's "damages are susceptible of measurement across the entire class." *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 760 (7th Cir.2014) (citing *Comcast Corp. v. Behrend*, —— U.S. ——, 133 S.Ct. 1426, 1433, 185 L.Ed.2d 515 (2013)). If damages can be estimated, the Court will move on to examining the matters identified in Rule 23(b)(3), which "deal with the interests of individualized members of the class in controlling their own litigations and carrying them on as they see fit." *Suchanek*, 764 F.3d at 760 (citing *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 615–16, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997)) (internal quotation marks omitted); *see* FED. R. CIV. P. 23(b)(3). In particular, the court should assess "the difficulty and complexity of the class-wide issues as compared with the individual issues." *Suchanek*, 764 F.3d at 760. The court should also assess "whether the class allegations are satisfied through evidentiary proof." *Suchanek*, 764 F.3d at 760 (citation omitted).

### A. Measurement of damages

"Damages are susceptible of measurement across the entire class" if there is "a single or common *method* that can be used to measure and quantify the damages of each class member." WILLIAM RUBENSTEIN, NEWBERG ON CLASS ACTIONS § 12:4 (5th ed. 2013). If damages are capable of measurement on a classwide basis, questions of individual damage calculations will

---

15. Defendants also argue that Plaintiff Carol Carr is an inadequate class representative because she is subject to unique defenses not applicable to the proposed class. (Doc. 34, p. 192). At the hearing on the motion for class certification,

Plaintiffs' counsel indicated that this argument is based on a misunderstanding about where Ms. Carr resides and purchased GSC. Therefore, the Court need not address this argument.

not overwhelm questions common to the class. *Contra Comcast Corp.*, 133 S.Ct. at 1433.

Plaintiffs' theory of liability rests on the claim that because GSC was overwhelmingly instant coffee, GSC's actual value is either nothing or a figure substantially lower than the price consumers paid for it. If GSC's value is nothing, Plaintiffs would be entitled to receive all of their money back. If GSC is worth something less than what consumers paid, Plaintiffs would be entitled to receive a partial refund. *See Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 760 (7th Cir.2014) ("[F]or example, plaintiff's damages might be computed by taking the difference between the actual value of the package she purchased (instant coffee) and the inflated price she paid (thinking the cups contained real coffee grounds).")

Candace Preston's "Retail Damages" model matches the full-refund theory (Doc. 101-12). Defendants contend, however, that the full-refund model is contrary to law (Doc. 192). They claim that "courts have universally rejected attempts to apply the theory that a defendant's product is worthless to food and beverage products, even if their value is minimal" (*Id.* at p. 36). Defendants vehemently insist that GSC is not completely worthless because it provided convenience, hydration, and caffeine (*Id.* at pp. 36–37).

Defendants' assertion that courts have "universally rejected" full refunds in cases involving the deceptive packaging of food or beverages is a gross exaggeration. Defendants cite to four cases from only three district courts. There are ninety-four districts in the federal court system and over six hundred authorized district judgeships. So it goes without saying that the decisions of four judges in three districts hardly establish "universal" proposition of law. Furthermore, the cases cited by Defendants are of very little persuasive value given that two of

them are unpublished,[16] Defendants cited to only a footnote from the third,[17] and the fourth case specifically noted that it was "quite different" from the instant case.[18] As such, the Court is not convinced that a full refund is never the proper measure of damages in a case involving deceptive packaging of food or beverages.

And if there was ever a case where this theory was appropriate, this may be it. There is plenty of evidence in the record suggesting that consumers would not have purchased GSC but for its deceptive labeling that created and/or failed to correct the misimpression that GSC was premium, ground coffee. Specifically, there is evidence that the only consumers who would potentially purchase GSC were those who owned a Keurig machine (or who were buying it for someone else who owned a Keurig machine) (Doc. 101-1, p. 253). And there is plenty of evidence showing that, when it came to coffee, Keurig machine owners wanted to brew only premium, fresh, ground coffee (Doc. 101-1, p. 4; Doc. 219; Doc. 101-7). There is also evidence that Defendants were fully aware of Keurig machine owners' preferences and went to great lengths to disguise the fact that GSC was not premium, fresh, ground coffee. And of course there is evidence showing that hundreds of consumers misunderstood GSC to be ground coffee and purchased the product based on misunderstanding (*see* Doc. 221). Furthermore, Defendants have produced absolutely no evidence that some consumers may have still purchased GSC had they known GSC was instant coffee. There is also no evidence that some consumers did, in fact, know that GSC was instant coffee yet purchased it anyway. Accordingly, the Court thinks it is entirely possible that the finder of fact could conclude that GSC was worthless to consumers.

To the extent that a partial refund turns out to be the correct measure of damages,

16. *Jones v. ConAgra Foods, Inc.*, No. C 12–01633 CRB, 2014 WL 2702726 (N.D.Cal. June 13, 2014); *In re POM Wonderful LLC Mktg. & Sales Pratices Litig.*, No. MDL 2199, 2012 WL 4490860 (C.D.Cal. Sept. 28, 2012).

17. *Allen v. Hyland's Inc.*, 300 F.R.D. 643, 671 n. 25 (C.D.Cal.2014).

18. *Langendorf v. Skinnygirl Cocktails, LLC*, 306 F.R.D. 574, 583 (N.D.Ill.2014) ("The record before the *Suchanek* court was quite different than the record here.")

the Retail Damages model could simply be offset by subtracting the actual value of GSC. Ms. Preston explained she could calculate actual value of GSC from the consumer price per cup of an equivalent instant coffee (Doc. 201-2).

Ms. Preston also presented a third damages model, the "Wholesale Damages" model (Doc. 101-12). This model awards class members the revenue Defendants earned selling GSC at wholesale prices to retailers (*Id.*). This model does not match either of Plaintiffs' theories of liability, and thus this damages model is rejected.

Accordingly, Plaintiffs have met their burden of showing a proposed class-wide damages model that is consistent with their theory of liability. *Comcast Corp. v. Behrend,* —— U.S. ——, 133 S.Ct. 1426, 1435, 185 L.Ed.2d 515 (2013) ("The first step in a damages study is the translation of the *legal theory of the harmful event* into an analysis of the economic impact *of that event.*") (citation omitted). If a single class is certified for the purposes of establishing damages, each class member will receive a full refund or a partial refund. Alternatively, in the event subclasses are created, class members in certain states will receive statutory damages. [19]

### B. Complexity and class-wide proof

Because damages can be estimated, the Court will move on to examining "the difficulty and complexity of the class-wide issues as compared with the individual issues" and "whether the class allegations are satisfied through evidentiary proof." *Suchanek v. Sturm Foods, Inc.,* 764 F.3d 750, 760 (7th Cir.2014) (citation omitted).

 As previously discussed, the common, class-wide issue in this case is liability, which turns on whether the GSC packaging was likely to deceive a reasonable consumer. This question is particularly appropriate for class-wide resolution. It is identical across every class member because all of the applicable consumer protection statutes require proof that Defendants' statement was likely to mislead a reasonable consumer. *Suchanek,*

764 F.3d at 756. And it is the most central aspect of every class member's consumer fraud claim; as noted by the Seventh Circuit, "the claims of every class member will rise or fall on the resolution of that question." *Suchanek,* 764 F.3d at 757. Additionally, the proof needed to resolve the question of liability—survey evidence and expert testimony—is common to all class members. It is also costly. For these reasons, it would be extraordinarily duplicative and wasteful of the time and resources of both the Court and the parties to litigate this question in individual cases. That is particularly true because Defendants make no argument, and the Court has no reason to believe, that multiple, individual proceedings are necessary to ensure that the question of liability is accurately resolved. *See Pella Corp. v. Saltzman,* 606 F.3d 391, 394 (7th Cir.2010); *Mejdrech v. Met–Coil Sys. Corp.,* 319 F.3d 910, 912 (7th Cir.2003); *Thorogood v. Sears, Roebuck & Co.,* 547 F.3d 742, 745 (7th Cir.2008).

Individual litigation is not even a realistic alternative. The Court estimates that the value of each class member's claim is somewhere in the ballpark of $10. And "only a lunatic or a fanatic sues for [$10]." *Carnegie v. Household Int'l, Inc.,* 376 F.3d 656, 661 (7th Cir.2004). But even if some of the class members were feeling especially fanatical, the survey evidence and expert testimony needed to prove the issue of liability would cost considerably more than their claim is worth, which almost certainly eviscerates any interest they may have in filing an individual suit.

Furthermore, contrary to Defendants' assertion (Doc. 192, p. 44), the fact that individualized proof from each class member may be required on the issues of proximate causation and reliance does not make the class format unmanageable or support the denial of class certification. *Suchanek,* 764 F.3d at 760; *Pella Corp.,* 606 F.3d at 394 ("Proximate cause, however, is necessarily an individual issue and the need for individual proof alone does not necessarily preclude class certification.") Proximate causation and reliance are

---

**19.** According to Defendants, statutory damages are available in Alabama, California, and New York (Doc. 192, p. 39 n. 31).

simpler issues than the issue of liability, and the information needed to prove them is more accessible to individual litigants than the information needed to prove liability. *Suchanek*, 764 F.3d at 760. That's because each class member can simply state for himself that, based on GSC's packaging, he mistakenly believed GSC was ground coffee, and he purchased it as a result of that mistaken belief. *See Suchanek*, 764 F.3d at 760 ("At the back end, if the class prevails on the common issue, it would be a straightforward matter for each purchaser to present her evidence on reliance and causation."). The individualized assessments can be conducted after liability is determined and damages are being considered. *Suchanek*, 764 F.3d at 756 ("It is routine in class actions to have a final phase in which individualized proof must be submitted.")

Accordingly, the Court thinks "it makes good sense" to resolve the common issue of liability "in one fell swoop." *Pella Corp.*, 606 F.3d at 394 (citing *Mejdrech*, 319 F.3d at 911). *See also Chicago Teachers Union, Local No. 1 v. Bd. of Educ.*, 797 F.3d 426, 444 (7th Cir.2015) ("[W]hen adjudication of questions of liability common to the class will achieve economies of time and expense, the predominance standard is generally satisfied." (quoting *Comcast Corp. v. Behrend*, —— U.S. ——, 133 S.Ct. 1426, 1436–37, 185 L.Ed.2d 515 (2013))); 7AA Charles Alan Wright, et al., Federal Practice & Procedure § 1778 (3d ed.) ("When common questions represent a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is a clear justification for handling the dispute on a representative rather than on an individual basis.").

To conclude, because common issues of law and fact predominate, and trying these claims individually would result in a substantial amount of repetition and wasted resources, proceeding as a class action is the superior form of adjudication for this case.

## V. Issues with the Class Definition
### A. Ascertainability

The Seventh Circuit has "long recognized an implicit requirement under Rule 23" that a class must be ascertainable, meaning "the class must be defined clearly and that membership be defined by objective criteria." *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 657 (7th Cir.2015). Defendants do not dispute that the proposed class is defined by reference to objective criteria (Doc. 192, p. 24). The definition identifies a particular group of individuals (in-store purchasers of GSC) harmed in a particular way (defrauded by packaging) during a specific period (from September 2010 to the present) in particular states (Alabama, California, Illinois, New Jersey, New York, North Carolina, South Carolina, and Tennessee). Defendants' objection to the proposed class is that Plaintiffs have not pointed to any evidence that identifies the class members or proposed a reliable method for ascertaining their identities (Doc. 192, p. 24).

The Seventh Circuit recently ruled on this precise issue in *Mullins v. Direct Digital, LLC*, 795 F.3d 654 (7th Cir.2015). The Court noted that some courts have recently imposed a "new" and "heightened" requirement to ascertainability by "requiring plaintiffs to prove at the certification stage that there is a 'reliable and administratively feasible' way to identify all who fall within the class definition." *Mullins*, 795 F.3d at 657. The Seventh Circuit declined to follow suit for two general reasons. First, the new, more "stringent" version of ascertainability "does not further any interest of Rule 23 that is not already adequately protected by the Rule's explicit requirements." *Id.* at 662. And second, the costs of imposing the requirement are high because it "erect[s] a nearly insurmountable hurdle at the class certification stage in situations where a class action is the only viable way to pursue valid but small individual claims," namely low-value consumer class actions like the instant case. *Id.* Accordingly, the Seventh Circuit opted to "stick with our settled law," which focuses on "the adequacy of the class definition itself," and not "whether, given an adequate class definition, it would be difficult to identify particular members of the class." *Id.* at 659. Under that standard, as previously indicated, Plaintiffs have satisfied the requirement of ascertainability.

## B. Overbreadth

A class is defined too broadly if it includes "a great number of members who for some reason could not have been harmed by the defendant's allegedly unlawful conduct." *Messner v. Northshore Univ. Health-System*, 669 F.3d 802, 824, 825 (7th Cir.2012). There is a difference between class members who *could not* have been harmed and those who *were not* harmed. *Id.* at 825. Class members who *could not* have been harmed are those who "could not bring a valid claim under the best of circumstances." *See, e.g., Id.* at 824–25 (antitrust plaintiff class could not be defined to include persons who purchased product before defendant possessed market power because those persons *could not* have been injured by defendant's alleged abuse of market power). On the other hand, class members who *were not* harmed are those who have valid claims that will ultimately fail on the merits for various, individual reasons. *See id.* A class should not be certified if it is apparent that it contains "a great many persons" who *could not* have been harmed at the hands of the defendant. *Id.* at 825, 826 n. 15.

Defendants claim that the proposed class, which is defined as purchasers of "Grove Square Coffee products," is overly broad because it includes consumers who purchased the instant and microground coffee products as well as Grove Square's cappuccino products, which also contain instant coffee (Doc. 192, p. 28). The Court disagrees. Based on the images of the packaging submitted by Defendant (Doc. 192, p. 29), it seems rather obvious that the instant and microground coffee product, which is called "Grove Square Coffee," is something entirely different from the cappuccino product, which is called "Grove Square Cappuccino." In fact, the package of the cappuccino product does not appear to mention the word "coffee" at all. Thus, in the Court's opinion, defining the class as consumers "who purchased Defendants' Grove Square *Coffee* products" is sufficiently limiting. Furthermore, the risk that cappuccino purchasers will self-identify as members of the class seems slim as there is no evidence in the record that large numbers of cappuccino purchasers ever complained of being duped or were otherwise dissatisfied with their purchase.

Defendants also claim that the proposed class definition is overly broad and certification should be denied because the class is not limited to consumers who purchased the original package with the words "soluble and microground" (Doc. 192, p. 27). Instead, it also includes consumers who purchased the modified package with the words "instant and microground" (*Id.*). Defendants argue that none of the named Plaintiffs purchased, and therefore could not have been injured by, the modified package, and thus they cannot seek to represent consumers who purchased the modified packaging (*Id.*).

The Court is not persuaded that a class with both original-package-purchasers and modified-package-purchasers is so overly broad that certification must be denied. Defendants have not presented any evidence whatsoever as to how many purchasers of the modified packaging actually exist. Therefore the Court has no reason to believe that a "great many" of the putative class members are modified-package-purchasers and has no basis to deny certification. *See Messner*, 669 F.3d at 826. If anything, the Court should amend the class definition to correct for the overbreadth. *Id.* at 826 n. 15. But not even that appears to be necessary at this time. Defendants do not argue or set forth any evidence that the consumers who purchased the modified package *could not* have been deceived by the packaging. On the other hand, Plaintiffs have put forth evidence that the modified package was not sufficient to prevent a customer from being misled and that consumers continued complaining about GSC after the modified packaging was rolled out (Doc. 101-8, p. 5; Doc. 100-12; Doc. 101-9). Therefore, it cannot be said that modified-package-purchasers *could not* have been harmed by Defendants' allegedly unlawful conduct in marketing and packaging GSC. Accordingly, including both original-package-purchasers and modified-package-purchasers in the class does not appear to implicate overbreadth concerns.

Instead, it seems to the Court that the question of whether the named Plaintiffs can present claims on behalf of others who pur-

chased the same product in the slightly modified package actually implicates issues related to commonality, typicality, and adequacy of representation. 7AA CHARLES ALAN WRIGHT, ET AL., FEDERAL PRACTICE & PROCEDURE § 1785.1 (3d ed.) ("[T]he question whether [representative parties] may be allowed to present claims on behalf of others who have similar, but not identical, interests depends . . . on an assessment of typicality and adequacy of representation."); *see also Bruno v. Quten Research Inst., LLC*, 280 F.R.D. 524, 530 (C.D.Cal.2011). But Defendants did not make that argument. The Court nevertheless spent considerable time thinking about that issue and is convinced that the requirements of Rule 23(a) are still satisfied.

The Court was unable to locate photos in the record of the modified package, but throughout these proceedings, the Court was given the impression that the original package and the modified package were nearly identical. The only difference was the original package stated in small font that it contained "soluble and microground coffee" while the modified package said "instant and microground coffee." As best the Court can tell, the modified package still contained all the other misleading descriptions, images, and statements and still omitted what percentage of GSC was instant coffee. And regardless of the package, the problem—that GSC's package misrepresented and concealed the true nature of the product—remains the same. The Court does not believe that the single variation between the original and modified packages is so significant that it makes the packages sufficiently and meaningfully distinct and requires an independent review of each. As the litigation unfolds, if there are

large and unmanageable differences in proving the deceptive nature of the original and modified packages, the Court may decide to exclude the modified-package-purchasers from the class or create a subclass. But, at this point, the Court does not see the different packages as an obstacle to certification of a single class.

In sum, neither of Defendants' arguments regarding overbreadth requires the denial of certification or even a modification of the proposed class definition.

### C. Class Claims Under Alabama, Tennessee, and South Carolina Law

The consumer protection statutes of the states of Alabama, Tennessee, and South Carolina permit individual actions, but not class actions.[20] If this case were proceeding in state court, these statutes would undoubtedly preclude Plaintiffs from proceeding with a class action. But, obviously, this case is in federal court. The parties dispute whether those state statutes also bar class actions in federal court. The dispute centers on the Supreme Court's decision in *Shady Grove Orthopedic Assoc., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 130 S.Ct. 1431, 176 L.Ed.2d 311 (2010).

In *Shady Grove*, the plaintiff brought a putative class action in federal court against an insurance carrier seeking to recover unpaid statutory interest on late benefit payments. The issue was whether the case could proceed as a class action. Rule 23 of the Federal Rules of Civil Procedure, which sets out the procedures for pursuing a class action in federal court, "unambiguously authorizes *any* plaintiff, in *any* federal civil pro-

---

**20.** The Alabama Deceptive Trade Practices Act provides: "A consumer or other person bringing an action under this chapter may not bring an action on behalf of a class . . . ." ALA. CODE § 8–19–10(f).

The South Carolina Unfair Trade Practices Act provides: "Any person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of an unfair or deceptive method, act or practice declared unlawful by § 39-5-20 *may bring an action individually, but not in a representative capacity*, to recover actual damages." S.C. CODE ANN. § 39–5–140 (emphasis added).

The Tennessee Consumer Protection Act of 1977 provides: "Any person who suffers an ascertainable loss of money or property . . . as a result of the use or employment by another person of an unfair or deceptive act or practice . . . may bring an action *individually* to recover actual damages." TENN. CODE ANN. § 47–18–109(a)(1) (emphasis added). The TCPA further provides: "No class action lawsuit may be brought to recover damages for an unfair or deceptive act or practice declared to be unlawful by this part." TENN. CODE ANN. § 47–18–109(g).

ceeding, to maintain a class action if the Rule's prerequisites are met." *Shady Grove*, 559 U.S. at 406, 130 S.Ct. 1431. New York law, by contrast, prohibits class actions to recover penalties, such as the statutory interest sought by the plaintiff. Thus, the Supreme Court was tasked with deciding whether Rule 23 or the New York statute controlled.

A majority of the justices agreed that there was a direct conflict between Rule 23 and the New York law because they both address "whether a class action may proceed for a given suit." *Shady Grove*, 559 U.S. at 401, 130 S.Ct. 1431. When a federal rule of procedure conflicts with state law, the Rules Enabling Act directs federal courts to apply the federal rule so long as its application does "abridge, enlarge, or modify any substantive right" under the state law. *Id.* at 407, 130 S.Ct. 1431. A majority of the justices also agreed that Rule 23 would not alter the parties' substantive rights. In determining that Rule 23 was valid, however, the Court fractured 4-1-4. Four justices applied one test, while Justice John Paul Stevens applied another. Importantly, however, five justices concluded that Rule 23 controlled. *See Hahn v. Walsh*, 762 F.3d 617, 631 (7th Cir.2014), *cert. denied*, ––– U.S. ––––, 135 S.Ct. 1419, 191 L.Ed.2d 365 (2015) ("A plurality of the Court held that Rule 23 was valid under the Rules Enabling Act ... and five Justices agreed that Rule 23, not the New York law at issue, should be applied in federal court.") (internal citation omitted).

Defendants believe that the fractured opinion in *Shady Grove* leaves room for debate as to whether this Court is required to apply Rule 23 or the laws of Alabama, South Carolina, and Tennessee that explicitly limit Plaintiffs' ability to bring a class action. More specifically, the question for this Court is whether Rule 23 abridges, modifies, or enlarges a substantive right afforded by those three statutes.

In answering that question, Defendants insist that the Court should follow the analysis of Justice Stevens in *Shady Grove*, and they cite to two district court cases from other circuits in which Justice Stevens's concurrence opinion was deemed to be the control-

ling opinion. (Doc. 192, p. 47, n. 27). Defendants then mention four district court cases where the courts evaluated the Alabama, South Carolina, and Tennessee proscriptions on class actions in light of *Shady Grove* (*Id.* at pp. 47–48, 130 S.Ct. 1431). Defendants assert those courts determined the proscriptions against class actions "are substantive restrictions on the state created rights, and declined to permit class action treatment under Rule 23" (*Id.*). Defendants then declare, without any further elaboration, that the three statutory prohibitions on class actions at issue are, in fact, "substantive definitions of the private right of action afforded under each statute, and not mere procedural rules" and therefore this Court "should follow the decisions cited above and refuse to permit class action treatment of those state law claims" (Doc. 192, p. 48).

Simply put, Defendants' argument is not good enough. It is really nothing more than an assertion. They did not even discuss the analysis of the other courts (let alone conduct their own independent analysis) regarding how the three statutes at issue are materially different from the New York law at issue in *Shady Grove* or how Rule 23 actually alters a substantive right under any of those three statutes. They also provide no explanation as to why the other courts decided to go the opposite way of the Supreme Court on the issue of whether Rule 23 displaced a state law prohibiting class actions. This Court will not employ a sort of herd mentality and mindlessly follow the decisions of other district courts without reexamining the legal issues. This Court will also not do Defendants' job for them and comb through the cited cases to piece together the contours of their argument in order to determine whether those decisions are persuasive.

Additionally, one of the district court cases cited by Defendants was recently overturned by the Eleventh Circuit. *Lisk v. Lumber One Wood Preserving, LLC*, 792 F.3d 1331, 1335–37 (11th Cir.2015). In *Lisk*, the Eleventh Circuit held that, under *Shady Grove*, Rule 23 controlled over the prohibition on private class actions in the Alabama Deceptive Trade Practices Act ("ADTPA"). *Id.* at 1336. In the view of the Eleventh Circuit, it didn't matter

whether the plurality opinion or the concurring opinion in *Shady Grove* was controlling. *See id.* at 1335, 1336. That's because "all five justices agreed that applying Rule 23 to allow a class action for a statutory penalty created by New York law did not abridge, enlarge, or modify a substantive right," and "[t]here is no relevant, meaningful distinction" between the New York law in *Shady Grove* and the ADTPA. *Id.* at 1335. The Eleventh Circuit supported that conclusion by addressing the major points of the plurality's analysis as well as Justice Stevens's analysis (*e.g.,* the legislative history of the ADTPA; the placement of the prohibition on class actions within the code; the scope of the prohibition; and the rights and obligations of the parties under the ADPTA, the available remedies, and the rules of decision for enforcing either). *See id.* at 1336. Under either analysis, Rule 23 was valid. *See id.* at 1336, 1337. Thus the Court concluded "[t]he Alabama statute restricting class actions, like the New York statute at issue in *Shady Grove,* does not apply in federal court. Rule 23 controls." *Id.* at 1336.

▮ Defendants' anemic argument is no match for the thorough, well-reasoned opinion of the Eleventh Circuit. The rationale by which the Eleventh Circuit arrived at its decision in *Lisk* convinces this Court that Rule 23 controls over the Alabama proscription on class actions. The Court also believes that the decision in *Lisk* applies with equal force and logic to the South Carolina and Tennessee proscriptions on consumer fraud class actions. *See also* 7A CHARLES ALAN WRIGHT, ET AL., FEDERAL PRACTICE & PROCEDURE § 1758 (3d ed.) ("It now is clear that Rule 23 controls whether a class action may be maintained, regardless of a conflicting state law.") Defendants have not given the Court any reason to think otherwise, and once again, the Court will not dig through the cases cited by Defendants in an attempt to supply itself with those reasons.

Accordingly, the Court finds class treatment of the named Plaintiffs' claims arising under the consumer protection statutes of Alabama, South Carolina, and Tennessee is permitted.

## CONCLUSION

For the reasons set forth above, Plaintiffs' Renewed Motion for Class Certification (Doc. 186) is **GRANTED in part and DENIED in part.** It is denied with respect to Plaintiffs' request to certify an unjust enrichment class. It is granted with respect to Plaintiffs' request to certify a statutory consumer fraud class under Rule 23(b)(3). The following class is certified on the issue of liability only:

All persons or consumers that during the Class Period, from September of 2010, up through the date the case is certified and notice is disseminated, who purchased Defendants' Grove Square Coffee ("GSC") products in Alabama, California, Illinois, New Jersey, New York, North Carolina, South Carolina, and Tennessee.

Excluded from the Class are: (a) Defendants' Board members or executive-level officers, including its attorneys; (b) persons or entities who purchased the GSC primarily for resale; (c) retailers or re-sellers of the GSC; (d) governmental entities, including this Court; (e) any consumer that already received a refund from Defendants; and (f) any consumer who purchased GSC online.

It is further ordered that:

1. The law firms of Burke Harvey, LLC and Ward & Wilson are hereby **APPOINTED** as co-lead class counsel.

2. Defendants' motion to exclude the expert report and corresponding testimony of Robert Klein (Doc. 193) is **GRANTED.**

3. Defendants' motion to exclude the expert report and corresponding testimony of Candace Preston (Doc. 194) is **DENIED.**

4. Defendants' motion to exclude the expert report and corresponding testimony of Professor Bobby Calder (Doc. 196) is **DENIED.**

5. Plaintiffs' motion to exclude the expert report and corresponding testimony of Professor Neal Roese (Doc. 203) is **DENIED.**

6. Defendants' Motion to Strike Improper Arguments and Evidence from Plain-

tiffs' Reply Brief (Doc. 210) is **DE-NIED.**

7. Plaintiffs are **GRANTED** leave to file a Second Amended Complaint as discussed at the hearing held on July 9, 2015, on the motion for class certification. The Second Amended Complaint **SHALL** be filed on or before November 17, 2015.

8. Finally, the parties **SHALL**, on or before **December 4, 2015,** advise the Court what, if any, additional discovery is needed (and explain how much time is needed for that discovery) and submit a proposed schedule for notice to the class and trial on the common issues of liability.

**IT IS SO ORDERED.**

# UNITED STATES COURT OF INTERNATIONAL TRADE

# 18TH JUDICIAL CONFERENCE

December 1, 2014

The New York Palace

New York, New York

The views expressed are those of the author and do not necessarily reflect the views of the publisher.

# THE CALL OF THE CONFERENCE AND WELCOME

TINA POTUTO KIMBLE: Good morning, everybody. Welcome to the Eighteenth Court of International Trade Judicial Conference.

Just a couple of housekeeping matters while your first panel sets up. First of all, in keeping with our tradition, there's no papers and no handouts, no materials for you today. Everything that you need is up on our website. So if there is something that you hear that is of interest to you today, just go on the CIT's website and you'll find it there.

CLE, we're doing something a little bit different. So those of you who need CLE, you should have signed in when you registered this morning. If you did not do so, please go make sure that you do it. Then you have little note cards. Turn in those note cards as you leave the room. So, for this panel there's no break between the first and second panel so you can turn in those note cards for the first and second panel when you leave. And then, every time you leave the room turn in those note cards.

Speaking of note cards, in keeping with our tradition, you have note cards on your table. Those are for asking questions. We have some court staff who are here, who will come around and collect the note cards from you when you have questions. So just hold up the card and you can ask your question.

And then, finally, our luncheon speaker, Beth Macy, she will be signing your books if you brought your books. She'll do it at the break after the first two panels. And then, depending on how tired her hand is, we can actually have her sign again during the pre-lunch reception. She will be leaving immediately after lunch, so if you want to see her, you know, do so in the morning.

Are you ready? Okay. With that, I will turn you over to the good hands of John Herrmann from Kelley Drye, who's going to be the moderator for your first panel this morning. Thank you.

# RESPONDING TO AGENCY REQUESTS FOR ACTUAL INFORMATION: RESPONSIBILITIES, BURDENS & CONSEQUENCES

MR. HERRMANN: Thank you, Tina. Thank you all for joining us this morning, and good morning. Glad to see everyone made it out on cyber Monday after Thanksgiving. And hopefully we'll have a good, strong panel to start us off here this morning.

The subject for our first plenary panel is responding to agency requests for factual information, responsibilities, burdens, and consequences. I'll introduce them in advance of their remarks in greater detail, but we're fortunate to have an excellent panel with us this morning. First, to my

immediate right, we have the Vice Chairman of the United States International Trade Commission, Dean Pinkert. To my far right we have the Deputy Assistant Secretary of Commerce for Antidumping and Countervailing Duty Operations, Chris Marsh. And in between the two we have Frances Hadfield, an attorney at Grunfeld, Desiderio, Lebowitz, Silverman, and Klestadt, LLP, who has written an excellent paper which I would commend to you all if you haven't read it already.

In terms of the format for our panel, we're going to have each speaker present introductory remarks of probably about 10 minutes. We'll then have a Q and A session which I will moderate with some questions. And then we're going to save some time at the end for questions from the audience, so we'd encourage you to fill out cards or, if a question strikes you at the end of the session, please just raise your hand and we'll recognize you.

Finally, one last housekeeping matter to take care of. While the remarks today and I guess all of the conference, frankly, is on the record, the speakers today are appearing in their individual capacities. Their remarks do not reflect the views of their agencies or of their firm or their clients. So, with that, why don't I introduce our first speaker.

Vice Chairman Pinkert has served as a commissioner of the ITC for more than seven years. I don't know if it seems that long to you. It doesn't seem that long to me. Following his nomination by President Bush and confirmation by the United States Senate on February 1st, 2007, he was designated vice chairman by President Obama earlier this year for a term from June 17th, 2014, to June 16th, 2016.

Dean had a wealth of experience in the international trade arena before becoming a member of the Commission. He had two tours in the office of Chief Counsel for Import Administration, most recently serving as a senior attorney with responsibilities for liaising with U.S. Customs and Border Protection, counseling the foreign trade zone program, advising the U.S. Trade Representative's Office in various trade negotiations, including the conclusion of the softwood lumber agreement in 2006, as well as serving as litigation counsel on antidumping and countervailing duty matters in U.S. and international tribunals.

Dean also served as trade and judiciary counsel to Senator Robert Byrd in 2001, and worked in the trade and litigation group of a major U.S. law firm. He's a graduate of Oberlin College with high honors, got his J.D. degree from the University of Texas Law School with honors, and also holds a Master of Laws with Merit from the London School of Economics. With that, let me give you Dean Pinkert. Thank you.

(Applause)

MR. PINKERT: Thank you, John. And I thank the Court of International Trade for organizing this conference. John already gave the standard disclaimer, but since there are a number of people from the Commission here, including former commissioners, I want to add to that disclaimer that I speak only as one commissioner out of six, and I can only give you my personal perspective. I can't give you the perspective of the other commissioners or of the Commission as a whole.

The subject matter today involves Title VII, the antidumping countervailing duty injury determinations that we at the Commission make. Of course, you know that we have lots of other activities at the ITC. We do Section 337 intellectual property cases. We handle lots of reports that Congress and the U.S. Trade Representative may have requested. But this area of Title VII has its own distinctive issues regarding information requests and the need to fill in the gaps in the record, whether those gaps are created inadvertently or because of the actions or inactions of a party.

And, as you all know, the way that gaps are filled in, in technical statutory terms, is by the use of facts otherwise available, also known as "facts available." And, as I said, there are lots of reasons why there may be a need to resort to facts otherwise available. It's not necessarily the actions or inactions of an interested party. It could be anybody that has made it difficult or impossible for the Commission to get the information that it needs. Typically, when resorting to facts otherwise available, the Commission will attempt to figure out what the best picture, what the best public information or best inference that can be drawn from the information that's on the record might be, and we don't typically resort to adverse inferences.

Adverse inferences, under the statute, can be resorted to when an interested party has failed to supply information and has not cooperated to the best of its ability in supplying the information. Adverse inferences are not typically resorted to by the Commission, I think in large part because we are not allowed to penalize a cooperating party for the actions of a non-cooperating party. And when we do injury determinations in Title VII cases, we are making determinations on a countrywide basis. The Commerce Department, which is charged with making determinations regarding dumping and subsidies, frequently makes company-specific determinations, but our injury determinations are not company-specific. And so typically, if we resorted to adverse inferences, we would be responding to the actions of a non-cooperating interested party, and other parties may be harmed by that. They may regard it as not in their interest for us to do so. So the difficulty is what do you do if you're in that situation where you've had a party not supply information, not acted to the best of its ability, but if you— if, as a Commission, you apply an adverse inference, what does that do to other parties that have cooperated.

Another factor that is important, I think, is that we're required to work with parties who have difficulty in supplying information that we've requested. And there is frequently, I think, a back and forth between Commission staff and parties that are having difficulty. The Commission may pare down its request for information, get down to the absolutely essential elements, if there's a difficulty in supplying that information.

Also, you've probably heard about sunset reviews. At the outset of sunset reviews, which are the five-year reviews to determine whether to continue an order, the Commission has to make a determination about whether to expedite. And a lot of the focus on whether to expedite or, in the alternative, go to a full review, is on the participation of the parties from the two sides, the responding parties and the domestic parties. And if there is an inadequate participation by responding parties, the Commission has the option of still going to full review, still conducting a hearing, or

expediting. But the decision to expedite means that we're deciding whether we are going to make that final decision in the sunset review based solely on the information that was supplied at the outset. And by regulation, if we decide to expedite, then we are using facts available. If you're relying on facts available and you don't have a full picture, can you supply an inference that's reasonable? Can you rely on public information that enables you to answer the questions that are in front of the Commission?

And, with that, I would just urge everybody to participate fully at the Commission in all of these cases and help us to avoid having to resort to facts available, with or without adverse inferences. Thank you.

MR. HERRMANN: Thank you, Vice Chairman Pinkert.

Our next speaker is Chris Marsh, the Deputy Assistant Secretary for AD/CVD operations since December of 2010. In that position, Chris is responsible for leading Enforcement and Compliance's efforts to administer the U.S. trade remedy laws. His office consists of seven offices with more than 100 staff; I think about 110, Chris? If I've got that right. He was previously the Director of the Office of Accounting within Import Administration.

He's been a partner at International Trade Resources, LLC, which is a consultancy specializing in litigation support for trade remedy proceedings. In that capacity he worked on behalf of U.S. and foreign companies in proceedings before Import Administration, the European Commission, the Ministry of Commerce in China, as well as WTO dispute settlement proceedings. Chris's prior experience also involves serving as a senior manager in Grant Thornton's consulting practice, as well as a manager for tax and audit—in the tax and audit practices at Price Waterhouse Coopers.

Despite his modesty, Chris holds a B.A. in economics from Harvard University. He is a certified public accountant and a member of the American Institute of Certified Public Accountants. Chris.

MR. MARSH: Thanks, John. Good morning. I would first like to thank the judges and Clerk of the Court for their hospitality today. A special thanks to my friend Tina, who is always so very warm and welcoming at this event. And if I seem a little nervous—I always joke about this because an accountant in a room full of lawyers, it can't have a good outcome for me. But I will nonetheless try to do my best here.

When John McInerney first strong-armed me into this process he told me it was a great opportunity for me. And I have appeared on panels before—you may not think so when this is over—but I thought on this one particular panel, because of the audience, I would take this opportunity, as John called it, to do a little research on something that has always interested me and always something that I wanted to do, and I thought I would share that with you.

What I did was I looked back at AD/CVD proceedings going back to the 1970s. Indeed, the first one I looked at was a 1968 case. And I kind of marched through the decades. I've been looking at samples of cases, just to see how Commerce's trade practice has changed. And many of you—or some of you here, not many of you, kind of are familiar with some of those cases in the past. Admittedly, my sampling technique wasn't as precise as

our respondent sampling technique at Commerce, but it was close. I looked at probably over 100—well, I know I looked at well over 100 cases, sort of throughout the decades, so let me start by sharing some of my fun facts with you.

I'll start with final determinations. Although I looked at reviews and investigations, I'll just give you some of the highlights. A comparison of final determinations drafted by Commerce in AD/CVD cases. So, in the 1970s the final determinations in AD/CVD cases averaged about one or two pages in the Federal Register notice. So, by 1980 the average final determination had grown to about six pages for an AD case and 19 for a CVD case. In the 1990s the final determination averaged 18 pages for AD and 42 pages for CVD. Today, the average final determination and investigation for an AD case is 109 pages, and for a CVD case it's 88.

So, moving on to the questionnaire, looking at questionnaires in the 1970s. I got—me personally having done this for a while, I got a kick out of this. In the 1970s, AD and CVD questions averaged about six pages. The first one I saw was a page. So in the 1980s, the AD questionnaire leapt to 47 pages, and the CVD questionnaire was 34 pages, in the '80s. And by the '90s, the CVD and AD—the AD questionnaire was 75 pages long and the CVD questionnaire was 68 pages long. Today the AD questionnaire averages about 183 pages. And the CVD questionnaire is 111 pages long.

So let me throw in a couple more fun facts that weren't part of my research, but I thought they were interesting. On average, each month during fiscal year 2014 that just ended in September, Commerce received nearly 190,000 pages of AD/CVD case filings through its electronic filing system. So add it all up for the 12 months, that's over two and a quarter million pages for the 12 months. Now, all that falls on a group of 115 Commerce analysts. To John's point, the 110 figure he mentioned, that's just the analysts, not their managers. That's just the people on the ground doing the work. Now we have five new ones, so we have 115. But that's about two-thirds of the staff we had a decade ago. So it's gotten—so what's this all say? And I posed that question to some of my friends at Commerce, some of my colleagues, and some of my colleagues that I still remember, friends from the trade bar. And I got some of most heated reactions of finger pointing, of who's responsible for this and who's responsible for that. I got more than a few jokes about like putting their kids through college and that kind of thing, right? But most folks kind of lamented about process, how the process has gotten too complicated. Way too complicated. It's hard for petitioners to petition and respondents to respond.

So then I asked, I said, "Well, who's responsible or what's responsible for making this so complicated?" And there I asked my trade group again, and a lot of folks offered up a number of different ideas. A lot of folks pointed to the Uruguay Agreements—or the Agreements Act. They said the URAA has made things more complicated, and I—more than one person mentioned that, but I will note the fact that the questionnaire and our final determinations were growing pretty rapidly even before the URAA. So I think it's probably more than one thing.

But then, turning to the who, who made the process so complicated? I will say, before I get into that, I think John talked a little bit about my

background, but let me just say that I've been working in AD/CVD for almost 30 years now. And when I left Price Waterhouse I went to the Commerce Department—I'm on my fourth tour now at the Commerce Department. I've been a case analyst, an accountant, a program manager, an office director, and now DAS. So—and in between each one of those I spent a lot of time working for respondents, mostly for foreign respondents but a number of petitioners as well. So I've written the questionnaire, I've answered the questionnaire, and I've tried to decipher answers to the questionnaire. So I have some background in this. And I point this out only because I think maybe that entitles me to an opinion as to the who.

And so, if I have to pick the who I would say it's all of us. It's Commerce, it's the respondents bar, it's the petitioners bar, and it's the courts. And for me it's just—in very broad terms, to me it seems like at Commerce we're constantly looking for a rule, like a one-size-fits-all rule. And on the one hand I can say that makes for transparency and it makes for consistency in an application of what we do in our practice. But on the other hand, if I had to be honest, there's an element, though—let's face it. There's an element that just says it's easy. It's easy to apply a rule. You don't have to think. Right? Sometimes you don't have to analyze the facts; you just put the rule into place. And that's when it doesn't work.

So, as for the trade bar's part in this, I think to myself, what do good lawyers do when their clients face an issue, when they have an issue and the rule doesn't work for them? Well, they argue why their client's an exception to the rule; right? And so it's the nature of what you do, and which one of you out there wouldn't make the best argument they could for their client simply because the Commerce Department says you shouldn't, right? It doesn't stop you.

So sometimes we agree with your arguments, which more than—more often than not we sort of create the exception to the rule of the basic rule, right? And oftentimes what that leads to is more discussion in our final determinations and more questions in our questionnaires so that we can discern whether you're the exception to the rule or you are the basic rule. So we try to ferret that out early in the case. But whether we agree with your application of the rule or our rule or not, we generally—well, we oftentimes end up in litigation. And there it seems to me that the courts want to understand from Commerce like, what's the rule and how does it fit into the framework of the law?

What seems to happen in cases with a court, the court will tell us something about—well, generally, the courts will say, "We understand the rule. We understand it fits in the law. But the results aren't reasonable." And so they say, "Commerce, go back and rethink whether there's an exception to the rule for these set of facts." And here again it leads to more discussion in our issues in decision memos and more questions in our questionnaire.

And in some cases we don't necessarily agree with the court, which also leads to confusion as to what's the rule. I remember when I worked in the private sector I was often answering the questionnaire with maybe two or three different data sets, saying, "If the rule is this, you have this set of

sales. If you think the rule is that, you have this set of sales." So it creates more work for respondents and more work for petitioners.

So, is there a way to make the AD/CVD law less complicated? Can we dial it back a couple of decades? And maybe the first question I would ask you guys is, is that what we really want? Because, I mean, shouldn't, where we have this complicated process and more involved, shouldn't it yield more accurate measurements of AD and CVD duties where they exist? Maybe. Maybe not. Because at Commerce I sometimes feel like these days we spend a lot of time with process and less time actually trying to determine whether or not there are—whether dumping is occurring or whether there's subsidies, and if so how much.

Well, one thing is certain to me. Whether you're on the petitioner or the respondent side, participation in an AD or CVD case has gotten extremely expensive for your clients. So are there ways that we can simplify the trade remedy process? And to me, I think that's difficult because it would take Commerce, respondent's counsel, petitioner's counsel, and the courts all working together to build a better mousetrap. Yet we all—at some level, we all bring different visions to the table of what the AD/CVD practice should look like, in which case we end up with our current Rube Goldberg mousetrap that we have. Somewhat complicated.

So, from Commerce's viewpoint I'd like to say there are certain things we could probably do better. What we could do better depends on who you talk to, but from my point of view, with my practice, I think that we would do parties a better service if we actually, when we ask for information in the questionnaire and we first got the questionnaire response, if we sat down with petitioners and respondents to try to have a better understanding. What we usually do at Commerce is you send in a questionnaire and we try to write—if we don't understand something we write another question and send you supplemental questionnaires with lots of questions. And if you come back again and haven't quite answered, we send another supplemental questionnaire. And in complicated cases when I was working for respondents, I would sometimes get eight or nine supplemental questionnaires.

Now, the secret is most respondent's counsel, good ones, know that if you have an issue it may or may not be an issue, but if it's something that's kind of sticky, you just want to avoid it, you keep answering the question you want to answer, right? You can always dodge these interrogatories, right? Because the idea is get them to verification. If you can get Commerce to verification, then you can sit down with them and explain your concept and what's wrong and what's right, without petitioner looking over your shoulder and seeing everything that you do. On the petitioner's side, though, sometimes they're looking for the little anomaly in the data that they can exploit and say that's an issue, whether it is or not.

But what I think would be in everyone's interest if we sat down and went through the questionnaire first and were able to direct our questions, talk to counsel and say, "These are the things that interest us. These are the things we want to know, and we will send you a questionnaire, we'll send you questions like this and please answer them."

Rather than take a shot that maybe they'll answer our questions or not. What that will entail, though, is counsel will need to know a little bit more

about what's in their response, which for some people might be a bit of a heavy lift these days because we oftentimes get responses to questionnaires, certified or not, that if you ask counsel what's in this they would have no idea.

So the other thing I think that we do, that we could improve on at Commerce, is we have a policy office. Most people don't know, but our process of determination—I run the operations. There's a policy office and then there's a general counsel's office. And when we disagree on something we write a briefing paper to the assistant secretary. We all express our views. And the assistant secretary sits down with us and goes through the process. I tend to listen carefully to my counsel because when they say something is not defensible, that's a problem. Oftentimes they'll say, "It's defensible," right? And so I'll take that as, "Okay, let's go."

But we have a policy office that is extremely busy these days. And they spread themselves very thin. And the problem with that is when they try to man each case that we have they oftentimes spend their time thinking about what have we done in the past; how can we be consistent with what we've done in the past. Or here we get back into that rule again and applying a rule that may not fit the situation. And what I think we might do better at is having a policy that looks forward. If the court's trying to tell us something, maybe we should be thinking about how we change our policy and how we look forward rather than backwards every time.

So, but beyond that, unless the stakeholders are willing to sort of meet somewhere in the middle ground I think the AD/CVD law just will continue to get more complex, or at least the practice.

MR. HERRMANN: Thank you, Chris. Our final speaker this morning is Frances Hadfield. She's an associate attorney in the New York office of Grunfeld, Desiderio, Lebowitz, Silverman, and Klestadt, where her practice focuses on Customs litigation, intellectual property, and regulatory matters pertaining to the importation and exportation of goods.

She has lectured widely on Customs litigation and import procedures, including at the World Trade Institute at Pace University. She is a licensed Customs broker, is active in the leadership of the Customs and International Trade Bar Association, and also is a former law clerk of Judge Evan Wallach during his time as a judge on the Court of International Trade.

She's a graduate of the University of Wisconsin–Milwaukee, and earned her J.D. degree from the John Marshall School of Law cum laude. Frances.

MS. HADFIELD: Good morning. I feel like, "And now for something completely different," after our morning of AD/CVD.

So some of the comments that Dean and Chris have made this morning regarding responding to the agency carry over to the administrative side of practice with Customs. And there are currently, as we all know, some growing pains going on with the agency as Customs is developing these centers for excellence and, is it expertise? I always get this a little bit backwards. It doesn't seem like a week goes by that some attorney in my office isn't complaining about a bollix with these new centers. So, in making

my comments this morning I'm going to highlight a few of what we see as growing pains in responding to the agency.

According to the CBP, the agency hopes that these virtual centers will be able to focus on industry-specific issues and provide tailored support. Well, one of the comments last week was, "Why was this NIS—" and I'm going to make this up, to protect the innocent—"changed from ball bearings over to rubber gloves? He spent 20 years in ball bearings. He doesn't know anything about rubber gloves." So, as far as providing tailored support—they're working on it.

I don't think that Customs has necessarily developed the expertise that we were hoping these centers for excellence would have, and we're seeing this in the form of the factual requests that we're getting. The forms of factual requests from the agency haven't changed. We're still seeing requests for information. We're still seeing notices of action. We get the occasional summons or third-party summons for a Customs broker. But the scope of the requests had changed, as you have new people in the agency and they're not necessarily certain what they're asking for. And to Dean's point about, you know, when parties are trying to provide the best response it becomes a little bit problematic when the agency is asking for information that's not in the possession of the importer.

And that typically happens in areas like FTA compliance. The collection and presentation of information of the agency is exceptionally arduous. So you get a CF28 and they want to have all this information. You're like, "Hey. I gotta go out and get the A1A information from someone else. I don't have it in my immediate possession." And it takes time for the importer to collect this information, not going to usually happen in 30 days, and then you have to have someone put it together. It has to be translated, in some cases, analyzed by the attorneys; and this is also very costly.

In the area of FTA compliance, you know, without naming names, I can say that we recently had two clients that decided it was better to manufacture in China than to keep on getting CF28s on every entry. And this was a client that was C–TPAT certified in the third tier. So you have clients who are saying, you know, "Nuts to this. It's costing me too much and it involves too many attorney hours in providing this information and putting it together." And if the request for information isn't, you know, responded to in a appropriate fashion, well, much like the adverse facts available, suddenly you had a notice of action from the agency which is doing a rate advance. And that's nothing that a client wants.

One of the questions we're getting from clients is, "Why is Customs asking me this question on every entry? Why did I bother with C–TPAT certification if I'm going to have all these requests?" And I think this is part of the growing pains of the agencies and these CEEs, along with the question, "Didn't we just do this?" And while this is, you know, wonderful to Chris's point about, you know, this will put my kid through college, you know, is that necessarily the goal of having this many responses and this much attorney involvement as the agency grows?

And we have kind of this prior disclosure conundrum. A Form 28 or 29 may be routine or it may indicate, you know, a significant problem for the importer, and we're having a little bit of a difficult time deciphering at this

point—is there a problem or do we have someone who's new and just doesn't know what questions to ask? So are we getting all these 28s because, you know, we need to dig deeper or is it just a new program? So growing pains with the agency.

Tina mentioned to me that our CLE panel this morning is going to qualify for ethics credits, so let me flip over to the ethics discussion real quick.

Administrative agencies are part of what the New York Rules of Professional Conduct consider a tribunal. And the rules regarding tribunals—I did a quick survey across the states because we are a court of national jurisdiction—and they are pretty much the same across the country. So a tribunal denotes a court, an arbitrator in an arbitration proceeding, a legislative body, administrative agency or other body acting in an adjudicative capacity. So obviously, in the same way that you owe a duty of candor to the tribunal as far as the court, you owe a duty of candor to the administrative agency as well. CBP, Commerce, what-have-you.

I want to make a few points where there's been some recent case law, as kind of an update, regarding first confidentiality of information. That a lawyer shall not knowingly reveal confidential information. And an attorney has an attorney-client privilege. What's happened in a few cases, specifically in New York, is in-house counsel thought they were getting savvy and they would say, "Okay, well, I'll just cc the attorney on every communication, and that way I'll be covered by privilege." But we've seen two district courts recently say, "Not so fast. You can't copy 30 people, you know, on an Email, blind copy, you know, the in-house counsel, and suddenly say, 'I have attorney-client privilege.'"

Two cases that highlight this, one in Pennsylvania and one in Louisiana, is the Vioxx cases and the SmithKline Beecham cases. And I'd also mention this as far as government counsel. Sometimes the government wants to have widespread dissemination of information and then, you know, cc the DOJ on it. Well, counsel should be mindful about this emerging trend and start educating their clients about only dispensing legal advice to those who actually need it.

Communication with the government when you're in the middle of litigation. The ABA has been a little bit less than clear on this matter. They've gone back and forth actually, as far as their ethics opinions. So I will say that the most current ABA opinion on communicating with the agency when you're in litigation is Formal Opinion 97–408, and the committee opined that there were two conditions on allowing direct contact: requiring the communication be only about a policy issue, which may include settlement of a dispute; and two, requiring notice to the government lawyer before the communication takes place. And the ABA concluded if these two conditions were not met, that you had a violation of the model rules of professional conduct.

NOTE: END OF 8:30AM SESSION AND BEGINNING OF 9:45AM SESSION NOT RECORDED

# REPRESENTATION IN CUSTOMS PENALTY ACTIONS AFTER TREK LEATHER: FIFTY SHADES OF GRAY IN CONFLICTS OF INTEREST

MR. JUNKER: A company receives a penalty notice from Customs under Section 1592 or 19 U.S.C. 1592, and the president of the company comes in. They've been manufacturing and importing widgets for ten years, and they get a penalty notice from Customs, and the penalty notice claims that they have incorrectly valued items for the last five years under the statute of limitations. So he's wondering how to deal with this penalty matter.

You're visited by the president of the company. President of the company has run the operation for some time, but he's looking at retirement or she's looking at retirement, and is just kind of handling these—troubleshooting these kind of problems. They're importing widgets, and they've gotten notice to their company, XYZ Company, for a penalty under 1592. The president of the company runs the operation, deals with problems, is titularly responsible under the import manual for Customs compliance.

He or she has a younger brother and sister who are really the hands-on operations people. They have the relationships overseas, they're running the sales, they're running the manufacturing, they're running the import side, they're running the sales side. And then they also, as is common these days, have an import compliance person who is responsible and tasked with compliance on importing under U.S. Customs laws. And that person, of course, is assisted by one's Customs' broker who has responsibility both to the government, as an officer of the government, ironically, and also of course to one's client, from whom he or she is trying to make an honest living.

The question is, in our scenario, when the company receives the penalty notice which occasions the president visiting with you, who is your client? Well, the penalty notice is issued to the company, the importer of record typically, for a penalty under 1592, but there are also, of course, officers and directors and shareholders who are very often the management of the company. You have employees such as your import manager or your compliance manager. And then you have, of course, agents such as your Customs house broker, who work for you.

You receive the penalty notice. Let's say in this case there was $200,000 in penalties—duties with interest due. You get the penalty notice. Say it's a culpability level of gross negligence, so your penalty is starting off at four times the amount of the underpaid duty. So the company conveniently shuts down, since the president is retiring, although there is a residual liability under the bond, and then the government sues to collect the outstanding duty and penalties and names not only the company, the importer of record and the party involved in the penalty proceeding, but also the brothers and the sisters and the Customs compliance person and the broker. It's conceivable that all those people could be named in an action to collect under 1582.

Who is your client at this point? To whom do you owe ethical obligations to defend or advise that you have a conflict, and advise them that they should get other counsel. Do they each have a potential liability? Are their interests adverse so that you cannot represent them even with a waiver of a conflict? Can those conflicts be waived? And indeed, when do you find out that you have conflicts of interest in these situations? These are all questions that are not necessarily clean in the middle of the haste of battle when your client is facing a million dollar penalty notice and the like. So it can be slippery business for counsel who's just trying to solve the initial problem placed on his or her desk by the representative of the company.

I don't want to be too pedantic here, but I know some of you are more into countervailing antidumping duties than you are Customs matters, so in the interest of just kind of putting us all on the level playing field, 1592 provides that no person, by fraud, gross negligence or negligence, may enter, introduce, or attempt to enter or introduce any merchandise by means of a document, electronically or transmitted data, a written or oral statement, or an act which is material and false, or any omission which is material. And it's also a violation of 1592 to aid and abet those actions that are culpable.

The recovery of duties is possible, as well as penalties, under the 1592 statute, with interest of course. And that falls within the jurisdiction of the court under 28 U.S.C. 1582. Under 1582, for that enforcement action to collect duties and penalties, it is the trial court de novo. So the court is not bound by the agency's record. And indeed, you can join parties—which is the crux of our problem—you can join parties that were not necessarily named parties in the underlying penalty action.

I'm going to focus on two quick lines of cases here to kind of set the stage for our issues before I turn it over to Professor Godsoe. One has been around a long time, and that's the *Priority Products* case that was in 1986 or '85, I believe. And in that case you had two owners that were 50/50 in the company, and one of the partners' wives was actively involved in the case. The government went after the company, Priority Products, as well as the individual owners. The one owner bailed in the penalty proceeding, and the remaining owner and his wife, Mr. Huss, were left to deal with the penalty matter. They provided information and then, of course, the matter went to collection. And the issue is whether there was actual or constructive notice to the parties for purposes of jurisdiction.

The court noted that not only was the company liable, but the individuals were liable as well as the wife of the owner. The court found that the owner had constructive notice and there was personal jurisdiction. But they've brought in the wife as well. As the court said:

"It is also significant that she had access to the corporation's attorney whom she could have consulted or perhaps did consult regarding the possibility of whether she might be called upon to pay some or all of the mitigated penalty. Under these limited facts and in view of her admission that she was largely responsible for attempting to import the imported merchandise, we believe that Mrs. Huss at the very least had constructive notice of her potential liability such that she should have consulted with Priority's lawyer on whether to pay the mitigated penalty

or risk the imposition of greater penalties at the trial court level. She was therefore afforded all due process to which she was due."

Then there was a subsequent case in 2000, which was the *Nussbaum* case before Judge Watson at the Court of International Trade. In that case the individual was the president and sole shareholder of the company, called Discount. The original penalty notice said that Discount and its principals filed false statements with Customs under 1592. The penalty notice did not name Mr. Nussbaum, President personally or as a principal. And in fact when Customs sought to enforce the matter they obtained a statute of limitations waiver from the corporation only, and did not seek one against— or did not obtain a statute of limitations waiver from the individual.

The court held that—this is Judge Watson:

"Although *Priority Products* was expressly decided by the federal circuit on its limited facts, and personal liability expressly occurs only in certain circumstances, it would appear that being a sole officer, director, shareholder of a small corporation represented by legal counsel and personal participation in the importation are significant concomitants of constructive notice of the potential personal liability for the penalties."

So now we have actions against the individual's under these limited facts, and the question becomes to what extent are they personally liable as well as the importer of record.

The more recent case now that has just come down from the court of appeals to the federal circuit is the *Trek Leather* case, in which Mr. Shadadpuri—I'll call him "Mr. S" if you don't mind—was not included in the underlying penalty action but was included as a party in the collection action before the court. In that case, the government granted motion for summary judgment as against both the company and Mr. S. The Federal Circuit in its decision found that liability was limited to the importer of record in the absence of fraud.

And so the government sought to have a hearing en banc, and it was granted. The decision below was vacated and then the complete court vacated, reversed the finding that only the importer of record had duties to make entry, and found that the individual was also personally liable. They sort of cut the Gordian knot in their decision. The court said, first of all, that the issues that were not being reviewed were the aiding and abetting issue. I just want to point that out because I'll return to that.

But the two questions that were presented were whether Mr. S was a person within 1592, the penalty statute, or is it just the importer of record, and whether the action was within the entered and introduced or attempted to enter and introduce provisions. The court took a very expansive view of who is actionable, if you will, under the statute. The "person"—who is a "person?" Is it just limited to the importer of record or can it be someone else? And the court expansively ruled that a "person"—the issue is straightforward in 1592. "Any person" in the statute is addressed this way: "There is simply no basis for giving and artificially limiting the meaning to this most encompassing of terms which plainly covers human beings."

With respect to entering and introducing merchandise, they did not address the statutory limitations on what persons are authorized to enter

merchandise under the statute 1484. They relied on the—rather than the "entry" provision of the statute, to "introduction" of merchandise. And they held that:

> "The statute is broad enough to reach acts beyond the act of filing with Customs officials papers that enter goods into the United States Commerce. 'Introduce' is a flexible and broad term added to ensure that the statute was not restricted to the technical process of entering goods. It is broad enough to cover, among other things, actions completed before any formal entry filings made to effectuate release of the imported goods. The term covers actions that bring goods to the threshold of the process of entry by moving goods into CBP custody and entering the United States and prior to critical—and producing critical documents for use in the filing of papers for a contemplated release into the United States Commerce even if no release ever occurs."

So, under the Restatement of Torts they found out that anybody who provides any activity, there is no argument that the person who personally commits a wrongful act is not relieved of liability because of the person acting for another. Note that this is the compliance liability for brokers as well. "This ruling does not weaken the requirements of aiding and abetting liability for those who do not violate subparagraph (a)."

So aiding and abetting is clearly included.

So I'm going to turn it over here quickly, but the point is, that when you're representing an individual—or you're representing companies now, the individuals with whom you'll be working, not just the company officer, but you may be dealing with operational people, you may be dealing with the compliance personnel, and indeed you'll be dealing with the Customs broker, these people are now potential parties to the action to collect. So this is a whole new era of Customs enforcement, potentially.

And I point out that with respect to our client representation where this would probably have the greatest impact is within medium and smaller size companies. The larger companies now very often have their act together with compliance personnel. It's the smaller companies who don't quite fully understand the implications of what they're doing and whose individual owners may have liability.

What that means for us attorneys, of course, is that if a party in a company, an import compliance person or the like, all of a sudden finds out that they have personal liability and are named in a collection action under 1582 and they find this out for the first time when they receive a notice, they may not be too happy that they weren't advised of this before. And so the possibility exists that a company or an individual who is facing that kind of liability may claim that counsel did not and should have advised them of that liability and the right to have their own counsel or the advisability of having their own counsel as they got into the matter. So all of a sudden that puts us in the uncomfortable position of maybe potentially facing E & O claims and dealing with our errors and omissions for indemnification. So it's a wild and wooly area out there that we are looking at potentially, in having individuals sued for duties and penalties as well.

So I'm going to turn it over to good professor here. She's going to be giving us some of the black letter on exposure here that we should be sensitive to as we're advising our clients. Professor.

PROFESSOR GODSOE: Sure. Thank you, Joel. As Joel mentioned, I'm from Brooklyn Law School, Brooklyn being home to the not world champion Brooklyn Nets, but we still love them. But also many distinguished alumni, lawyers, and judges, some of whom are here today.

So I wanted to give some of the black letter on conflicts law, most of which, you know, should be a review to people but it still is definitely more pertinent now for people representing small to medium size companies, given *Trek Leather*. There is always the risk there, but the risk is greater now that individual employees could be held personally liable. So basically the issue is not unique to this bar, right? It comes up for anyone representing entities basically, and so the basic rule, as Joel mentioned, the most important thing is to be clear at the beginning of who the client is. At Rule 1.13, this is—I'm going to talk about the Model Rules of Professional Conduct, but they're basically every state except, to some degree California, which is always an outlier, but every state follows them really pretty closely.

So basically the—the basic rule is that a lawyer represents the entity. So that's the entity itself, whether or not it's closely held or publicly traded. A lawyer may also represent employees or constituents, officers or directors of the entity, but does not necessarily. So it's always a risk to represent individual employees as well.

Now, what happens a lot is that people do represent both. That's common practice I'm sure in this area of law but certainly also in other areas. And what has to happen for that joint representation to occur is a client waiver. So first of all, there can't be joint representation if there's a significant risk that the representation will be materially limited because of a conflict. So if there is a conflict, like there's already a penalty notice, that might be a situation where you couldn't represent both the entity and its employees. But if the conflict is just potential in the future, it hasn't come, there's nothing significant there right now, then you have to get a waiver from all the clients that you'd be jointly representing, and it has to be in writing.

And you can't do blanket waivers. Courts have consistently found blanket waivers are not sufficient. So a client can't waive, you know, any future conflict that will come up. No. It has to be very specific and you have to specify what would happen if the conflict does arise.

So if a conflict arises, is the lawyer going to withdraw from representing both parties? Is the lawyer going to continue representing one party? And even though you might agree to that, that sometimes things fall apart, right? Sometimes courts have said you can't continue to represent one. So there are always these risks to joint representation. But you put as much in the waiver as you can, and then it could potentially survive review if that does come up.

So once you have these waivers, then what happens? What happens if you decide not to represent the employees of the entity, that it's too risky and you want to be able to continue representing the entity and don't want

the risk that you're going to have to withdraw. Well, then you have to give what are called *Upjohn* warnings to the employees or other constituents of the entity. So the minute that you basically start representing this company, whether it's a mom and pop company like I said or a large company, if you're not going to represent them, you have to tell all the employees that you do not represent them.

And going back to something Joel said, if you think there is enough of a risk that they're going to need representation at that time, tell them that they might want individual representation. Or that if a penalty notice comes or something, that they might want individual representation. But if you don't give those warnings at the beginning, then it's very likely that you could be held to be representing both parties, which, as I mentioned, can lead to significant problems down the road if there is a conflict and you have to withdraw from all of them.

The other way that a client representation can be imputed is through your conduct. So Joel was discussing the case where the partner's wife, it was seen that perhaps she had consulted with the attorneys. So if attorneys aren't really clear about treating clients and non-clients differently, and that would include the entity and its individual constituents, if you give legal advice to employees or if you don't give them these warnings that you don't represent them, then even if there's no retainer or anything or no letter of engagement, it's very likely that you could be imputed to be representing them. So it's not just that you can decide down the road who you're representing. It's really something that has to happen up front before any conflict arises. Or else, as I said, the relationship could be imputed, and then there's real significant problems for maintaining representation of any of the parties down the road.

Okay. So what do these warnings look like? And let me just clarify that the title of this panel talks about gray and, unfortunately, that is the reality of conflicts, so even sometimes where attorneys have given these *Upjohn* warnings to entity employees but then have acted in a way that sort of implied that they were their attorneys, then they've not been found to be enough. So again, you have to give these warnings and then you have to consistently act in a way that shows that you are not individually representing them. The warnings include saying that you represent the entity, that if there's, you know, anything that they do or say that harms the entity that first of all it's not privileged or confidential, and that you would use that, you know, to protect the entity. And again, as I mentioned, that they might want to seek individual counsel. And these warnings have to be given at the beginning of the relationship and again, you know, if a conflict arises. You want to be clear that your conversations with non-clients are not privileged or confidential, and you know, who you are representing.

So, finally, a couple of practice tips that come out of some other areas, because as I mentioned this is true in a lot of areas where people represent small businesses or multiple parties. First of all, at the beginning, be very clear who you represent in either a retainer engagement letter, and, if you're jointly representing, have the waivers in writing about specific potential conflicts in the future.

Interview clients separately if you are going to represent them jointly or you're thinking about it. Then interview each employee or constituent of the entity separately so that you can find out if it's even possible to jointly represent them. Right? So you might find information from one that leads you to believe, "I can't represent them jointly because there's already sort of a potential conflict here."

And also, if you do represent jointly, so for instance the entity and various employees, they have them waive as well confidentiality and privilege between each other, right? So you can't be representing the entity and an employee and have them have confidential information from each other. That would put you in a problematic position of not being able to inform your clients, and so then you would have to withdraw. So you want them to waive confidentiality when they're being jointly represented.

And finally, determine at the outset what would happen if the joint representation ends. So if there is a conflict that arises, you want to put in writing at the beginning who you're going to continue to represent, if you do want to continue to represent, or oftentimes jointly represented clients don't want to agree to that. They want you to withdraw from both, and sometimes, as I mentioned, courts will require that.

So, again, that's a risk of joint representation, but you could try to, you know, if you can get clients to agree, "Oh, if a conflict arises I'm going to continue to represent party X." You should put that in writing and that will at least, have a chance of standing up. But you want to determine that at the beginning, again, rather than waiting until the penalty notice comes and sort of the crisis is happening. These are all things that need to happen at the beginning of the representation.

Now I guess, Josh, you're going to talk about the government interests and enforcement?

MR. KURLAND: Sure. So, Josh Kurland from the Washington, D.C. office of the Department of Justice. And I can't speak to Washington, D.C. sports teams. I'm a native New Yorker, so we have one sports team on Long Island, where I grew up, the New York Islanders, and they're in first place—

PROFESSOR GODSOE: They're moving.

MR. KURLAND: They're in first place for the first time in 20 years, and moving to Brooklyn next year. And that's about the bottom of the scale, from world champions, to my team's leaving me for Atlantic Yards in Brooklyn.

I should also say at the outset that as government attorneys always do, my views are solely my own and don't express the views of—necessarily express the views of the Department of Justice or of the U.S. government in general.

So, as government attorneys, we are rarely if ever in the type of position that Joel described, where we have concerns about who our client really is. We tend to know who the client is. Although, you know, I should note briefly that that's not always the case. It's rare in our CBP practice or our Customs enforcement practice, but the government does run into these types of issues where you have more than one agency who are interested in

a particular legal case, and then there are various bureaucratic processes that occur where we as the Department of Justice determine what the position of the government is, even though different agencies may have different views about the correct position. But that's not really an issue that often arises in our Customs practice.

What makes my presence here relevant is that the type of conflicts that Joel is talking about and the type of decision-making largely arise out of the type of decisions that we make, "we" the government make, in terms of how to pursue Customs enforcement proceedings, and particularly in seeking to initiate Customs enforcement proceedings against individuals or entities other than the official importer of record, which is really what the *Trek Leather* decision is all about. When can the government pursue a Section 1592 Customs enforcement proceeding against, canonically, an individual, but you could also have parent entities or related entities who are not the official importer STFT record, the person whose name is on the Customs form.

And so my intention is to talk a little bit about our practice in this area, to give you all as much insight as I can into how we approach these cases and what types of decision-making goes on, on our end, to lead to how we pursue these types of individuals or entities. I'm going to kind of give some background. I'll discuss a little bit about my own view of *Trek Leather*, and then go into a little bit of our process.

The overriding concern that leads the government to initiate Customs enforcement proceedings against a party that is not the importer of record is generally a concern about allowing violators, and particularly serial violators of the Customs law, to escape liability. And in that regard I would say that we take our role as the folks who are charged with protecting public revenues fairly seriously. And in that vein, I know a lot of people in this audience, but all of us here, I think, or most of us here, are U.S. taxpayers.

And it's only a bit of an exaggeration to say that in cases where you have people who have shorted the government potentially hundreds of thousands of dollars in Customs duties that they were obligated to pay, for example, but didn't pay, that the American taxpayer is left holding the bag. And so I think it would be fair to say that we and CBP both take seriously the notion that we are charged with protecting the public revenue by ensuring that people don't escape liability, at the very least for the duties that are supposed to be owed on imported merchandise.

And another concern that may arise is simply making sure that the remedies that the government provides, whether in antidumping proceedings or CVD proceedings, are real remedies and not illusory remedies. So, for example, if you have a case where a party is subject to antidumping or countervailing duty remedies and then, when it comes time to pay the duties that are owed, that company simply dissolves or goes out of business or otherwise disappears, you're left with a situation where a party—well, I know that we have folks who are respondents' counsel as well as petitioners' counsel in the room, but at some level if a party has gone through the process and has earned legitimately an antidumping or countervailing duty remedy, our view tends to be that then that remedy should be enforced.

And so when you have parties that are ultimately evading that remedy, that's another motivator for ensuring that those who are responsible for either paying duties or general import duties or antidumping and countervailing duties, are not allowed to escape liability.

This is complicated by a couple of trends that Joel referred to earlier. First of all, corporate importers tend to be closely held corporations or even sole proprietorships. In addition to that, we've seen a significant trend—and there are recent cases coming out of the Court of International Trade that reflect this trend—of under-capitalized companies and corporations. So companies that are—if, at the end of the day, if they are hit with duties from the get-go they're unable to pay those duties, and there's been, I think, a fair amount of struggle as to how do you deal with those companies, both in the context of Customs enforcement proceedings and simply in the context of the bonding requirements and cash deposit requirements that go along with the general antidumping and countervailing duty practice.

I've found in my practice, when you are in a Customs enforcement proceeding the frequent scenario is that you're dealing with a company that is a dissolved corporation with maybe a principal who still exists. And that's the type of scenario that we confront when we are determining whether it's appropriate to seek to initiate proceedings. And it would be fair to say the same is true of CBP when we're determining whether to seek proceedings against an individual versus a company. That's the type of scenario we confront.

So this is where *Trek Leather* comes in. And turning to that decision I think it's fair to say that my sense is that my colleagues and I take a different view of the *Trek Leather* decision than some of the articles that I've seen written about it in the legal press. I've seen articles that have referred to it as a "groundbreaking decision or a new font of potential liability for individual importers." And it would be fair to say that we just don't view it that way.

As far as I can tell, and I'm only speaking for myself, but my sense is that around the halls of the Department of Justice the view of *Trek Leather* is that the Court of Appeals for the Federal Circuit confirmed that Section 1592 means what we and CBP have always interpreted it to mean. Which is that the term "person" in 1592, which is an extremely broad term and is one that is subject to considerable jurisprudence, even recent Supreme Court decisions outside of the trade realm, is a very broad term, and that can include individuals and other entities. And the same with the term "introduce." So a person who introduces goods into the United States by means of a false statement or a similarly misleading omission may be subject to liability.

And indeed, one can look at our brief before the Federal Circuit in the *en banc* decision and see that we noted various decisions of the Court of International Trade that not only permitted the government historically to proceed on the type of joint and several liability theory that we did in *Trek Leather*, but took the time to say that this statute has long been interpreted or the government has often pursued cases in this way.

So you don't have to agree with the view of *Trek Leather* I just espoused to understand that if I'm saying that as far as we're concerned it's business

as usual, it's unlikely to expect a significant change in practice as a result of the *Trek Leather* decision. Because essentially from, at least my perspective, and I'm one of the attorneys who's charged with enforcing these proceedings, it didn't change much from what I was already doing.

So let me turn to that practice to try to describe what that's like. And although one certainly can't guarantee that practice doesn't change over time, what I'm seeking to describe has been our historical practice, and I have no indication that the practice is in the process of changing.

One thing to note is that we are not typically involved in Customs enforcement proceedings at the CBP stage. Usually we get, towards the end of that process, a referral from CBP where CBP has had proceedings going on for a significant amount of time. We may get the referral right at the end of the process, when CBP is ready to sue. On occasion, we will get advance notice from CBP that something is coming, so that we can begin working on it. But, at least in my experience, we have not received notice of these types of proceedings years in advance when the penalty notices are first starting to issue and CBP is considering, for example, whether or not to include individuals in the penalty notices.

The referrals come from the individual ports at CBP, which means it's a fairly decentralized process. CBP has folks in Washington, D.C. and in New York, and actually in Indianapolis, who are coordinators, but a lot of the individual decision-making in a particular case will occur at the particular port, whether it's the Port of Chicago or the Port of New Orleans or other ports around the country. And so it is somewhat dependent on the STFT actions and the idiosyncrasies of those individuals.

Generally I would say that, if it's coming to us, it's because the Section 1592 process has broken down. It's a robust administrative proceeding. And with lots of opportunities for mitigation, for parties to go back and forth with penalty notices with the agency, and in and of itself as we heard on the first panel, the agency itself is considered effectively a tribunal.

So for us to get the case, generally either there has to be some kind of overriding legal issue that makes it impossible for the case to be resolved before CBP, or the 1592 process simply hasn't worked, and so the case is referred to us essentially in a debt collection posture where we are in the position of having penalties, or frequently penalties and outstanding duties that weren't paid that are owed and CBP hasn't been able to resolve the issue, and it's our job to go and collect this money from the party that isn't paying it.

And so in that context, in this kind of debt collection and protecting the public revenue posture, it's important for me to note that there's really very little incentive for the government to pursue proceedings against, for lack of a better term, middle management. Right? I mean, you have the importer of record, who's responsible. And if the importer's a large company the government is generally going to be able to pursue any type of collection action from the large company and there isn't a lot of need for us to pursue middle managers or even individual executives unless they've engaged in some kind of particularly egregious behavior, in order for the government to collect the money that's owed.

Even in the case of smaller to mid-size companies, there still isn't a tremendous amount of incentive to initiate proceedings against peripheral actors who may not really be in a position to satisfy the debt that we're seeking to collect. In that regard, the main actors that the government would seek to enforce against are the importer itself and if it's an individual or a corporate importer, and if we're assuming it's a corporate importer then the government may seek to collect against a principal who, if you have a company that's dissolved, the principal potentially is the only source of funds from the company's assets.

But again, there isn't a heck of a lot of incentive to go after these types of other parties. That said, there's always an exception that is going to prove the rule, and you know, given *Priority Products* and cases like that, there may be egregious circumstances where, for example, a middle manager's behavior is just so beyond the pale or someone is doing something repeatedly in some way, that we do believe that it's necessary and important to include that individual. But in the main, as far as we're concerned, *Trek Leather* has confirmed that the statute means what we've thought it meant for all these decades. Customs has not spent a lot of time going after peripheral people, going after importers and Customs brokers and other professionals who have a shared responsibility with the government to ensure the accuracy of Customs entries. Could they, in egregious circumstances? Yes. But to date neither CBP nor we have sought those types of proceedings, and there's no indication that we are on the verge of a rash of doing so.

MR. JUNKER: Great. Thank you, Josh. If you have questions, there are cards that can be filled out and circulated.

You know, we can sit here in the cool of this beautiful room and talk about these refined issues. Out there in the hurly-burly of the real world, of course, it's not nearly that neat and clean for purposes of analysis and handling. You know a very typical example is when you sit down with the vice presidents of operations, the Customs compliance person, talk to the broker, you advise them that they could have, at this point, personal exposure to penalties under this case, and then of course you should get waivers but the next day the compliance person comes in and says, "You know, I talked to my mother's lawyer who wrote her will and I think I want my own counsel in this thing," and obviously you have to work with that counsel and prepare your petition for the penalty or deal with the collection action without this person's perhaps active cooperation. So it can get pretty messy in terms of your own representation and what you factually can represent, factually cannot, how much control you have over your case. So it is not a clean, nice, neat situation that practicing counsel often inherit.

Another interesting situation is your relationship with the broker. I happen to have had the privilege of representing a lot of Customs brokers as well as importers, and the Customs broker is an agent for the importer. However, they have their own interests and they have their own liability and penalty exposure. And so their willingness to cooperate and provide information and all can interfere with your preparation of the case when they find out that they could be party to the collection of the entire penalty and duties.

I did have one case where the importer disappeared, went under. And Customs was not very happy about it in a western port and so they went after the broker for a broker penalty, maxing out at $30,000. And so the broker is not necessarily your friend, not necessarily an ally, and so that can be another complicating factual situation.

I want to just throw this out for you—responding to one of the comments that distinguished counsel made, and the definition of "person." Who is likely to have liability, or who would the government go after? The court was quite clear that the issue of who is a person for purposes of collection is an issue that is straightforward: "There is simply no basis for giving an artificially limiting meaning to this most encompassing of terms, which plainly covers human beings."

So, while the Justice Department may think that things haven't changed, the court certainly used language which opens up the possibility that individuals could have liability and be named. So that creates some discomfort on the part of importers as well.

Do we have any questions? Everybody feels comfortable with the state of play? Okay. We have just a couple of minutes.

There is a very practical, from the practice standpoint, consideration when you're dealing with a client. In the good old days you'd sit down, you'd meet with the president or the vice president of a company or their head of operations, trade operations, and that was your client. And then you'd interview the witnesses. You'd talk to the compliance person. You'd talk to the broker. You'd talk to the V.P. who did the ordering and did the valuation decisions and the like. And it was nice and neat.

Now, of course, it's a fairly extensive operation where you almost have to advise them of the right to remain silent, to get their own counsel, to make sure you get a conflict of interest waiver. So the process of getting in to a client and analyzing their involvement and determining and advising individual employees what their rights are can make a relatively straightforward Customs penalty type situation quite complex, as far as being advising counsel.

I have a question from the audience for Josh.

MR. KURLAND: Okay.

MR. JUNKER: "Do you recognize that *Trek Leather* will increase CBP's leverage in dealing with small importers?" That's a good question.

MR. KURLAND: Well, let me kind of combine that a little bit with the response to your point about the term "person."

You know, if I wasn't clear, I think we've always taken the view that person has that type of broad connotation, and that's certainly not inconsistent with the general jurisprudence. I mean, we are in a time when people are speaking a lot out there about the notion of corporate personhood, and the very broad notion of person in that realm. And so I don't know that we view it as having changed that definition. It's always been a broad definition as far as we're concerned.

As to the specific question, whether *Trek Leather* changes CBP's leverage. Again, this is just my own opinion. It would seem to me that this is

one of those issues that has been around the CIT for quite a long time, but you know, only bubbled up to *Trek Leather*—I'm sorry, to the Circuit in *Trek Leather*. And so to the extent that the Circuit has now confirmed that view of *Trek Leather*, I guess one would imagine that CBP can now rely on that view as additional leverage.

But again, for us, we—as far as I can tell, the government has, for a long time, viewed the statute as meaning what the Circuit ultimately decided it meant in *Trek Leather*. And so, as a result, there may be more leverage, but it's not going to change tremendously the way that the government approaches these type of situations. For example, when you're talking about using leverage.

MR. JUNKER: Just one final thought and then we'll close.

You know, in the era of informed compliance it can be fairly said that through outreach and strong efforts by Customs, we have achieved a level of compliance among the larger importers who constitute the great majority of value imported in the United States. Where we are now, I'm finding in practicing myself and the colleagues out there, is that we are in the era where enforcement is now turning to those folks who don't have the resources or opportunity of taking the occasion to get their compliance act together. The smaller, medium-size companies in particular.

And so it is not unforeseeable that our good friends at Customs may start naming, as an example, individuals, participants, informed compliance officers, without any real expectation of enforcement or collection from those individuals. But it is not unforeseeable that they could start sending messages of enforcement for compliance at all different levels. For those of us who are out in the wild and wooly west, that is a very conceivable option as we deal with Customs offers. And it would be entirely fair. It's within their rights, within their legal authority to do. So these could be interesting times ahead of us. Thank you.

MS. KIMBLE: And I just foreclosed Josh from making a rebuttal point. So, sorry. If you want to hear his view, please corner him later.

Fifteen-minute break. Don't forget to turn in your cards if you want CLE credit. Staff is at the door to accept your cards. Thank you. Thank you.

(Applause)

# CAUGHT IN THE CROSSFIRE: AGENCIES' RELATIONSHIPS WITH EACH OTHER AND THE COURT

MS. KIMBLE: Could everyone have a seat, please? We're going to start. We're going to go ahead and get started.

MR. CAMERON: Okay. Tina has told me to get started while she rounds up all of the recidivists outside. Before starting, I'd like to briefly introduce the panel. In your brochures you already have their biographical material, but let me just make a couple of comments.

On my immediate right is Shara Aranoff. She was an ITC commissioner for what, 11 years?

MS. ARANOFF: Eight and a half.

MR. CAMERON: Eight and a half years. And she was the chairman of the Commission. She ended her term earlier this year and is now in private practice at Covington and Burling.

Let me just say that when she was commissioner she was an absolutely terrific commissioner. She asked very good questions. She was considerate to witnesses. And as all of you who have practiced before the Commission know, that is generally the norm, but it's always appreciated because people come in and they don't really understand what the process is going to be and you have to explain to them that this is not *Law and Order* or *Perry Mason*. And she was always fair in her decision-making, whether she agreed with us or disagreed with us. That's hard for me to say, but it's true.

Next to Shara is Jeff Laxague. Jeff is currently the president of Bird Island Consulting. Prior to this, Jeff worked in a number of agencies, the ITC, the World Customs Organization, the Department of Commerce. And his most recent tour was at the Customs Service.

Jeff, when he was at Customs, was one of those people that you could call with a question and he would actually discuss and engage in a discussion of the issue. Which, of course, made him an incredibly valuable asset at Customs because not everybody gives you that experience.

Next to him is Deborah King. Deb is a senior counsel at the Office of Chief Counsel and Trade Enforcement and Compliance at the Commerce Department. That's an awful lot to get out. I've got to tell you that Commerce has very strong lawyers in the Office of Chief Counsel. And Deborah is one of them. She's an excellent attorney and she is held in high regard, both by her colleagues within the Department and by the members of the bar.

Finally, Judge Restani on the end. Now, in this room Judge Restani needs absolutely no introduction, but let me just say that for any counsel that have not appeared before Judge Restani, I just have a little bit of advice for you, and that is, be prepared. And be very prepared. Actually, that goes for appearances before any judge at the CIT, and that is a compliment. But it goes especially for Judge Restani. She runs what we would refer to as a "hot bench." And if you know your case she is fun to appear before. As fun as—that's a term of art. I mean—I will grant you that it's an acquired taste. I'm just telling you. Okay?

But you know, honestly. I mean, you may win or you may lose, but you know that you've received a fair hearing. And frankly, she exemplifies the best of this court. That is the sum total of the introductions, and now we're going to get on to business.

What we're going to do here is we're going to have a dialogue or we're going to attempt to have a dialogue with the panelists. And before you, I think they distributed the questions that we intend to ask. If you have any additional questions, feel free to write them out, send them up, and we'll try and get them in.

The first question is a very broad one, which is please describe what kinds of issues have necessitated inter-agency interaction from each of your perspectives, and what has worked and what hasn't in terms of resolving these issues? Shara, why don't you start?

MS. ARANOFF: Well, good morning, everyone. It's a pleasure to be here. And while I don't have to give that disclaimer anymore about not speaking for the ITC, I do have to give a disclaimer, which is if the word "we" creeps into my speech while I'm talking about the ITC, I'm still working that out of my system.

I actually was asked to cover two types of interactions here, between the ITC and Commerce on dump countervail cases, and also between the ITC and Customs on 337 enforcement, an area that Jeff has said is beyond his expertise, so I don't speak for Customs either.

On Title VII cases, everyone who does those cases know that, for the most part, Commerce and the ITC are proceeding independently with their own inquiries and not interacting that much. But there are three areas of interaction that I think are particularly important, and those are scope, scheduling, and margins. Just briefly, because we'll circle back to all of these. Commerce is supposed to define the scope of the investigation, the ITC is supposed to take that to define the domestic like product and the industry, and importantly also to define what import data it's supposed to collect.

There are, now and again, ambiguities in the scope. From the ITC's standpoint those are best resolved by Commerce as early as possible, and certainly before the questionnaires go out in the ITC's final phase investigation. That doesn't always happen. When that doesn't happen, the ITC has to either become a little clairvoyant and try to figure out what it is that Commerce would do, or collect multiple datasets, which is a burden on everyone involved.

On scheduling, most of the deadlines, of course, are set by statute. Commerce has a little bit more flexibility about extensions and, of course, about not keeping all of the cases for each country together on the same schedule, which the ITC generally has to do. The result of that is that you can, as you know, end up with investigations at the ITC that are staggered, and that can raise questions as you get to the last ones in a row, about whether the ITC's data all still fresh enough on which to make a determination of injury as of vote day.

And the last one is dumping margins. The statute says that the ITC is supposed to consider the dumping margins, but of course it's reasonably common for Commerce to make adjustments to the margins, either at the last minute before the ITC's vote or even after the ITC's vote in the final investigation. That won't always change the result at the ITC, but it can. And in particular, if something goes from having a positive margin to being *de minimis*, that can have a big effect. That just recently happened in one case, the *Certain Oil Country Tubular Goods from India, Korea, the Philippines, Taiwan, Thailand, Turkey, Ukraine, and Vietnam*, Inv. Nos. 701–TA–499–500, 731–TA–1215–1217 and 1219–1223 (Final) USITC Pub. 4489 (Sept. 2014) case. So those are three issues on the dump countervail side where agency interaction can be important.

For a brief mention on the 337 side, interaction between the ITC and Customs, and this may be a less familiar area for many. When the ITC writes an exclusion order in a Section 337 investigation it uses very intentionally broad language that basically applies to all future imports that infringe a certain patent or list of patents. And then it's Customs's job to enforce that at the border.

Ambiguities are going to arise all the time. You read sometimes articles that will tell you that a single cell phone can read on thousands or tens of thousands of patents. Well, it's just not going to be obvious to Customs at the border whether or not some widget coming in actually infringes a particular patent that's at issue. So when ambiguities arise, Customs and the ITC have somewhat overlapping responsibilities for figuring out whether or not that product is within the scope of the order. The goal of both agencies is and always has been cooperation. I think those who have been involved in the process, and I can say this because I don't work at either agency anymore, if you remember the game "Hot Potato" from your childhood? It can sometimes be a little bit more like that.

I'll stop there.

MR. CAMERON: Jeff.

MR. LAXAGUE: Thank you, Don.

Well, I think it's pretty obvious what issues we face. We face a thousand issues every day, because that's the approximate number of entry summaries filed every day where they claim the merchandise is subject to an antidumping or countervailing duty order. There's another thousand entries or so per day that are identified as potential dumping, but which haven't been filed as such by the importer of record. Three hundred orders. Duty rates that range from one percent to 351 percent. You can have a single case in which there are 40 different what we call ten-digit case numbers, that mean you can potentially have 40 different cash deposit rates on a single case. We collect approximately—and I still say "we" when I agree with my former agency, and when I don't agree it's "them." And every year there's less "we" and more "them," but—because they don't listen to me like they used to.

But, you know, collection of about $500 million a year in cash deposits, another $200 million roughly a year in refunds that are issued, and then of course untold millions in billeds but that number doesn't matter because, as we all know, they don't collect them.

So what works and what doesn't work? I would give them some grades. On the front, what we call the front end of the processing, the actual import summary processing at the time of entry, I'd give them about a B-plus. They do a pretty good job. I think they should be a little more aggressive on scope issues, and we'll talk about that later.

On the back end, what's called liquidation side, I'd only give them a C. And we disagree on this. I say they have a problem in liquidation; they tell me everything's fine.

And on the true, true enforcement end, you know, I'm sorry, I gotta give them an F. I think they do a lousy job. I've thought that while I was still in the agency and I still believe it. But, you know. There's obvious reasons

why. We have to have a great and very tight collaboration with the Department of Commerce, and when I asked them—when they told me there was no problems they also said, "Yes, we have a very good relationship with Commerce," and also that other agency you asked me about, whoever they were. But that's the basis of why we do all of this. There has to be. I mean, I've been doing this so long I was actually there on that fateful day in 1980 and I helped a couple of my friends at Customs pack up their belongings to make that historic journey across 14th Street, so that gives you an idea. They're doing such a great job that the White House and the Congress agreed it should be taken away from Treasury and handed over to Commerce. So a lot of—not all of the issues were solved by that trip across 14th Street. But that's—it's just an ongoing process. It's just a volume. It's clearly a complex area, and that's why we have such a good partnership with our fellow agency.

MR. CAMERON: Deb.

MS. KING: Good morning. As a government attorney I just want to make the disclaimer that the statements I make today are strictly my own. They don't represent the position of my agency necessarily.

In terms of inter-agency cooperation or interaction I want to pick up on something Deputy—

MR. CAMERON: Move your microphone a little closer.

MS. KING: Usually people don't have a problem hearing me, so it's good that today I was a little more quiet than normal.

I want to pick up on something that Deputy Assistant Secretary Marsh said earlier this morning. He mentioned that when an administrative review on antidumping orders stops, that's where additional work begins. And that's the type of inter-agency collaboration I want to talk about right now. It's the collaboration between Commerce and Customs in the context of instructions from Commerce to CBP, instructing CBP to either suspend entries or liquidate entries at a particular rate. It's a routine interaction between Commerce and Customs. It's robust, to the tune of over 1,000 liquidation and cash deposit instructions alone in FY 2014. Commerce issues these instructions, but where we face a problem is sometimes the information provided to Commerce, which is the basis of our instructions, doesn't match the information provided at Customs, which is the information based on which they apply the instructions from Commerce, so there can be a potential disconnect.

Something that has worked, one of, what we're talking about now is inter-agency interaction and what has worked. Something that has worked is in 2006 Commerce created this Customs Liaison Unit to help facilitate issues that are faced by both Commerce and Customs. And this, through the Customs Liaison Unit Commerce and Customs are able to work effectively to resolve potential issues that arise with respect to such instructions, and we'll get into details of such issues later.

MR. CAMERON: Your Honor.

JUDGE RESTANI: I want this side of the room to see me because I'm in the back of the podium. So—

MR. CAMERON: It's a first.

JUDGE RESTANI: So when you hear this voice from nowhere, this is the voice. Anyway, I think, Don, I have only substance to talk about and cases to talk about where I'll violate all the rules by talking about cases that are live, and—but I'll try not to say anything terrible. So I think I'm going to skip the general stuff and wait for the specifics.

MR. CAMERON: Sounds good. Okay.

First, let's talk a little bit about scope and the roles of the Commerce Department and Customs. Commerce determines the scope and the Customs Service administers the scope. First question is, at what point is it necessary for an importer to seek a scope ruling from Commerce if it believes the product being imported is outside of the scope of the order? And under what circumstances can an importer file a protest with Customs if it believes its product is outside the scope of an order, and when is a protest not available?

Deb. Why don't you start with that?

MS. KING: Sure. So the courts have recognized that once an antidumping or countervailing duty order is in place, Commerce may interpret and clarify antidumping and countervailing duty orders. The Department of Commerce does so, pursuant to its regulation 19 C.F.R. 351.225. There is a procedure set out. According to the Federal Circuit, in a 1998 case called *Sandvik*, Commerce determines whether certain merchandise is subject to the scope. Then, in a 2002 Federal Circuit decision called *Xerox*, the Federal Circuit determined that where an order is unambiguous and undisputed, a party can protest CBP's erroneous application of the order.

So Commerce has one role, I would say, interpreting and clarifying, and Customs can have another role applying the order. To me, the issues for the practitioner are how do you know whether to request a scope ruling and then another issue is timing of a scope ruling. And to me, timing could depend on a particular party's objectives.

For instance, in *Sandvik*, the Federal Circuit talked about a timely scope determination. Well, what exactly does that mean? Is a scope request timely if the entries haven't been liquidated yet? I think in the context of proceedings before Commerce, parties who are filing scope requests have to determine what would be the appropriate time for them to file. Is it appropriate before they've imported the merchandise? Is it appropriate once the merchandise has been imported? Or is it appropriate, you know, after liquidation. How does that work? Practitioners have to determine what's best for their client.

MR. CAMERON: Jeff. Go ahead.

MR. LAXAGUE: Okay. This would be a "we" answer. Give me a break. Come on. You heard the famous magic words said by Chris, aluminum extrusions? If you're going to have a case called aluminum extrusions, you will have scope issues. There's always been scope issues; there will always be scope issues. Commerce cannot possibly write a scope ruling for every single product that's covered under the listed tariff numbers for a particular case, so you are going to have issues in the courts.

Now let's—okay; you saw my background. I'm an old tariff guy, and we all know the boilerplate instructions, the written description, dah dah dah dah dah. And the HTS numbers are just there for reference. Well, that's a crock. In ports of entry they are crucial. There are some who would say that are critical. And part of that goes back to about 20 years ago at the behest of Congress as a result of a GAO report, Customs put in a set of edits and validations to address each and every single line item on an entry summary from that day going forward, with a view to examine it in terms of AD and CVD cases.

And how that works is, if you have an HTS number that's listed in the database for that case, and a line item comes in that matches up the country that's involved on that case and an HTS number, and there's no duties attached—if there's duties attached, the system will compute and make sure you've got the right deposit rate, et cetera, et cetera. If there are no—if it's not declared as subject merchandise, a warning—sorry, not a warning. An advisory, depending on who your client is. An advisory goes to the importer of record and the broker, saying, "This could be possibly subject merchandise." At the same time a similar warning goes to the port office at Customs and designates that line item for team review.

Well, now I would say that's a bit of a red signal. If you get a notice from Customs that says, "This line could be subject to antidumping or countervailing duty orders," maybe you should exercise some reasonable care. Maybe you should look at that and decide, well, what's my risk? Notwithstanding your humble opinion as the importer of record, maybe you should exercise some due diligence. Maybe you should do a little more research and find out if this is a legitimate issue. Is there a potential for Customs at some point to say, "Well, we've decided we think it's covered."

So it's not like this is something you don't know about. You know, Customs field offices have to make scope decisions every day and they need to be aggressive. I wish they would be more aggressive because, let's face it, if you're an importer, you bring in something that's covered by an HTS number for a case and you say, "Well, I just don't think this is subject merchandise," and Customs does an "Ole," nobody's going to ever know about it. Certainly not the Department of Commerce, and most definitely not petitioners.

So in order to get the issue to where it should be and to get it out in the open, if it's a legitimate scope issue Customs should be aggressive, should force the matter, should force them to pay the duties, and then let them decide if they want to write for a scope decision. You would think at that point maybe the little light bulb would go on and say, "Well, maybe I should get this resolved because it doesn't look like those guys are going to change their mind." And I don't know, I don't know what—I don't know why that's a problem. I don't see why that's problematical, and so this is my wee bulletin there.

And like I said, I wish Customs were more aggressive on those cases and send out more requests for information, ask for more samples. I thought in that case that was cited, I thought Customs did a good job. Maybe they shouldn't have denied the protest so quickly. That was what we call a drive-by denial. But—and it was obvious at that point that the importer

had filed the scope request from Commerce, and so maybe they just could have held on to that protest instead of—for a few more months, and we wouldn't—I don't think this should have come before the court, to tell you the truth.

Now, for the importer, you know, if the importer really, really wanted to make sure that the court didn't do anything stupid with its protest while the scope ruling was pending, they should have gone the AFR route, the application for further review, which would have taken the matter to OR & R at headquarters. And since that was only filed in 2012, you know, we'd still be waiting for that answer.

(Applause)

MR. CAMERON: Judge Restani. But before you say anything, Judge Restani, and I know you're going to have a lot to say on this, I would note that it's nice for people to talk about questioning scope rulings from the Commerce Department, and if it would only be done in a timely fashion then the Customs Service would have it at time of liquidation, all set. "No problem; we're all set."

Now, I don't know about anybody in this audience, but I've had scope requests that have taken over a year and a half at Commerce that were done immediately after the order was published. So I don't know. Do you think we're going to have liquidations within that time? I think possibly so. So I think it's a convenient answer and it doesn't answer the question, which was why I think that the case that was cited was quite correct.

Judge Restani, you may have another view. Sorry; I'm a moderator.

JUDGE RESTANI: I was going to get all excited, but since Don's already gotten all excited I'll try and be calm.

MR. CAMERON: Yes, Your Honor.

JUDGE RESTANI: One of the problems is that we actually don't know how the court gets jurisdiction over these things. And if you want to see a case that explains where the law probably is at this point in time, it's Judge Kelly's opinion in *LDA*. You know, the *Sandvik* case came along, and as usual, this started with the CIT and we were very emphatic about we knew where jurisdiction was, and it wasn't with Customs, it was over in Commerce because you needed a scope determination. And you couldn't even wait for that, because that's where it was. Well, then so *Sandvik* came down and didn't use all that language. But agreed. And said, "No; it's over in Commerce."

Well, everybody was a little too emphatic, because then *Xerox* comes along and says, "Well, if it's clear what the scope is, and Commerce does it wrong, then obviously it's a Commerce decision and you can protest and then you're in the CIT."

Now. Here's the problem. When do we know that a scope decision is clear, one way or the other? That's the difficulty. So I think we're in this situation where we have a huge problem in that anybody who wants to protect themselves has to get a scope ruling, has to protest, and you hope that one way or another you'll get before the court. And this happens in

other areas too, like in liquidation instructions. But that's the best thing you can do at the moment, try everything.

Now, obviously there's going to be some point in time where you think you weren't covered by the order and therefore you didn't get a scope ruling, and other times you were covered by the scope order so therefore you actually do want to get a scope ruling, but I think there's a lot of times that, until Customs acts, you don't actually know what's happening. And so then your merchandise is liquidated. You say, "Oh, my goodness." And then you have to file a protest and then you hope there's jurisdiction.

Now, on the other hand, there could be some people who are gaming the system, and I've seen this too. I have seen merchandise—I got a case called *Hubbel* (phonetic). I saw merchandise that was not subject to antidumping because the person simply didn't list the right classification, so—and I'm sure that happens a lot, as our friend here says. But the opposite happens. So I commend for your reading and educational benefit the *LDA* case, which sums all this up, and I have no idea where the law is going from there.

MR. CAMERON: Thank you, Your Honor. And I—

JUDGE RESTANI: Was I calm?

MR. CAMERON: You were. And that was an excellent summary of the state of the law. *LDA Incorporado v. United States*, Slip Op. 14–54 (CIT 2014) is actually a very good decision to read because it sums up the state of the law right now. But the question that the judge raises is quite—it's still there. Okay.

So let's look at the rules of Commerce and the ITC when it comes to scope. First, again, Commerce determines the scope, but the ITC determines the like products, and those are not necessarily the same question. So, first of all, to what extent does the ITC's understanding of the scope and its definition of the like product and the U.S. industry constrain future scope determinations?

Secondly, where the scope language is ambiguous, how much deference does the ITC owe to the Commerce Department and how much deference does the court owe to the ITC when it interprets ambiguous language? Shara?

MS. ARANOFF: So, Don, I'm going to start by answering the second question first, and then the first question.

MR. CAMERON: Absolutely.

MS. ARANOFF: That's how it makes sense to me. So when the scope is ambiguous, the ITC is supposed to decide what the scope is for purposes of making its injury determination. So it needs to defer to the language and intent of anything essentially that it has in writing from Commerce, then come up with its own interpretation where there's an ambiguity. But of course, the ITC's interpretation is not binding on Commerce.

So, just to give you an example of how this comes up. The case *Certain Coated Paper Suitable for High–Quality Print Graphics*. In that case, the scope referred to "certain coated paper and paperboard suitable for high-quality print graphics and using sheet-fed presses," and then it had some

other requirements about the brightness and weight and other physical characteristics of the paper.

Well, the parties disagreed over what "suitable for high-quality print graphics" was supposed to mean, in terms of limiting the scope. Did it mean that in-scope paperboard was only in-scope if it was going to be used for that particular end use, or did it mean that if it met all the other requirements it was still in the case even if it was used for a packaging end use, which was not the high-quality print graphics?

Well, usually Commerce can resolve these kind of scope issues before the ITC's final, but that didn't happen in this case and so the ITC had to parse some Commerce scope memos and then just go ahead and give its best explanation. This case also wasn't helped by the fact that the parties made opposite arguments to the two agencies about what the scope meant, where they argued one thing at Commerce and then flipped sides in front of the ITC. Oddly, in that case, I don't think the issue came up on appeal, though it very well could have.

Then the second question was, well, what if the ITC goes ahead and resolves a scope issue like this because it has to, what deference should it get on appeal?

Well, if Commerce ultimately gets around to resolving an ambiguity but, for some reason, it's too late for the ITC to act on it, you can see where that's going to be a problem on appeal and could lead to a remand. But what if the issue was never raised in front of Commerce in the first place? And that's another example that I wanted to call to your attention, and that comes out of the *Multilayered Wood Flooring from China* case. For those of you who didn't follow that case too closely, multilayered wood flooring is made from a bunch of thin veneers of hardwood attached to a core, which can be made from a variety of different wood-related materials.

In the final phase of the Commission's investigation the respondents argued that there was a product which they called "hardwood plywood for flooring", which respondents argued was within the scope and said that the ITC should include it in the like product and include hardwood plywood producers. Well, they should include hardwood plywood producers in the domestic industry along with the finished flooring producers.

The Commission's response in the final phase was that the scope didn't include this product, hardwood plywood for flooring, that respondents never asked Commerce to include that product in the scope, never asked the ITC to define a domestic like product that was broader than the scope that would bring in this product, and so the ITC basically said, "We don't have to collect data on this." That case went up on appeal, and on appeal the Court of International Trade agreed with the respondent that the scope language, which covered unfinished multilayered wood flooring, could conceivably include this hardwood plywood for flooring product that the respondents were talking about, and so it ordered the ITC to reopen the record and do something about this.

And, on remand, the ITC sent questionnaires to 20 domestic hardwood plywood producers, didn't change the scope definition which it was using in the questionnaire because Commerce hadn't changed the scope, and all 20 of

the companies that received the questionnaire sent them back saying, "No, they don't produce this product as defined in the scope," so it went back up to the court and the court affirmed.

So the ambiguity that was created, you know, created this necessity to go through a reopening the record and all these extra questionnaires, and nothing changed in the end. Which I think my conclusion on that would be perhaps that it does suggest that a little more deference in a case where the ITC was faced with having to resolve this ambiguity without help from the parties or from Commerce, perhaps more deference would have been appropriate in that case. In any event, it would have saved a lot of resources, both of the government and the private parties.

So, let me turn from there to the second question, which was to what extent does the ITC's understanding of the scope then become binding on Commerce later in a scope inquiry. Two cases were mentioned, *Eckstrom* and *AL Patterson*. As I look at those cases, they do in some ways turn the traditional logic on its head. Right, they basically assume that the ITC got the scope right and collected data on the correct scope of subject imports. And so that now, what the ITC did in its final investigation can be used to limit Commerce's discretion to interpret the scope of an order in a subsequent scope inquiry.

Most of the time it's probably fair to conclude that the set of imports for which the ITC collected data should be an accurate indicator of what both agencies thought that the scope was, at the time. But, that isn't always going to be true. There are going to be times where the ITC either didn't or couldn't collect data on every product that it knew to be within the scope. And there are a variety of reasons for that; sometimes in very, you know, big diverse industries the ITC is relying on some public data source, which may not cover everything.

There are other cases where a particular sub-product that is within the scope and the like product, or could be within the scope and like product, is only produced by one or two producers, and those producers don't answer the ITC's questionnaire and because they're relatively small, the Commission doesn't use its resources to go after them, and force them to comply.

So, the basic premise of those cases that the ITC, because it collected data on certain products must have been right in its understanding of the scope; that just may not always be true.

MR. CAMERON: Deb?

MS. KING: So, I'm not going to speak about the deference that should be owed to the ITC. I don't have—

MR. CAMERON: Fair enough.

MS. KING:—much to say about that. But, with respect to whether Commerce's scope determinations are constrained by what the ITC decided in an investigation. Under Commerce's regulations, under 19 CFR 351.225, under K1 we look at various factors. Among them are IT—you know, determinations meeting the investigation by both Commerce and the ITC. We also can look at the petition for information, we can look at prior scope rulings. But, the extent to which Commerce's scope determinations may be

constrained by ITC decisions, is really a fact intensive question, because scope determinations are so, by their nature, fact intensive.

You have to look at the information put before the department, weigh the information, conduct your analysis, explain it, and come out with your answer. So, something that was decided by the ITC, or mentioned by the ITC may have more or less weight depending on the totality of the circumstances. So, that's just to say its scope determinations are very fact intensive and how much the ITC can constrain Commerce really depends on the information before Commerce.

MR. CAMERON: Your Honor, before you answer, I would like your opinion. Did you think that the *AL Patterson, Inc. v. United States*, 585 Fed. Appx. 778 (Fed. Cir. 2014)case turned on the ITC decision, or was the ITC element of that supportive of the overall decision that the Commerce Department had failed to follow k1 (19 C.F.R. 351.225(k)(1)). Rather, it had basically conducted a k0 analysis, which said, "Well it's clear, and therefore we don't have to do any of the steps in k1." So, I'd like your opinion on that.

JUDGE RESTANI: Okay. Whatever you say, Don. You know, I did find *Patterson* kind of interesting, because once I started reading it, I thought it was going to be about why what we said before isn't true, and that you can't pay too much attention to the petition, to the ITC. That's where I thought it was going. I don't know that it ended there, but I did find something very interesting about *Eckstrom* and *Patterson*. And that is in both those cases, at the end of the day, the Court of Appeals said that the agency's decision should be reversed.

No back to it for remand, for more evidence. In *Patterson*, the opinion said it's not supported by substantial evidence. Well, something else could be supported by substantial evidence, but I think the clear import of that case is that that record can simply not sustain that scope determination. And I think the *Eckstrom* case, early on, was very clear that said there was overwhelming evidence for the other side, the other opinion, not the agency's opinion.

So, I interpret that to mean that any reasonable finder of fact could only have concluded this way. And that's not to insult any finder of fact. What seems very reasonable at one point, by the time you figure out a whole bunch of other stuff, it can then seem unreasonable. And I think that's what happened, so I think maybe in the area of scope we have a situation where at some point you can figure out this record stands for this, and only this. And so I find that very interesting, but I think *Patterson*, I find a little bit confusing, because—but, I think in the end, the answer is when you look at everything together, we know what the scope is.

MR. CAMERON: Okay. I do have some questions here from the audience and I will try to get to some of them, but before I do, I wanted to get into transshipment the issue of the question regarding circumvention and the rules of Commerce and Customs. First of all, to Deb I guess, is Commerce correct in declining to investigate allegations of transshipment and misclassification and other forms of alleged circumvention that don't fall within the purview of 751 in administrative reviews? And secondly, is the issue strictly one for Customs? And if so, does Customs have the resources

to address the problem? How can and should Commerce and Customs share information in these types of allegations?

MS. KING: I'm going to start by saying I disagree a little bit with the premise that Commerce doesn't look into transshipment and misclassification. When information does come up in the context of an administrative proceeding, Commerce does or can, I should say, refer the information to Customs. But, let me just provide a little bit of a lay of the land before.

So, Commerce and CBP the way I see it, have complimentary roles under Commerce's statute. Commerce has the ability to investigate circumvention; there's several forms. Assembly, in the United States or in a third country, minor alterations, or later developed merchandise. And those are four of the particular types of circumvention that Commerce can look into. We also can look into issues of country of origin in the context of a scope determination.

The transshipment and misclassification that Don mentioned, are items relating to reporting to Customs. So, Customs can look into that and has a basis to look into those things. Also, Customs has the ability to impose penalties for misclassification and reporting. But, the way I see it, Commerce and CBP effectively work · together. Like I said, if Commerce obtains information in the context of one of its administrative proceedings, we have the statutory authority to provide such information to Customs.

If we receive information of a context of a proceeding indicating potential transshipment or potential misclassification, we have the ability to provide that information to Customs in the context of a Customs fraud investigation, and that's Section 777 of the Act. And if one did just a quick search of Federal Register notices that the Department of Commerce published in the last few months, you'll find a handful of cases where Commerce actually says it's going to refer a particular matter to CBP or it has referred a particular matter to CBP.

Just two examples, in the very recent past, are *Warm Water Shrimp from China* case, and a *Mushrooms from India* case from September 2014. Sorry.

JUDGE RESTANI: You need to speak louder and more slowly.

MS. KING: Okay.

JUDGE RESTANI: Okay?

MS. KING: Well, that's better. Okay so—effectively just to quickly summarize what I said earlier. Commerce has the ability to provide information that it receives concerning potential transshipment or misclassification to Customs and it does so, and just in a quick search of recent Federal Register notices, it's apparent that Commerce has said it would refer or indeed did refer such matters to CBP. So, I think that Commerce and CBP have complimentary roles and we effectively work with one another on issues of misclassification and transshipment.

JUDGE RESTANI: I don't get the answer.

MR. CAMERON: Well, Deb, I think you're right in that Commerce does refer these, but I think that the problem sometimes arises and there are petitioner counsel in this room who could be much more—know much more

about this than I do, but when it comes to respondent selection in Commerce, for instance, there are instances in which petitioners will say, look I realize that X producer is not—is reporting zero shipments of widgets. But, it is our position that actually X producer was a huge exporter of in-scope products that are not being reported.

Not only are we alleging that there is circumvention, but we want it investigated as under an administrative review. And that is the point at which this issue kind of gets buried, because the Commerce Department, and I can guarantee you this, will not select that producer as a mandatory respondent. The Commerce Department, as we all know, only has the resources in order to take two, two out of the thousands of possible respondents.

JUDGE RESTANI: Great.

MR. CAMERON: Yes. No, well, I'm sorry, Your Honor. Two—and—can I—it should be three often, but it's only two. But, this is, I think the part where this comes up and, you know, you never really see it.

MS. KING: So, if you're talking about respondent selection like you mentioned, the Department of Commerce frequently relies on CBP data and we deem it sufficiently reliable for respondent selection purposes. Sometimes in cases where petitioners or other parties bring to Commerce's attention that there might be some discrepancy between CBP data and information that another company provides. Those are the instances where Commerce has the ability to refer such matters to Customs. And I would note that the cite in the case called *Connetic* (phonetic), and before that *Globe Metallurgical* upheld the Department of Commerce's decisions not to examine transshipment in the context of an administrative review.

MR. CAMERON: Fair enough. Jeff?

MR. LAXAGUE: Okay. Well, this is the answer where Customs is them and Commerce is we. Because, I used to work there too. No, I agree with what Deborah has come forward with and I think there's ample provisions for information sharing between the agencies, even if there is not a direct referral from Commerce. Customs has the authority once they open a 592 investigation to subsequently request as much information as they want on those parties from the Department of Commerce, and they will gladly give it.

I believe the breakdown is really on the Customs end, that they don't pursue these aggressively enough, it's not high enough priority. They've given lots of information and lots of evidence, and yet at the end of the day, I just don't see the results. And this is not a new phenomena, this is going back forever as far as I can recollect. And so, no I don't see how doing these kinds of things should be within Commerce's purview, and they don't have the resources and Customs does. Don't tell me they don't have the resources. Did you ever see their budget? It's obscene.

So, it's clearly just an issue of priorities and I just don't see them devoting the resources that they could and should to these efforts.

JUDGE RESTANI: Can I ask a question to the—our two panelist Customs, former Customs and Commerce? Doesn't it depend, kind of, at a what point do you get the information? If you're in the middle of an

investigation, and you can actually find out enough information to change what you were going to do, then you probably should. But, if you get the information later then maybe only Customs penalties or investigations are the way to go. Am I wrong on that? The timing may have a lot to do with this?

MS. KING: I think I would say it depends, but beyond investigations and administrative reviews there is an avenue for parties to allege before Commerce that circumvention is taking place and so we have particular avenues that can potentially handle such issues. So, whether it should be handled in an administrative review or some alternative forum, the alternate forum exists.

MR. CAMERON: Jeff?

MR. LAXAGUE: I don't know if I have a comment on that. I mean, you know, Customs just takes what they get, when they get it, and it's a question of what they do with it. I don't know if they care when they get the information from Commerce, they just—

JUDGE RESTANI: That wasn't my timing question. My timing question was, looking at it from the point of view of the parties to a trade case before the agency, and whether information, if it comes at a certain point could actually affect the proceeding. I mean at a certain point, it can affect the proceeding, but if it comes in early enough, does Commerce always throw up its hands and say, we can't do anything? Or is it possible that you give them the information early enough, they could do something?

MR. LAXAGUE: Well, I do think that it's fair to say that if, for instance, if you have a mandatory respondent in a review, and if in the course of said review, if they do a verification with the scarce resources that they have, and they discover one way or the other that indeed there is circumvention. I can guarantee you that that is going to be referred to Customs for action. I mean, so in terms of the timing issue, that part will occur. And I don't think that there would be a problem with that. You would agree with that, right Deb?

MS. KING: That you can refer the matter to Customs and—

MR. LAXAGUE: That they would? No, I think they would. I mean, I don't—and when it's referred—

JUDGE RESTANI: I'm trying to get—I'm trying to find out how to fix the Commerce proceeding, if it's based on bad information.

MR. LAXAGUE: Your Honor, I—

JUDGE RESTANI: Not possible?

MR. LAXAGUE:—it's five minutes to 12:00. I don't think we have enough days in the calendar in order to fix what's wrong with the Commerce Department. That's—sorry. That was an immoderate remark, I apologize.

JUDGE RESTANI: I think that's a comment that my question is no good. Okay.

MR. CAMERON: You're kind of—there's no bad questions. I think that because we're running out of time, I would like to skip to section 337, and

the role of Customs and the ITC. And this is basically going to be a discussion between Shara and Judge Restani. The ITC 337 exclusion orders are written intentionally broad to cover existing or future products and that infringe the relevant patent. When a question comes up about whether a particular product is within the scope of the order, the parties seeking clarification may seek an interpretation from either CBP or the ITC.

Recently there's been a lot of talk about improving the exclusion order enforcement process, including a White House proposal.

And I'm sure many of you have seen that there was recently a GAO study that was released about CBP. So, can you talk about the pros and cons of the existing options and some of the proposals under consideration to improve them.

MS. ARANOFF: So, I'm going to try and abbreviate this, because lunch is coming. It's a very complicated area. Section 337 has been on the books in one form or another since 1922 and we still haven't figured this out. There is, just to put it briefly, there is no road map. If you go to the ITC and you win an exclusion order and then you need to get an interpretation of whether or not an incoming product is part of the scope or if you were an importer of a product that may or may not be covered, you have a lot of options, and none of them is guaranteed to get you the answer you need in a reasonable period of time for your business.

You can go to Customs and get a pre-importation ruling. If you're the importer, does my product fall within the scope of this exclusion order? That can be quick and inexpensive, or not, because if you disagree with the result, it can be appealed to the CIT and then you're in appellate process. If you are the complainant at the ITC who got the order, this is a terrible process, because it's *ex parte*, you don't even know what's going on until Customs issues its ruling.

You can also, if you're an importer, just go ahead and import, see if Customs notices or if they decide that your goods can't be allowed in and then you can file a protest, and see if that works out for you. Obviously, if Customs doesn't notice and your product actually gets in, that's fast and some businesses view that as good, but the fact that the product got past an order once, doesn't mean it always will, or that that's an approach that your lawyer would recommend that you take.

You can also go to the ITC, if you're an importer and ask for an advisory opinion about whether or not your product is within the scope of the order. Well, the ITC knows its record best, it's the expert. It also has a transparent inter-partes process, where everyone has an opportunity to be heard. That's the good news. Also, if the ITC does issue an advisory opinion, Customs will defer to it, so you've got some certainty. But it is slower, it can be costly, and if you don't like it, it's not appealable. Because, it's not considered a final agency decision.

You can also go ahead and import with or without a Customs ruling, and then the complainant can file an enforcement proceeding in the ITC claiming that you violated the cease and desist order against post-importation sale and distribution of the product. And then you can be subject to

substantial civil penalties, and that process also can take a year or more and there can be a new trial in front of an ALJ, so it can be costly.

So, you have all these potential routes. Sometimes you can pursue more than one of them at the same time. The White House proposal that came out in 2013 was for improvement in exclusion order enforcement. And there was a big survey done by the White House Intellectual Property Enforcement Coordinator. And what you basically heard and I'm summing up lots of complicated comments now, so those of you who wrote them know that I'm skimming over what you said.

But, basically what the user community for section 337 said they wanted is a process that clearly delineates agency responsibilities, gives expeditious results that support business certainty, has plenty of transparency and due process, and provides excellent expertise in resolving complex patent issues.

So, basically what the public would like is the best of what both agencies provide and also more. Which, you know, under given government resource constraints one questions whether this is actually achievable, but I will conclude by saying that both agencies are making a sincere effort to, at least, chip away at the problem. Customs has announced publically that it has a notice of proposed rulemaking to change its pre-importation ruling process from *ex parte* to *inter partes*. But, no one can see the notice of proposed rulemaking, because it's in internal review in the Department of Homeland Security and then it has to go through interagency review and so, well maybe we'll see that someday.

And the ITC has internal working groups going that they've talked about and have tried in some ongoing enforcement proceedings or advisory opinion proceedings to introduce some more expedited procedures that, again, will make hopefully some at least incremental difference in the amount of time that it takes parties to get answers to their questions. But, this is a topic where you really need to keep watching this space.

MR. CAMERON: Your Honor, the CIT has been seeking some expansion of its jurisdiction in the 337 matters, and the question is whether or not this area of exclusion order interpretation is a place where you think that the court could make a contribution to improve enforcement of ITC orders?

JUDGE RESTANI: Yes. You know patent issues, always reminded me of the Customs classification issues anyway. So, the technical expertise is lacking or not lacking to the same degree. I think it applies to just about any court. I think it is a funny area, I think, as I look at it now, this is kind of funny, but it looks like this is one of the areas where the importers may have more rights than the not-importers. That happens in erroneous liquidations, and it seems to happen in this area.

Apparently it looks as if an importer whose goods were excluded under a general type of ITC exclusion order can get into the CIT and have its rights adjudicated as under the basic Customs protest denial jurisdiction 1581A. I haven't figured out any way yet, except the person who wants their patent rights upheld can intervene. I haven't found any clear way—John Peterson is shaking his head. Okay, I'll say it this way, there's a potential for being an intervener in those cases.

But, I haven't done anything which would let the patent holder bring a suit in the first instance. I think some people have tried it under h, that is there's a ruling, and you don't like the ruling, but the language for h is a little squirrely, didn't look to me like it was clearly there. So, it looks, in this area, as if the person who's goods are excluded has more rights than the other person, and maybe that's a little problem that should be straightened out somewhere other than in the courts.

MR. CAMERON: Fair enough. We have a couple of questions that people have been asking. One is, and I'll throw this open to the panel for anyone. The Court is experiencing a surge in cases where importers challenge single transaction bonds, that CBP requires, because AD/CVD liabilities are anticipated. Are Commerce and CBP working together to identify this merchandise?

JUDGE RESTANI: Anybody—

MR. CAMERON: It's one of the two of you.

JUDGE RESTANI: Yeah.

MS. KING: I'll let the former—

JUDGE RESTANI: This is a problem in the middle of the panel.

MR. CAMERON: Exactly.

MR. LAXAGUE: Well, first of all, and I've had some discussions with folks in Indianapolis of the finance center, some of the attorneys involved, I mean what kind of partnership is that? Supposedly there's a partnership between Customs and sureties that says if you provide a bond and we can't collect from the importer, we come to you. And they go, well yeah except we don't want to. And, I mean it reminds me of that one line in the movie long ago, we talk about banks. And the guy goes, on a sunny day they give you a free umbrella, and when it starts to rain, well they want it back.

What kind of partnership is this, where they could just disregard Customs and the sureties? I believe there's more than a 100 cases pending before the court trying to collect on these single transaction bonds, paper documents. If there's a solution, it was announced recently that starting in January Customs is going to make available electronic single transaction bonds. And by next November they will be mandatory and I ask the head of the revenue section, I said, well does that mean you can actually collect on these? And he said yes, he didn't think they would be any quick cases on electronic single transaction bonds, but the—I just think it's a farce, and I don't understand how that works and I don't understand why they continue to partner with those surety companies. So there.

MR. CAMERON: Nothing?

MS. KING: No.

MR. CAMERON: Okay. Okay, if you say no—okay, let me see, is it—tell—this is with regards to the CBP, is it proper for CBP to require a reference to an AD/CVD case on an entry where the subject merchandise is *de minimis*, but it is part of a set for which the components may be broken out. Did I get that question right?

JUDGE RESTANI: Too complicated.

MR. LAXAGUE: Too complicated.

MR. CAMERON: It's very complicated, yeah.

MR. LAXAGUE: I don't know.

MR. CAMERON: Okay. Well, we have a couple of minutes. We do have some other questions, but before we do, we had a question and Deb spent a lot of time on—in her paper on this issue of liquidation instructions, and I think it's an important issue for all practitioners, so I would like to get the comment of the panel on this. Commerce provides liquidation instructions to Customs and orders liquidation based on the foreign producer and exporter, based on the form producer, exporter, and importer. The names of the importer are taken from anti-dumping responses of a foreign producer.

But, what happens when the foreign producer doesn't know the name of the importer, because they may be selling to trading companies who export to the importer. Or the foreign exporter puts the wrong name in, for instance the name of the trading company who may not be the importer. And these things happen all the time, but this is exactly what Deb was referring to in her introductory remarks. Where she said, you know, the information that goes to the Customs service and the information that goes to Commerce may be very different and then how is this going to be resolved?

So, in these cases, how does, and should Customs assess the AD rates at a proper amount for the importer, and what is the role of Commerce in this? Why don't you start Deb?

MS. KING: Well, so I want to address a little bit of a different quest—

MR. CAMERON: Yeah, go ahead—

MS. KING:—same idea, but a little bit of a different question. To me this presents an opportunity for outside parties to get involved in enhancing Customs and Commerce collaboration with respect to instructions. I think that outside parties, petitioners, importers, respondents, have an important part to play in providing Commerce with the information it needs to help Customs liquidate. So, for instance let me give you an example, when a foreign exporter reports its customers or its importers that the Department of Commerce in the context of an administrative proceeding, an importer might get involved in the proceeding and confirm, or double-check that the information provided by the foreign exporter or producer reflects that particular importer.

Such that the importer's merchandise will be properly liquidated. Such that the importers name for instance would be properly reflected in Commerce's instructions to CBP, such that CBP can properly liquidate. So, I would just use this as a plug for parties to become involved in the administrative review process to provide Commerce with the information it needs, in terms of names, such that it can instruct CBP, and CBP can assess appropriate duties. Because, names of companies seems like something that could potentially very simple, but it turns out to be quite more complicated in certain instances when you have misspellings or parties providing different iterations of their names.

You know, producers providing some iteration and importers providing to Customs another iteration, so this is a way that private parties can become involved in the proceedings to help themselves too.

MR. CAMERON: Jeff?

MR. LAXAGUE: Well, please correct me if I'm wrong, but it's my understanding that petitioners are not given all of the Customs entry information, so how you would expect the burden on them to identify parties when you don't tell them who are the parties on the import transaction. I don't know how you do that. This is not a new issue. Years ago when I was in the commissioner's office I was actually asked to referee a meeting between the Commerce liaison grouped with Customs with their counterparts at Commerce. And the conversation went sort of like this, and Customs goes, "We've got these entries out in the port of whatever, and they say they don't have liquidation instructions for this case, for this time, for this administrative review."

Commerce goes, "We've issued all the liquidation instructions that we are obliged to issue under the statute." Full stop. Customs, "We have these entries out here that we don't have liquidation instruction for." We have issued all of the liquidations, so I said, "Stop, you're both right. You have issued all the liquidation instructions you're going to and you're not going to issue an amendment, we know that you're not going to issue a clarification." And the port is still saying I don't have liquidation instructions.

So, I believe they're doing a much better job of handling those discrepancies. The two groups today are very good and they are working a lot harder to resolve those, but it's still an issue. And then if you say it's not covered by the administrative review, what's your liquidation rate? I don't think that's always so clear. So, in my view, if there were a solution, I believe—and this is something I'm hoping next year that Customs and Commerce, and hopefully me, through the trade support network, will be working on developing liquidation and ACE; Customs new automated system.

And we're going to look at liquidation issues unique to AD/CVD, and see if there's a way we can use the enhanced ACE functionality to improve that process. I think they should do a better job at the time when they decide what's going to be subject to an admin review and what's not. And they should actually look at the universe of import data for that case, for that administrative review and say these are covered by the administrative review, these are not.

MS. KING: Don—

MR. CAMERON: Go ahead.

MS. KING: Since this is supposed to be a dialogue I feel like I'll just respond to Jeff—

MR. CAMERON: Go ahead.

MS. KING:—real quickly. He mentioned a question about how petitioners can get involved and one way for petitioners to become involved in reviewing the information is when they request administrative reviews for particular parties, there can be names, and if a particular name isn't used,

what Commerce does is it will instruct CBP to suspend entries of merchandise that should be covered by an administrative review. And it will instruct Customs to liquidate automatically. Merchandise that's not subject.

So, to the extent petitioners request an administrative review, they can, for instance, check past federal register notices, or past instructions to Customs that are public to see what names for a particular party Commerce has used in the past in hopes that the relevant merchandise for the particular name that they're hoping to have a review of, would remain suspended during the administrative review and not get liquidated prior to the completion of the administrative review. So, that's one way that, you know, petitioners can get involved in checking information and providing information to Commerce.

MR. CAMERON: Your Honor?

JUDGE RESTANI: Yeah, I'm not going to comment on the whole business of request for administrative reviews and the evaporation thereof. The—and, but I will say Deborah's paper which is on the website is a really interesting practical piece of information. Now, if all goes wrong and you have to end up in court, all I can say is file under a and file under i; both.

MR. CAMERON: Correct. Okay. I did have one comment with respect to Deb's observation. She is correct that the way to protect yourself if you are representing the importer is to actually participate in that review, that way you actually will have appeal access, you'll be able to see whether or not the exporter has screwed up the database and has not reported your imports, because they've reported somebody else's.

The only fly in that ointment is that, what? Importers don't want to pay to participate in the administrative review process in order to do that. And it's very rare, quite frankly, that independent importers do participate. The problem then arises that number one, they don't have any right to appeal, so they can only go through Customs. Secondly, the other problem that occurs there is that the importer, because the liquidation instructions, and the assessment instructions are APO, does not have access to the actual assessment rate for the imports that he thinks that are his now.

So those are practical issues that arise here. I will say one thing given the fact that I've been beating up on Commerce, is I'm sure my colleagues will tell you, Commerce has done a nice job of, is Wendy Frankel I think is now in charge of the office to collaborate with Customs, and she knows both ends of the spectrum in terms of Customs and Commerce. And they've been doing a very good job, I think, of trying to at least resolve as many of these issues as they can. And if you bring this to their attention, they do try to get it right. It doesn't mean it always works, but anyway there have been a lot of efforts done there.

I've got one more question from the audience, because it's going to take time for Tina to get up here. And that was—let me see here. If you say— no, we didn't have that. Well, come on walk slower.

JUDGE RESTANI: More slowly.

MR. CAMERON: I did that one.

JUDGE RESTANI: Don't forget your L–Y.

MR. CAMERON: I think we're done.

MS. KIMBLE: Okay. Thank you everyone, so now we go to the pre-lunch reception, which is just straight out and take the elevators up, the elevators are dedicated to you. Ms. Macy is here, so if you would like your book signed, please first stop at the registration desk if you brought your book with you. And you can turn in your CLE card, your CLE cards either at the exit here or when you get upstairs, there's staff upstairs to do it there too. Okay? Thank you.

(Break in proceedings)

# STREAMLINING LITIGATION IN CUSTOMS CASES: OPPORTUNITIES AND OBSTACLES

MR. LEO: Welcome, everybody. We're starting before Tina tells us to. Hi, Tina. See you later. Hi. I'm Bob Leo. Welcome to this afternoon panel. I am your cheery moderator. Just so you know, there was no tryptophan in the chicken or in the vegetarian dish, so you all have to stay awake.

We have a great panel for you and I'll introduce them in a minute. Some of you know me. Please don't talk to the people who don't know me because they might think I'm a good guy and like me. People are wondering, how do you get to be moderator. It's a long process. I know the DOJ people are going, Who is this guy? We don't see him in the court and we're talking about the court today. Ralph in our firm, Ralph Sheppard is the litigator and the expert at the Court. I just look better in a suit, so that's why I'm moderating.

I want to introduce our panel. I'm not going to read the bios in the interest of time. We have, starting at the far end, Judge Gordon, who needs no introduction and will not get one. Next to him, Russell Semmel from Neville Peterson, Bev Farrell from the Department of Justice, and Will Sjoberg from Adduci, Mastriani and Schaumberg in DC.

So we're going to tackle this in a little bit of a logical order, on how we're doing this. We're going to have some interaction. You have the cards in front of you for questions. If you put $5 on the back of that, we will actually ask that question. It's not an ethics panel. I can say that. Also, there are some copies of Russell's paper, I believe, outside. I don't think we have enough for everybody, but everything is online and it will be online if it isn't. If there are questions and answers that we cannot get to today, we will hopefully post them online after the conference.

MS. KIMBLE: And Beverly's paper.

MR. LEO: And Bev's paper, too, yeah. With that, we're going to start with Mr. Sjoberg.

MR. SJOBERG: Good afternoon. I'm going to begin my short comments with a proposal for next year's conference. When I was reviewing my notes

after the first conference called with the panel here, I wrote down "meditation." I'm here to talk about mediation, but I thought about meditation a little bit more and I thought about the last panel right before lunch. Meditation might have been good for them. It might be good for us, too. So what I suggest is next year's conference, is that Tina spring for yoga mats for everybody, maybe next conference.

Having participated in mediation at the Court, I assumed that the research would be readily accessible. I was wrong. I'd like to give a special thanks to the Office of the Clerk, the Office of Case Management and the CM/ECF staff. So if you don't like my paper, it's their fault.

I'm here talking about mediation. Why? It effects less than one percent of the cases closed at the Court in the last ten years. When I was volunteered for this issue no one said, Come up with proposals to fix mediation, so I don't know whether necessarily mediation is broken and whether it needs to be fixed. I submit the Court is in the best position to answer that question.

A show of hands, who has been involved in a motion for mediation at the Court? Okay. A show of hands, who's actually mediated a case at the Court? See, that's what we're talking about here. Mediation is important, notwithstanding some agencies positions. It's not only for settlement. It can be a viable tool to streamline litigation, which happens to be the topic of this panel.

In the interest of time, I would like to focus us on three of the five issues in my paper; classification, parties to mediation, and then timing of mediation. Classification: Now, I try to attend as many CITBA and court events as possible. In some of those events, I hear panelists say that classification cases are not amenable to mediation. I respectfully disagree with those panelists. Unless there's something inherently obstructionist in introducing a neutral third party into a classification case, the statistics of the Court clearly support the notion that those cases are amenable to mediation.

Granted none of the classification cases that went through mediation were settled through mediation. However, all but one of the mediated classification cases were settled post mediation. Moreover, the Court disposed of 48 percent of the classification cases via either a stipulated judgment or a voluntary dismissal, the two ways cases are disposed of in mediation.

As further support for mediating classification cases, parties have successfully mediated 1582 cases and settled not only the penalties at issue, but also the revenue lost as a result of the Defendant's misclassification. Classification cases are amenable to mediation.

Parties to the proceeding: This should probably stay in this room, but the Department of Justice is not a big proponent of mediation at the Court. Sure if Justice is ordered to mediate, it will, but given that the DOJ moved for mediation in only one case, there's no real support that the DOJ is a big fan of mediation.

Put another way and maybe kind of timely, if you're ordered to eat your brussel sprouts at Thanksgiving dinner and you've made your mind up that you don't want to do it, it's difficult to believe that you're going to put forth 100 percent of your effort to eat those brussel sprouts. In fact, mediating a

case in which all parties don't buy in 100 percent can have the opposite effect of what mediation is trying to accomplish, and that is streamline litigation and/or early termination.

The DOJ appears to have a checklist for the type of cases amenable to mediation and if one of the boxes is not necessarily checked, apparently Justice will oppose. Subject to Bev's input, and I know she'll have some, I think the checklist includes at least the following for classification cases: a discontinued product or an HTSUS number that's no longer valid. I know there are others.

Considering that list, it appears to me that it focuses too much on the settlement aspect of mediation or the end game and not the efficiency aspect of mediation or the process. I cite in my paper a number of benefits and studies ascribed in mediation other than settlement. Now I submit that those benefits should be given equal time.

I'd like to end my short comments with a related issue, that's timing of mediation. From my research, with a couple of notable exceptions, it appears that the Court orders the parties to mediation relatively late in the proceeding, after the parties have had time to dig in their heels and become set in their respective positions.

As a research cite in my paper indicates, early mediation appears to be more effective in early termination. That's not to say that the parties should feel pressured to settle a case early in the proceeding, rather the parties should use early mediation to establish common ground, narrow the issues, iron out discovery and, if appropriate, discuss the merits of the case which could possibly lead to settlement. Hopefully by doing so will save future resources and streamline litigation. Thank you.

MR. LEO: Thank you, Will. By the way, you really should read Will's paper if you haven't had time to do it yet. It's the treatise that we all should have in our quiver going forward, especially as we, hopefully, talk more about mediation.

So we're going to ask the panelists now to comment next, except for Bev—I mean, Bev, you're next.

MS. FARRELL: Well, first and foremost, I am here, of course, in my own capacity. I don't represent the Department of Justice or Customs or anyone in the government, so anything I say is just me speaking individually.

So when Will comes through and he says, Well, you know, DOJ has a checklist, I can't say one way or the other about that, but I will say this, I've had the opportunity in a few instances and, in fact, Will and I were involved in a case where we were attempting to mediate, and Will is correct, I mean, this was a case that was remanded back from the Court of Appeals and Judge Stanceu served as our mediator. It was extremely helpful and it didn't lead to a resolution and without revealing a lot of things, but it was extremely helpful because it did narrow issues. It put a focus on where we needed to go.

I think, Will, your team did a great job in proceeding—in going into the next bit of information that I needed for my next steps.

So mediation does have—you're right, it does have a place and it may have an earlier place or a later place. I think what has happened is that mediation sometimes—the focus is settlement. Indeed, if you look in the guidelines it speaks of mediation in the Court of International Trade in the form of settlement, but I think there are more things.

A lot of times, you know,—we have a trial judge who's been assigned and you could easily go to the trial judge with your discovery questions or issues with different problems, but I would prefer, myself, to not have my trial judge see kind of the nitty-gritty because when you're in disputes in discovery, that's when it sometimes gets ugly.

Just to follow on from Will, one of the things that I'm thinking about is whether or not discovery mediation with a separate judge might be a very helpful tool. To the extent you begin to work your way through discovery and people begin to get heated about. "Well, you're asking for this and it's overly broad and unduly burdensome and, oh, my goodness, what you're asking for is ridiculous", maybe we can get a mediation discovery judge who will speak to that. So I do agree with you.

I think that we have to stop thinking about purely from settlement perspective, but from a perspective where the judge will say—we have so many judges who have so much experience. They've been there. They've done that. They've seen it. For them to say to us, "Well, listen, you know, I can appreciate you're going here with that issue, but it seems you might be able to narrow." I do think we ended up with some narrowing in our case. I'm a proponent.

MR. LEO: Thank you. Russell?

MR. SEMMEL: While I haven't had much or really any experience personally with mediation in the Court, having been in this Bar for a little over four years now, in our firm we have been dealing with one case, especially recently, where mediation was initiated. There were actually two cases there, the first a 1581 classification case and second a 1582 penalty case.

We went through a lot of motion practice to determine whether—to decide whether the two cases should be consolidated, whether one should be dealt with before the other one, should be stayed, and whether the cases should be combined in some other way, but through mediation we're able to, like Bev said, narrow the issues a little bit and perhaps resolve one of the cases at the same time as the other. And litigation that could drag out much, much, much longer than it should, classification cases take long enough, of course, and then a penalty case could take a toll on the Court, instead of dragging those out so far mediation it seems as being—is a tool, a successful tool, to reduce that.

MR. LEO: Thank you, Russell. Judge Gordon.

JUDGE GORDON: Well, the three fine litigators to my left are surrounded by Leos, one with a first name and one with a last name. If somebody says "Leo" up here, God knows what's going to happen there. Heads will be on a swivel.

MR. LEO: I won't answer.

JUDGE GORDON: I'd actually like to take a step back and move us away from the buzz word "mediation" and talk about it in the light of something that Judge Stanceu said at the lunch meeting, and I know that many of you have heard me say this, and that is Rule 1, right, just, speedy and inexpensive. So the question is, are there mechanisms that we can use in—we're mostly Customs litigators here, so we'll narrow our focus to Customs litigation—where judge intervention, judge assistance or assistance from the Court will be useful?

Now, much like the government lawyers, I speak solely as Judge Gordon. All right? I don't represent the collective views of the Court. This is just one judge's view. It doesn't mean that some of my views aren't informed by conversations with my colleagues, but the Court speaks on policy issues. At court meetings, the Court passes resolutions and adopts rules and policies. So I can't speak for my other 13 colleagues. Some of these thoughts are reflective of my own views.

Again, back to the point, judge intervention or assistance. I think the observation about judge intervention or assistance in the form of mediation, and it's true that the rules or the procedures speak to it mostly in the settlement context, I think we need to take a step back and look at that.

Now, I think we need to recognize some unique aspects of what the Court is. First of all, unlike civil litigation in the district courts, we don't have magistrates. So in the district courts in the civil litigation context, the district court judge, for the most part, is not involved in discovery disputes. So as to Bev's observation about a mediation discovery judge, we don't have somebody to play that role like they do in district court.

So the question is, can parties who are engaged in a discovery dispute come and seek assistance from the Court? At the end of the day, there's nothing that prevents anybody from picking up the phone or sending an e-mail and contacting whether it's the case manager for the judge or Tina in the clerk's office and saying, we need help.

I think that there's a natural reluctance and there's intention, frankly, in the rules or the practice. The practice in discovery is you're not supposed to involve the Court unless there's a real dispute. The parties are presumed to behave like adults and to resolve most of the matters. Well, practical common sense would tell us that we don't have a magistrate. Well, I don't want to burden the judge, and there's a natural reluctance, I think, to engage the Court to get somebody to help you. I think there's a natural reluctance on the part of folks litigating the cases to acknowledge, particularly to the assigned judge, that they can't figure it out for themselves.

So I think, like any other human endeavor, it's very difficult to take a step back and engage in self reflection. I don't necessarily know that the problem or the challenge exists with the process. The process may be perfectly fine. We just haven't figured out how to make the process work for us to solve some of the challenges that we face. Some of that, very candidly and not to belabor the point, is a matter of litigants willing to take a step back and be self reflective and figure out how the process can best help them.

I think narrowing of the issues is a critical thing. Trying to figure out what the appropriate number of questions or what the focus of discovery ought to be is a legitimate role for some assistance. Now, whether it's the assigned judge or a mediator judge, that's a different story. It's a mind set and you have to be willing to take that step back and say, is there a better way?

MR. LEO: Thank you. Will, any last words on your subject?

MR. SJOBERG: I'm good.

MR. LEO: Okay. By the way, if anybody wants to use "Judge Leo" during this—I'm fine with that. I want to call that out. I'm perfectly fine with that. I was really remiss at the beginning. I should have thanked— Marcella Powell is my co-chair here and the co-chair here of this panel and did a lot of work putting all of this together. I forgot to recognize you. Sorry. I mean, I do recognize you. Okay. Bev, you're up.

MS. FARRELL: So following on the comments from Judge Leo, this Judge Leo, I focused my paper on kind of streamlining discovery and looking at it from the perspective of Customs litigation. One of the things that I often hear from plaintiffs counsel—and that's when the government's not a plaintiff and we're the defendant—plaintiffs counsel will say, why do you need all of this? We gave this to Customs during the administrative process. Yes, I know that you did, but the problem is that pieces of it may be sitting in the court file because Rule 73.1 requires certain things to be given over by the port to the court. Just because there are things in the file doesn't necessarily mean that those are, in fact, admissible evidence.

What happens is we're shifting from an administrative process into a process that's now litigation before an Article III Court and the Federal Rules of Evidence are now coming into play. So one of the things I'm trying to think of is, is there an easier way to do these things? One thing is the sample. Often the sample will be given to Customs. A lot of times Customs will—depending on the sample—may be tearing it up and taking it through the lab and trying to figure out what the article is, so we may need yet another article submitted.

Sometimes these cases stick around for a long time. I know Russell will be getting into that with respect to his portion of this panel. I have cases from when I used to be an actor. I have cases from 1992. It's crazy. People will say, well, I have no samples now. Yeah—or the evidence is stale. For sure. From 1992 to 2014, you betcha. That evidence is now stale and you need samples. Sometimes, like the festive articles, I don't know how—don't laugh, please—I don't know how it happened, but I ended up with buckets of them, okay, and it's—

MR. SJOBERG: Where were they—

MS. FARRELL: Mickey, you're here. In fact, let me tell you where all of my festive article cases came from. Thank you, Mickey Cottet. When she left to go to Washington, DC, I inherited her festive article cases, some of which she inherited from Bruce and some other people. We're going back and back, but they're from 1992.

So you don't have samples and plaintiffs counsel is trying—I have a case in *Russ Berrie* where plaintiffs counsel, they went out onto E-bay because

their samples were destroyed in the World Trade Center. I give them credit because they went out and they fought hard to try to find some samples of all the goods at issue.

I think one of the things I'd like to see is at the front end of the case. As soon as the summons filed is—and this is to the extent this is not a gigantic sample—you may want to submit the sample to the Court. Now, we know it's here. For the Department of Justice, I can pull the court file and get my hot, little hands on that sample and it may move my case forward. To the extent I'm thinking, well, geez, this might be a good case for mediation, we have the sample, or this might be a good case to start thinking about stipulating this case because we now have the sample and we can gather more information or maybe there's been case law that's gone by.

I think on the front end instead of holding back, I think plaintiffs counsel would serve the process and streamlining very well by getting a sample into the Court to the extent it's not some gigantic sample. If it is a gigantic sample, photographs submitted would be helpful early on and also maybe an affidavit indicating that, while we are not going to submit this sample to the Court as part of the reserve calendar process and as part of the summons filing, we will indeed hang onto this and you'll be able to have access to it later down the road, because we'll say the sample is the potent witness. We all use it in every brief. It is a potent witness and it is important to the case. I think on the front end it would help streamline litigation if plaintiffs were able to submit samples when they file their summons.

The next step is obviously then we try to work it all out. It doesn't work out. Now a complaint has to be filed. Is there room now to start beginning to move into the process documents that the plaintiffs bar—I mean, most of us are repeat customers. Most of you folks have been doing this for an awfully long time. You know exactly what the U.S. Government is going to ask for. You've seen our almost *pro forma* document requests, so you can close your eyes and say, I know they're going to ask for this, this and this. Why not provide that up front, but why not attach it to the complaint because when you attach it to the complaint now under Rule 11 it's got indicia of trust worthiness. So we're beginning to move the evidentiary component of the case forward. Maybe that's the right way to do it.

If you don't want to attach it to the complaint, because I'm thinking all of the documents that the port puts into the court file, it would be really helpful to have that up front, attached to the complaint because now I've got them in front of me and they've been given the indicia of reliability by the plaintiff because they've attached it to a complaint. They've incorporated it. It's right there. It means they believe it to be truthful and trustworthy, so I should be able to rely a little bit more on it. That again advances the litigation.

If plaintiffs don't want to do it at that stage of the game, the next stage where we have an opportunity is in Rule 26 in the initial disclosures. There's no question you know what we're going to ask for, so preempt us. Just give us what you know we're going to ask for. It never hurts even in a non principle use case to just dump all documents associated with *Carborundum* factors. Because if we have all of that in front of ourselves, we're able to think about this case a lot sooner.

I've had a case recently where people gave us documents up front as kind of as a look-see for the complaint phase. When it came to drafting the discovery, we were able to be much more narrow in what we were asking for because we have seen a preview of documents. It was funny because I had a conference call with these folks and they said to me, Oh, your document requests are incredibly narrow. I said, Well, yes, because you provided me with documents up front so it made my job easier. I didn't have to come more broadly trying to catch things. I kind of knew what to focus on now.

It is a way to streamline the case and I think it assists your client to get less discovery. We are narrowing issues when we see up front really the granularity of the data that we need to then proceed forward. It may enhance the ability to know whether or not this is the type of case that ought to be stipulated.

I think that all of those processes are something we should be thinking about and it's voluntary. One of the things I wanted to say in my paper was I went out and I did a pull, I did a Westlaw pull, to find out where motions to compel discovery—how frequently they were filed and were they granted. It was very rare. That suggests to me the repeated nature of our interactions. We work together. I mean, we do honestly all work together. I mean, yes, once in a while there will be a scrape and a blow, but for the most part this Bar practices with the government because we are the repeat customer, unfortunately, but we seem to work well together. I don't see very many motions to compel where there's a lot of heated nature.

So maybe this is a problem that for motions to compel purposes we don't have to worry about, but the one thing that I do see on the horizon is electronically stored information. This court is a paper court right now. Customs is a paper entity. Most of the plaintiffs that we're dealing with provide paper to us. I have a few cases where it gets a little squirrelly because it's ESI from the perspective of the incredibly large company and Customs has got papers sitting in the file and it's coming to the Court.

So we're kind of in a world—I think even smaller shops and smaller importers are going to begin to shift to digital information and everything is going to end up ESI. My experience from my past life where my world was always ESI and giant document productions with 169 contract attorneys going through documents for privilege view, when you hit that point that is when discovery gets ugly. That's when it gets expensive, people trying to go to legacy systems, people becoming just overly aggressive about getting at things that really people can't get to very easily.

In the long haul, I think we're going to see a transition in the Court and a transition in our practice. I think that the discovery mediation judge may become someone who could be extremely helpful. If we had a few judges that may became ESI gurus, they could become tremendous assets to us once we begin to transition in. I know in the Southern District of New York, Shira Scheindlin is the sedona—she's the queen of that stuff and she's really, really well informed and she's someone that you can lean on. I think probably our in our practice and in our court, we may begin to see that transition as well.

MR. LEO: Okay. Thank you, Bev.

MS. FARRELL: Thanks.

MR. LEO: Will, comment, question?

MS. SJOBERG: I hate to say it, but I agree with Bev.

MS. FARRELL: Are you okay?

MR. SJOBERG: Yeah. No, I'm kind of under the weather. I think this sort of dovetails to what I was saying. Bev is saying that we need to be more proactive than reactive. I know that's kind of a cliche. I'm willing to give her some rope. I mean, I think that what she's suggesting has some merit, but this is not my first rodeo and it's not indefinite. I mean, if we go down this road, there's going to be a point where we have to do an assessment of whether it's really working. It's going to mean a lot more work for us as plaintiffs attorneys up front. Again, we all like work, so we'll see where it goes.

MR. LEO: Thanks, Will. Russell?

MR. SEMMEL: Well, traditionally the first thing that we do say whenever we get an interrogatory request is, haven't we given this to Customs already in the administrative proceedings? I think that should be written in the rules somewhere. Auto disclosure, that's something that I discussed with colleagues or, rather, increasing the body of disclosures. Like you said, most of the interrogatory requests you issue are pro forma and there's absolutely no reason to react rather than address it ahead of time, especially considering that we do have it down at the administrative level and have it accessible to craft quickly into a form presentable to the Court, presentable to the government. I agree as well. There's plenty of agreements up here on the stage.

MR. LEO: Thank you, Russell. Judge Leo.

JUDGE GORDON: I agree with Bev in the sense that over my history both wearing my hat as first the assistant clerk and then the clerk of the court and now a judge. We don't see all that many discovery disputes. Now, that's not to say that they don't exist and there aren't frustrations, but it seems to me that if one can say that there's a bright-line rule around discovery and problems with discovery, it tends to be the following: One, counsel have to want to engage and sometimes that's just not—I won't say possible—doable for a variety of reasons. When the problems really occur, it's principally due to either a breakdown in communication or a lack or a failure to communicate at all.

That makes it tough because then what happens is people's views and expectations get hardened. They don't necessarily hear each other and the ability to take that step back and reflect, think about it, use common sense and come to a resolution becomes that much more difficult.

I think harkening back to the first topic, and that is when you find yourselves in those circumstances, again, it's this balance between trying to resolve it itself and engaging the Court, but someone has to be the adult in the room and someone has to recognize that there's a problem. You can't fix something unless someone recognizes a problem and not everybody has the ability, the resources or the skill sets to solve all the problems. Sometimes you have to ask for help and that's very hard in our profession.

Right? We have been doing our jobs for a long time. We make representations to our clients. We don't want to lose face, but the reality is that the Court is there not only to resolve the ultimate issues in the case, but to help move the case along.

Some judges are more proactive in their engagement with the lawyers. Other judges have a view of it's the lawyers case and I'm only going to get involved when they tell me. There is no one-size-fits-all on all of this. A lot of it just does depend upon the facts and circumstances, the personalities involved, *et. cetera,* what the clients are pushing or not pushing. I do think at the end of the day more often than not if you open up lines of communication, even if there's a facilitator, the problems, the challenges can be resolved.

One last comment on electronically stored information. This is a hot topic. It's been emerging within the federal judiciary over the last couple of years. I had the privilege to go to a multi-day seminar on this run by the Federal Judicial Center. It's a fascinating topic. If you really want to learn something about this and get a sense of what you may be facing in the days, weeks, months and years ahead in our particular area, I strongly suggest that you look at the work of the magistrates.

As I said earlier, the magistrates are the ones who are really in the trenches on discovery and they are the ones who have published the most in this arena. They really have a very good handle on it. I would suggest that you look at their work. There are some publications put out by the Federal Judicial Center that you may be able to access that will be very useful for you to get a handle on this topic.

MR. LEO: Okay. Thank you. All right. Russell's here not only because he has very good intense litigation experience in a shorter period of time, but it's also to show we did not discriminate against young people with hair that don't have any gray hair. Russell?

MR. SEMMEL: I have a couple.

MR. LEO: You'll have more after this.

MR. SEMMEL: Clip them off. Well, I am going last. I'm evidently the sacrifice here on this panel since I'm the greenest and in light of some recent developments with the reserve calendar. So if you've glanced at the title of my paper, you'll know I thought I'd go whole hog and maybe ruffle a few feathers here. Just college football rivalry weekend, so I'm pretty pumped, ready to butt heads with someone.

Now, we're all Customs litigators in the room, so I'm sure every single one of us has at one point or another dealt with the reserve calendar. By definition, if you've filed a case in the Court, a Customs case in the court, you've dealt with the reserve calendar, probably with motions to extend the reserve calendar because the nature of the merchandise and the nature of custom's decisions lends itself to the drawn out resolution process in court.

We've had a lot of discussion about Rule 1 here. The chief judge mentioned Rule 1 during our lunch, which is to encourage the inefficient just—inefficient, Freudian slip.

JUDGE GORDON: The inefficient? Boy. Wow.

MR. SEMMEL: Freudian slip. I'm sorry—the speedy, just and cost-effective resolution of cases in the court. In my short experience and the experience of those to whom I've spoken about this, the reserve calendar does the opposite of that. It is inefficient. That's why I said inefficient. There isn't a ton of information. There's a bit of a paucity of information on the reserve calendar itself, but there's plenty of information on the suspension calendar out there.

In the paper, I make a recommendation that we abolish the reserve calendar and the reserve process entirely and merge it into the suspension calendar. That, of course, would require the filing of a complaint in some case concurrent with the summons or perhaps within a specified period of time—a short period of time thereafter.

That might concern some of you, like me, who are in the plaintiffs bar, but truth be told, we know our positions when we file the summons because so much goes on during the administrative process. Bev was talking about how parties have the information for discovery already, generally, and we say, we've already given it to you, we've already given it to Customs. We have that information. We have our positions and lately with the more robust ruling practice that has developed since the '90s, after the reserve calendar was established back in 1970, we have even more certainty. We, being importers, have even more certainty as to what our positions will be and what we can expect when we get into court.

The reserve calendar period does have certain benefits, of course. It was there to serve a purpose, at least when it was created, some of those purposes from what I've learned are to preserve jurisdiction over cases, over protest denials, because the statute of limitations is relatively short, and also to accommodate the continuing stream of importations of similar merchandise because *res judicata* generally doesn't apply or applies only in a very limited manner in Customs cases.

Hundreds, thousands—maybe not thousands, but hundreds of cases can pile up on the calendar, on the reserve calendar, at the same time that deal with the same subject and that's good for nobody. All it does is encourage useless motion practice that doesn't go to the substance of the case and produces debates that otherwise wouldn't need to take place.

That being said, the complaint would be filed for the very first case that, to borrow the language of Rule 84, is of a specific significant question of law or fact. The presumption would be, when a case is filed, essentially the presumption upon certification from a party, that a case has not been before the court before on that question of law or fact or that it has, in which case it becomes suspended. If it hasn't, the complaint will be filed. So whereas a case might have ended up on the reserve calendar or would have ended up on the reserve calendar, will end up in one of two places; an active litigation or on the suspension calendar to be dealt with as suspended cases would.

Of course, a party might certify even in the best of faith that a case does involve the same significant question of law or fact when it actually does not. There are mechanisms in the proposed rule that I've drafted as an appendix to my paper that would allow the government or the party itself, upon discovering new information that might not have been available earlier, to

remove that case from suspension and within a period of time proceed through active litigation on that one.

Like I said, I know that might ruffle a few feathers, but I've seen recently in cases that my firm and I have dealt with, the reserve calendar has taken most of the attention away from actually solving the issues at bar, seven years even after the test case, which isn't a technical test case, but because the rest of the cases were on the reserve calendar even after a case was long solved.

So the conclusion, the summary of this, is that the reserve calendar does very little in my experience to benefit anyone. To the extent that it does benefit the government, the plaintiffs or the courts, the benefits can be shifted elsewhere or can be accommodated or simply are not necessary as they were in 1970 when the calendar was first created.

MR. LEO: Okay.

MR. SEMMEL: What do you think?

MR. LEO: Will.

MR. SJOBERG: I don't know.

UNIDENTIFIED SPEAKER: Hmm.

MR. SJOBERG: Hmm, you're right. I don't know. I'm going to pass to Bev and think about that for awhile.

MS. FARRELL: I appreciate Russell's outside-of-the-box thinking on this. I mean, because we did see kind of this spate of reserve opinions that recently came out that I know shocked many people and got some people concerned, but I think that from my experience on some of the reserve calendar cases there are some strange one-offs that will happen. I've had cases that got filed on the reserve calendar where a person was grappling with a bankruptcy and so they're just—I mean, they're preserving as an asset of the estate because you don't want to blow the statute of limitations, but they're not sure where the case is going to go. I mean, the trustee for an estate in bankruptcy may decide that that Customs case, the amount of money you might recover and the amount of effort you'd have to put out isn't worth it. It buys the time by preserving the statute of limitations, so it's kind of a strange one-off.

I don't think it would necessarily fall well into a suspension calendar. They probably aren't going to want an active case because a bankruptcy estate's main job is to gather as many assets as cheaply as possible, so they may not want to try to commence litigation. So there are sometimes that I think the reserve calendar is beneficial, but I do—yeah, there are some cases, you know, kind of seem to fester. I think maybe it's just a matter of extensions of time being a little bit longer.

I think if we go back to people providing samples and documents and evidence early, which was what I was talking about earlier, you might not feel so bad about things sitting out on the reserve calendar maybe for a little bit longer than one might want, but at least evidence isn't becoming stale, at least we have a sample, and that may help actually move things more quickly through the reserve calendar. So these two points may actually work hand in hand.

MR. SEMMEL: Agreed.

JUDGE GORDON: Well, despite the fact that I have all my hair and most of it is still dark, I am going to show my age, or at least what's my length of experience in the field. The more things change, the more they stay the same. I came—I first started working on issues related to the court in 1978 or '79. And periodically the reserve calendar has been the source of much discussion over the years. Sometimes the issue is the purpose of the calendar. Sometimes the issue is how long a period of time should the calendar be; what's the purpose behind the calendar.

I'm going to differ with Russell. I don't mind outside the box thinking. When I was clerk of the court many people heard me say, you know, "I'm happy to look at anything. You know, let's take a look at the basis and the reason for why something existed, and if the rationale is still valid then we hold on to it. If it isn't, then we ought to change it." But I wonder—and this came up in our phone conference—whether the problem is with the rule or the problem is with the abuse—with the use-slash-abuse of the rule.

And I remember at a point in time—Mike or Pat, correct me if I'm wrong—but I think at one time the reserve calendar may have been either 24 or 36 months, and then I remember at one point in time it got cut back to 12 months. There was a very significant conversation about what should be occurring when a case gets filed with the court and it's on the reserve calendar. What kinds of conversations, what should be taking place between importer counsel and the government. What kinds of discovery, what kinds of information should be obtained so that at the end of the period there would be a reasonable decision made about whether the case was going to get litigated, and whether litigated could mean the filing of a complaint or suspended under a test case. And those who go back in the field as long as I do will remember not only was there a reserve calendar, but there was an unassigned joined issue calendar. Right? And we merged those two into the reserve calendar and came up with an 18–month period.

Listen, folks. There's plenty of accountability to go around. There are multiple participants in this process and there are ample opportunities for someone to put up a yield or a stop sign and say, "The case has been here too long." All right? And so I don't know that we should throw the baby out with the bathwater and get rid of the reserve calendar. I think it's fair game to ask whether the rationale for it still exists, all right? But I really wonder whether the problem's not with the use or the abuse of the system.

I think it's also critically important to understand the role of each participant in the process and the standards that apply as the process unfolds, both the administrative process and then what happens with the filing of the summons and then the case becoming actively litigated by the filing of a complaint. And I think different things come into play at different points in time. And Bev and I had a conversation on the conference call about presenting information. And so if a case is on a reserve calendar and it's possibly the subject of settlement, right, importer counsel is providing a lot of information to Bev. And the Justice Department. And in turn, the Justice Department's client, Customs.

Well, then the question becomes is, okay, how does this impact on discovery and why are some of the same sets of information being requested again. And it has to do with understanding the process. All right? And, as Bev mentioned earlier, there's Rule 11 certifications, right? And so what may be provided to counsel in the course of a settlement conversation does not necessarily—I won't—the word "efficacy" is not the right word. But it takes on a different stature when it's submitted informally for consideration, ultimately potentially leading to a 58.1 stipulated judgment on an agreed statement of facts, and whether it is subject to the Rule 11 certification.

Now, there are ways to truncate that process and make it easier for everyone, but I think it's a fair and legitimate question on the part of importer's counsel to ask, why do you need it again and is there a better way? But I think sometimes that question gets lost with, again, not taking a step back and reflecting about how the different parts of the process work.

I want to make a couple of quick comments about Russell's proposal here. The simultaneous filing of a summons and complaint cannot be fixed by a rule change. It's statute. And the statute says that 1581(a) and (b) cases are commenced by the filing of a summons. Now, it doesn't mean that the court can't adopt a rule, right, that complements that, but the commencement of an (a) or a (b) case by statute is by the filing of a summons only, and we have a similar circumstance in the trade area and the court has developed a work-around around that, but it's not just as simple as waving a magic wand and fixing a couple of words in the rule.

The automatic suspension or self-certification in automatic suspension I think also loses sight of an opportunity that exists, and it came about as a result of a couple of Chief Judge DiCarlo decisions years ago, where it asked the parties to juxtapose test case designation and suspension and consolidation. And the question is, if we go to an automatic suspension process do we lose the opportunity for some efficiencies that come about as a result of the consolidation process?

And for those of you who are not familiar, understand the very significant difference. In the test case designation and suspension process, the children cases, right, retain their individual identities, and each one of them has to be resolved based upon the outcome in the test case. Whereas, if you meet the criteria under the Chief Judge DiCarlo cases ostensibly you get consolidation. All of the entries get merged, for lack of a better term, into the lead case, and when you get a judgment, that governs the outcome on all of those. So there are certain efficiencies that absolutely already exist in the rules. I can't say that they're taken advantage of often, right, but I think the questions that Russell raises are fair for consideration. But let us not lose the history behind some of these. And if we're willing to take a look at their purposes and rationale, and they're still valid, that's one thing.

I do think that some of what concerns the bar is not the normative situation. It's the problems that result from anomalies. From the difficult or awkward case that's out of the box, that presents concerns. You know, much like the case that you had where you had the companion civil penalty case with a classification case, and that creates a lot of frustrations. And so, again, I think we need to be careful that when we go forward and we

examine these things—and it's appropriate topics for the court's advisory committee on the rules—that we not get caught up in the exception and have the exception start to swallow the rule, and then we find that we're inadvertently creating other problems that we haven't thought about because we're so focused on fixing the exception.

MR. LEO: Thank you. We have a couple of questions. I'm going to ask some moderator questions. Believe it or not, I was paying attention. So if anybody has questions, please forward them up.

Will, are there any—and the panel—any instances where you would absolutely not consider using mediation? Any type of case, any type of—

MR. SJOBERG: I guess in my—I mentioned in my paper (c) cases. And I know this is a Customs panel, but ADCVD cases you've usually got an intervenor and you're going to have, you know, probably three interested parties in there, and I think mediation can get awfully sticky. I know that people do settle (c) cases outside the court, you know, without mediation, so people do do it. But having a neutral third party in three separate parties, I think that that's a tough sell.

MR. LEO: Bev? Any thoughts?

MS. FARRELL: I think sometimes if there's an area of law that's a little unsettled we may actually want a decision from the court to help settle the area of law. And so, while mediation is nice for that once case, for purposes of the agency, the agency may actually want to get the court to actually speak on the issue because it may resolve other cases that are percolating.

MR. LEO: Russell? Any—

MR. SEMMEL: Never. Never mediate. Just fight it out. No.

MR. LEO: Russell's making his last appearance at these programs. Just kidding.

MR. SEMMEL: Obviously, not every case is amenable to mediation, particularly constitutional questions that might come in under (i). So I don't have a more substantive answer to that. We have to be prepared, of course, to go forward when questions like that arise, but I—mediation should be used to narrow the issues at every possible turn, I think.

MR. LEO: Judge Gordon, any thoughts?

JUDGE GORDON: Well, again, you know, I hearken back to what I said earlier. If you have a broader perspective on it in terms of what judicial engagement and involvement can do, then I think the answer is, it has broad applicability.

I would—I want to comment on something that Will said. (c) cases are a difficult area because there are antitrust implications for conversations between the domestic industry and the importers of foreign manufacturers. And so while certain things may have, shall we say, a kneejerk appeal to judicial engagement or mediation, you have to be careful of the consequences in other areas.

MR. LEO: Thank you. We're going to—I'll take a couple of questions because we have some time. Yes; this is my natural hair.

Okay. This one's for Bev. "How does DOJ perceive its role in the process of litigation?" And I don't—I think it was meant—and whoever wants to—whoever wrote this, if you want to correct me, but I think this is meant in the idea of streamlining litigation in the court. "How does DOJ perceive its role in the process of litigation? Is it, one, whatever it takes to win? Two, whatever your client, Customs—" CBP, excuse me; showing my age—"says, irrespective of its merits?" Which was a nice word instead of what was written. "And, three, getting to the correct result?"

MS. FARRELL: Right. Yeah. I mean, it's a no-brainer. It's three. I mean, it's just that simple.

As Department of Justice, you know, your job is to do justice. And so, I mean, I at every turn will try—I mean, if we think that a client's agency's position is not correct we will work with the agency and talk and talk and talk, and—because our job is, at the end of the day, we represent the United States. Our job is to do it the right way and to get the right result, period. That is the ultimate.

MR. LEO: Okay. All right.

JUDGE GORDON: Bob, before you leave that. I think it's important to differentiate and talk about (i) cases that involve CBP. In deference to our—to your friend Barbara Silver Williams, when she used to be on these panels, she really talked about engaging with plaintiff's counsel, particularly in an (i) case, about streamlining. About streamlining. And about under-standing what it is you're asking the court to do, and not get caught up in the formalities or the kneejerk formalities of come in for a TRO and a PI. But if you want expedition, to pick up the phone and call the ITFO and have a conversation and figure out if there is a way in which to save both parties a lot of time and aggravation, wisely utilize the resources of the court and not just go through certain processes for the sake of trying to get expedition when, in fact, there may be no good that comes from it and what you really want to be able to do is engage in a conversation about a process, about how to have an expedited schedule, and how to get the necessary documents in the hands of both the importer's counsel and the Justice Department in order to get to a just, speedy, and effective resolution.

MS. FARRELL: And that's a really—that's a terrific point, Judge. As a matter of fact, when Barbara was there, she—we had two cases where there were potential TROs, and indeed it was your firm. And what the firm did was they contacted—

UNIDENTIFIED SPEAKER: Russell's firm. Not—

MS. FARRELL: Yeah. It was Neville Peterson, and they contacted us in advance and they said, "We are anticipating that we're going to need to file a TRO." And we said, "Well, what's the problem?" And the problem was described. And we said, "Well, you know, give us a day. Give us two days before, you know, before we burden the court. Because this may be something we can resolve."

And we have one case where—it was a really strange case, and it just seemed unfair. It was someone trying to take a broker, a broker's test. And it just seemed unfair that this person wouldn't be allowed to take the broker's test. And we said, "Well, just give us a second. You know, before

you jump and file something, let us do—you know, give me a day. We'll do some research." And we found great case law. It was buried, but we were able to get this person to take his broker's exam without having a TRO or anything.

And you're right. That's exactly Barbara's approach to this, was let's talk first, particularly if it's going to be a TRO or preliminary injunction or any kind of strange type of litigation that's not the norm, and see whether or not it's something that's resolvable. Because it may just be.

JUDGE GORDON: Right. And one of the things you have to remember, and it's not so easy in the heat of the moment. You cannot obtain, as a provisional remedy, that which is your permanent relief. And so going through the exercise may be important for your client, right? But what's your goal? What's your objective? And your goal and objective is to try to get the merits of the concern before the court in the most effective and efficient manner. And going through the process of a TRO and a preliminary injunction may not necessarily get you what you want, and only spends your client's money and the government's resources and the court's resources in a way that's not going to get you further down the pike to where you want to be.

UNIDENTIFIED SPEAKER: You and I have a case right now with a broker penalty—or—yeah, a broker penalty case, where, you know, we're not able to settle with Customs because litigation has already begun, and—

MS. FARRELL: Right.

UNIDENTIFIED SPEAKER:—you've gone back to the industry to see what we can work out without continuing through litigation.

MR. LEO: Thank you. Two questions for Bev to start on, and I'm going to combine the two because I think one leads into the other. "How does DOJ encourage its lawyers to streamline cases and to look for opportunities to do so," and then, as a subset of that, for—I'm going to say, "For example, is DOJ amenable to settlement, meaning prior to a complaint being filed?" Which kind of leads into what you just said.

MS. FARRELL: Well, sure. I mean, it depends. So much of it—I think it goes back to what Judge Gordon was saying earlier, which is communication. Most of the problems that happen in life are a breakdown of communications. There are some things that—you know, there's some strange event and you contact DOJ and we can hear you and we'll say, well, maybe—you know, maybe there's a way of resolving this where no one needs to file a lawsuit because, you know, there may be case law on this or there may be an elegant solution to the problem.

So obviously I don't—look, I don't speak for DOJ, but I can tell you what my experience has been. We're not interested in making life hard for people. If there's a solution, we want to try to get to the solution more quickly. You know, I have cases where I'll pick up the phone and I'll call the other side and I'll say, "Is this—what exactly do you want in this discovery? Because it seems to me—it seems overly broad, but I think I know what you want. Let me ask you if this is what you want."

"Well, yeah. That is what I want."

"Oh. Okay. Well, when we produce this to you we're going to say, in our production, this how we're going to—"

Randy Ferguson and I had a case where he said, "No, no. I didn't want all that. That's okay." I said, "Well, what did you really want?" He said, "Well, I saw something in the file in the port and I want to get my hands on that."

"Oh, okay. Well, that's easy. We're going to go find that and get it to you." I mean, that's really, I think—we are officers of the court. I mean, all of us are officers of the court, and we do have the Rule 1 obligation, to try to move these cases as efficiently and as fairly and as justly as possible.

Now, it's easy for me because I'm Department of Justice, and so I have the luxury of doing the right thing. That's my job. My job is to do the right thing. And that's what we try to do. And I will say, as an office, that is the culture of our office is to try to do the right thing whenever we can. And if people bring—I'm telling you, there were at least two cases, there may have been three, that we had these really strange, weirdo things. There's another one that was stuff we stopped at the border. "We're going to have to file a TRO."

"Give us a chance. Let us work with it." And it was resolved. So these—again, it's communication can lead to resolution. Now, that's not every case, obviously. You know, we do go to the mat. When we believe we're right we will fight you tooth and nail. Because we have an obligation to getting the right answer and we have an obligation to our client and we have an obligation to the revenue to the United States. So yeah, if we think we're right we're going to go tooth and nail, but we're going to fight you fair and square and, you know, if it works out we'll win.

JUDGE GORDON: Now, Bob, in my former life as clerk of the court, I probably settled hundreds of cases that were involved in the suspension disposition calendar, and I kind of want to come back to a couple of things that were said earlier.

Let's take a realistic assessment, right? Merchandise gets imported into the United States. The entries are filed. The protests are filed. It goes through the administrative process. It gets summonsed into court. Eventually there's a test case and cases are suspended under it, CIT makes its decision. Goes up to the court of appeals. And so you are clearly several years down the road. And one of the things that I observed over time was this issue that Bev alluded to earlier, staleness of evidence. The reality is that, again, some common sense would help.

Time and time again, where I saw things break down in the settlement of cases pursuant to a suspension disposition calendar was over communication, and a lot of times the communication problems existed because information that was perceived to exist legitimately, either by importers' counsel or by the government, for whatever reason, sheerly because of the movement of time, was not so readily accessible. May not even exist anymore.

And so the question is, how do you make the process more efficient? Well, sometimes you have to spend a little time and money up front to preserve information so that you can be in a position, if you get an

affirmative decision, to be able to resolve the cases in an efficient manner. The reality is, if you can't lay your hands on the information, there's only one of two things that can happen. Right? Either the case is going to have to be voluntarily dismissed or somebody's going to have to go through and re-create the information and ultimately certify it, which means somebody at Justice has got to look at it, somebody at Customs has got to look at it, and that's time.

And so one of the things that may be beneficial to think about is the preservation of information, particularly if you're moving down a road where time is going to take away the evidence that's fairly relevant and going to enable you to resolve the case down the road, assuming you get a positive outcome from the courts.

MR. LEO: We have one more readable question, then we might be able to open it up. And this is—we're sparking some ideas here. The questioner would like us to comment on the following, and he or she has the points that he or she would like us to comment on. "Abolishing the reserve calendar is a terrible idea." I think. "Eliminates the period for stipulated cases or settlement."

Two, "Reserve calendar is a cushion for importer to make final decision on full litigation."

Three, "Per Bev Farrell, it allows for preservation of jurisdiction." Question, "What is the harm of an 18–month reserve calendar? Elimination would result in unnecessary protective complaints and glut the court."

And, because it's a lawyer question, it's two sides. "What would elimination accomplish?" Comment? Oh, that says, "Please comment." Oh, thank you, Will. "Please comment." Russell, you're up.

MR. SEMMEL: Oh, was that my topic?

MR. LEO: Yeah. I think it was.

MR. SEMMEL: I might have to ask you to read back a couple of those. I was writing them quickly.

This panel discussion today is about streamlining cases, and in my short—relatively short experience with Customs cases, the least streamlined aspect is the reserve calendar. Importers have reasons—have their reasons to delay, some legitimate, some not; some from the importers themselves, some from counsel. And simply, this distracts from the substance of the case. The calendar was, from my understanding, was established in response to the Customs Court Act of 1970. Please correct me if I'm—

JUDGE GORDON: Right. And what happened then is there used to be an automatic referral of every denied protest from Customs to the court, and in 1970 that legislation imposed, for a very modest fee of five dollars, the requirement that if you wanted to challenge the denied protest you had to file something with the court to invoke its jurisdiction, and that was a summons. And you know, clearly from 1970 to today the dynamics of Customs litigation has changed dramatically. And from, you know, a five dollar summons as compared to the $200 and something dollar summons today, I mean, there have been a lot of changes. Duty rates. There was a lot larger spread then than there is today.

The size of the reserve calendar is substantially different today than it was then. Back in those days the court was obliged by the court rules to serve as the calendaring secretary for every law firm and send you a notice 30 days prior to the expiration of the calendar. The court made a policy decision, "That's not our job. You're responsible for managing your own calendars." All right? So there's a lot of history. You've heard my views earlier on this.

You know, if the bar wants to tackle this issue, you know, it's fine. The court's only going to get involved in it once there's a recommendation that comes from the court's advisory committee. If the reasons for the reserve calendar are still valid, great. If they're not, it doesn't mean that things can't change. But there's a lot of history behind the reserve calendar, and understanding its purpose and its rule. And again, my question is, is it the rule or is it the use or abuse of the rule, and there's lots of participants in the process who all have an element of accountability. And just because there have been some anomalies or exceptions doesn't necessarily mean that the rule is a bad rule.

MR. SEMMEL: When the exceptions take place, I might say they seem to take a lot of time and distract a lot from the case itself. And a lot of the benefits of the reserve calendar—preserving jurisdiction, for instance— aside from the very first case, can be had on the suspension calendar as well. The government will lose none of its rights to challenge the cases separately later, and in the proposed rule there are ways to take it off the suspension calendar in the circumstances where it's justified.

The question was why would we dispose of the reserve calendar, and the answer is that it no longer serves a purpose that isn't more easily served elsewhere, in my opinion.

JUDGE GORDON: Well, look, I have no skin in the game, you know. I mean, seriously. I mean, you know, the court's in a reactive position on this, for the most part. I mean, this is a bar issue that you all have to debate and discuss and figure out whether there's a need for a change. Wholesale or otherwise.

MS. FARRELL: Although I will say—I mean, we get assigned cases and we don't make—you know, we get assigned when a summons comes in, gets divvied out, and a lot of times it doesn't end up as a complaint and it doesn't end up as a case. And I'll see, in my mailbox, where someone, you know, has a Rule 41 dismissal. So it wasn't on the reserve calendar and then it was dismissed, where clearly the importer and counsel to the importer, you know, did their cost/benefit analysis. They had preserved their statute of limitations. They did a cost/benefit analysis and the system worked. They decided this case wasn't the case to go forward on, and next thing I know I see it in my mailbox; it was dismissed. I cheer when I get those. I'm so happy.

But to me, I see that the system is working. So I—there's, you know, there's a cost/benefit analysis here, and it would be a terrible thing to force someone to maybe try to make a statement that, "Oh, suspend me under this case because I'm just like this person." Well, that's an assertion that I'm like that case, and that could be a little scary if I'm not. So, and maybe you're just trying to get suspended somewhere. So the reserve calendar is

a nice safe place where you don't have to make any assertions yet, where you can really think about your case and do justice by your client. So I don't—you know, I can see your point, but I can also see the other side of the issue as well.

MR. SJOBERG: I don't think the debate should be set up as an either/or. I think there's legitimate concerns, and the question is, does the system need to be tinkered with a little bit or a lot in order to fix what the perceived concerns are. And does the data bear out the concerns.

MR. LEO: Okay. One last question. Bev, "True or false."

MS. FARRELL: Truth or dare? No, no; I'm not playing that game. No way. No.

MR. LEO: "True or False. It's difficult to settle cases because it's easier for DOJ to do a summary judgment motion than it is to write settlement recommendation memos on different settlement offers to Customs and DOJ supervisors." I am just the messenger.

MS. FARRELL: Listen. I don't want to do that summary judgment motion any more than you do. If I'm able—you know, if I'm able to get a case—if a case truly should be settled then, you know, we'll work on getting the memo done and moving it on and getting it approved. So sometimes it takes a little while. I mean, sometimes you'll send a memo up and people want changes in it. So, you know, it's a little bit of a bureaucracy. You know, we're dealing with the government, so there's a little bit of bureaucracy there but, yeah; no, no. I would never—please. I have so many summary judgment motions I don't need any more. I'd rather do the memo if the case can settle.

MR. LEO: Okay.

JUDGE GORDON: Bev, can you take a minute to describe what the settlement process is that you have to go through? Because I think it's important for the audience to understand the degree to which this is a DOJ silo and the degree to which it's not. And there are various settlement authorities that come into place also.

MS. FARRELL: Right. You know, in the first instance obviously—oh, five minutes? In the first instance, there is the issue of have we gotten enough discovery, do we have a sample, do we really know what this case is about. And then, if we reach the point where we decide, "Hmm, this looks like a case that is amenable to settlement," first, you know, you got to go to your client. I mean, I have a client that I serve. So my client has to be on board, just like your client would have to be on board if you were going to settle.

Now, there is an overarching theory that once the case is with the Department of Justice we have the final say. But, you know, I'm dealing with an agency that does this day-in and day-out. And so there's an expertise there. They know an awful lot more than I do, so I need to listen to them. And you know, if I see a disconnect we can fight it out. And if you've done your job, you've provided me with the tools for me to convince the client if that case ought to settle.

So first we go through the Customs, getting Customs on board, CBP. I still call them Customs, too. Getting them on board, that they're comfortable that this is a case that ought to settle. And then, depending on the value of the case, that has to go through an approval process. So they have to work through their approval process, and it could be, depending on the amount of money it could be the highest levels of their agency have to sign off, so it has to work its way through several sets of eyeballs, each set of eyeball approving, and they may want to send a memo back down, "Revise it." Send it back down. "Revise it." And then it goes up, up, up. So it works its way through the Customs silo.

Then I have to do the exact same thing and, depending on the value of the case, it works its way up through the Department of Justice silo. And so it does take time. So you've got one silo you're working through; that gets resolved. Then you take it into our silo and it works its way up, and they may send it back down and say, "Oh, I have a question about this, I have a question about that. Can you please expand on this concept for me, show me why there's really truly litigation risk here." So it does— unfortunately, it takes time. And the more value on a case, the higher up the silos on both sides we have to go.

So I know it's frustrating sometimes for you. Hey, I would love to be able to go like that and say, "Hey, yeah. Great; we're done. Woo hoo." But unfortunately, we represent the government and the government has very formal systems that we have to go through. You have so much more freedom with your own private clients than we do, because we just have silos we have to go through. So thank you for asking that question. Just so you all know why sometimes—I know you're frustrated, but just so you can understand why it takes time sometimes for us.

MR. LEO: Okay. Thank you, Bev. Lightning round. Any other ways to streamline, just like one word type of ideas that have come up during the course of this panel. There's no wrong answer. Other than reserve calendar.

MR. SJOBERG: Doing my research I ran across—

UNIDENTIFIED SPEAKER: No four-letter words.

MR. LEO: Yeah.

UNIDENTIFIED SPEAKER: Meditation.

MS. FARRELL: Meditation.

MR. SJOBERG: Meditation. That's one. In doing my research I ran across a very good article, by Larry Friedman. He suggests a Markman-like (phonetic) hearing for discovery disputes. Has it been published yet, Larry?

MR. FRIEDMAN: Yeah; it's on Brooklyn Journal International Law.

MR. LEO: I used to work there. Everybody read it. Anything else? Okay. Oh; sorry.

MR. SEMMEL: I just want to repeat this. That this article is meant to spark conversation, because there is clearly some problem with the reserve calendar that's bothering not only me, but others in the bar, and it's something worth exploring when, after nearly 44 years, I guess that it's

been around, whether it's still serving its original purpose. So thanks for entertaining the idea.

MR. LEO: And it was entertaining. Thank you. No; I'm serious. Russell, you will be invited back because that's the whole idea, is to spark thought and keep you all awake.

I just want to say one last thing as the moderator, besides thank you to Marcella once again. At the beginning I said, "What does it take to be a moderator," and you've seen it today. You surround yourself with better-looking people that are much more intelligent than you are, so thank you all, panelists, for all your hard work in getting it together, and thank you all for participating.

(Applause)

# AVOIDING THE BREAD LINE: TRADE REMEDIES FIXES WITHIN SHARED RESOURCE CONSTRAINTS

MS. KIMBLE: Good afternoon and welcome to this breakout session. This is Avoiding the Bread Line: Trade Remedies Fixes Within Shared Resource Constraints. Your moderator is Thomas Beline of Cassidy Levy Kent.

MR. BELINE: Thanks very much. See if this is on—can everybody hear me? Okay, so, this is the afternoon breakout session. I'm Tom Beline of Cassidy Levy Kent, Washington, D.C. Joining with me on the panel are some esteemed members of our bar who really need no introduction.

However, it's my duty as moderator to, in fact, introduce them. So I will go in the order of the "Honorables". So, on the far end of the desk is Senior Judge Don Pogue. Senior Judge Pogue was appointed as Judge of the U.S. Court of International Trade in 1995 and became Chief Judge November 1st, 2010. In that position he served as a member of the Judicial Conference of the United States. Prior to becoming Chief Judge, he served as Chair of the Court's Long Range Planning Committee and of the Court's Budge Committee. He also chaired the Judicial Conferences Committee on Administrative Office. Judge Pogue recently took senior status and stepped down as Chief Judge on July 1st, 2014.

Kathy Cannon is next on the desk. Kathy is a partner in the Washington, D.C. office of Kelley Drye & Warren and chair of the International Trade and Customs Practice Group. With more than 30 years of experience in International Trade Law, Kathy focuses her practice on assisting domestic industries that are experiencing injury due to unfairly traded imports, primarily through the use of anti-dumping and countervailing duty laws.

I should say I'm only reading the first paragraph because if I went on, the entire presentation we would be talking about these folks' accolades, which I commend their bios to you in the back of your program.

Dan Porter is a partner of the International Trade Group of Curtis, Mallet–Prevost, Colt & Mosle. He focuses his practice on International

Trade Law, counsels clients on a myriad of U.S. laws that effect cross-border shipment of goods including trade remedy provisions, export controls and customs regulations. Dan has assisted in defending numerous clients with exporting operations in China, Canada, Japan, Korea, Brazil, Indonesia, and Vietnam.

Finally, Michele Lynch to the right of me—is senior counsel for litigation in the Offices of the Chief Counsel for Trade Enforcement and Compliance at the U.S. Department of Commerce. Her responsibilities since joining Commerce in 2001 include defending Enforcement and Compliance's administrative determinations before the U.S. Court of International Trade and the U.S. Court of Appeals for the Federal Circuit. Michele is instrumental in the government defense of Enforcement and Compliance's administrative determinations before NAFTA panels, and various WTO panels and appellate bodies.

So, that's the set-up for while you're all here, and what I think is fascinating about our panel is we've got a government representative, two practitioners on both sides of the aisle, and a judge who has seen it all and I think still gets excited about the neat issues facing the court.

The panel's topic this afternoon is Avoiding the Bread Line—well, that's a subtitle I guess—and Trade Remedies Fixes within Shared Resource Constraints. And each of the panelists comes from a different background, so I'd like to pose a question to the panel, and I'd like to start with Michele, from the government's perspective. What is the world of limited resources look like today?

MS. LYNCH: Well, Deputy Assistant—can you hear me? I sound pretty loud up here. Deputy Assistant Secretary Marsh this morning, I think, threw out some nice statistics that demonstrate that almost every day at Commerce these days is triage. Right? Every single moment of every single day, including holidays and weekends, is consumed with work matters. And I see Matt smirking at me, but it's true.

We have an incredibly dedicated group of people at the Department of Commerce who really give their all to work on these cases—you know, at the expense of their own personal lives and their children's—you know, holiday parties and things—but he had some interesting statistics, and I just wanted to follow up on a few things given what Chris said this morning.

I told Tom that this year we had 387 documents go out. So 387—that includes prelims and finals—both statutory and regulatory, okay? Our percentage of ministerial errors was only three percent. I mean I think that's pretty good for an agency that's, you know, locked in a triage mode almost every single day.

I had our—now it's called Access, not IA Access—but our Access personnel ran some numbers for me last week, because I was curious how many submissions were filed every day on Access, okay? So the average of documents per day—since its inception, so that's about 2011—is 229 documents filed a day, okay? The average filings—which is slightly different because, you know, the filing can include a few more documents than just one—but the average filings since the inception is 156 a day. From FY14 the average was 180 filings per day that E & C receives.

So when I say triage—I mean, maybe in your own little limited world at your law firm, you don't quite, you know, comprehend what's really happening at the agency. But I mean that's 180 filings a day—not a week—a day that we see at E & C.

So, I mean, resources as Chris said this morning—I mean, I think we had a high perhaps of somewhere like 168/170 analysts maybe a decade ago, and I think this morning the number you heard was 115. A decade ago I think we had 60 investigations initiated. FY14, we had 52, but we only have 115 analysts to work on them.

So that's what limited resources looks like right now for our agency.

MR. BELINE: So, Dan, you're responsible for a lot of the filings that get filed. And you're also representing clients that are a target in the growing number of cases that Commerce has. How are you viewing it and how are your clients viewing it?

MR. PORTER: I guess the short answer is I want to do more filings. And the reason I say that is—is in the world of limited resources, the issue that sort of causes the most consternation for respondents is the issue of mandatory respondent's election. This is the Commerce practice of deciding that it cannot investigate all exporters which arguably the law requires. Instead it's only going to choose a few to essentially examine intently and those rates will apply to everyone else.

The interesting thing about this particular issue is that it's actually enshrined in the law. As everyone knows, the statute affectively agrees with the Commerce Department perennial complaint that they're overworked and underpaid and allows a bonafide exception to do a little bit less than what arguably is required. And so the statute itself sets out criteria for when Commerce can essentially apply this exception and investigate fewer respondents.

What's a little bit disconcerting for those of us who have done this a number of years is that Commerce has adopted a practice—you can almost say a policy—that we're only going to examine two in every single proceeding. Now that's just two respondents for—and those rates will apply to everyone. One of the things there's been actually not many cases at the CIT on this point, but over several cases the court has disagreed with Commerce on this.

Essentially the court says, "We don't agree with you that any number larger than two is large, because large is the statutory criteria for determining that. It's not practical to do all the cases." And yet, notwithstanding that there have been several court cases telling Commerce, "We don't agree with this," Commerce is still employing this practice, and that's probably the biggest issue for respondents.

MR. BELINE: So Kathy, on the domestic side though, I wonder if I can get you to agree with Dan on this? Is this actually something that domestic industry would like more respondents examined?

MS. CANNON: You know, there may be cases where we find there to be some potential exceptions, but I would say overall—and I'm going back to the theme of our panel here which is, "Are there resource constraints facing the agency and what do we do about them?" I think the answer to the first

question is yes, it's hard for anybody to have heard the statistics we heard Chris Marsh mention this morning and Michele supplement just now without saying, "Yeah, there are real challenges facing the agency these days."

So, if we try to go on with business as usual or trying to promote more and more workload by just saying go after more respondents or do something that's going to add to the burden we all are facing already without counterbalancing it, I don't think that that's the right framework.

So my view is that, yeah well, Dan and I may agree on a very rare occasion, that there—you know, that there should be some additional respondents looked at from time to time or that you should go beyond your normal framework. Overall I think you have to keep in mind that if you're going to try to do anything like that, you've got to do something to save resources.

And in my paper, that is why I've really been focusing on some of the things that I think the Commerce Department and the International Trade Commission might consider doing that would reduce resources. And I've focused particularly on situations where parties don't show up—where you get no cooperation at all—and the parties that do cooperate, the agency and the courts are left to expend significant resources trying to backfill a void in the record, if you will.

And that, you know, sort of writ large and we can get into the specifics, Tom, later, but that writ large is a fundamental area that we should focus on and target to try to address to deal with this resource constraint.

MR. BELINE: Judge Pogue, from the Court's perspective—and I think, you know, we hear this at many conferences that, you know, resources are growing scarce and issues are harder to decide and there are various things that, you know, people will cite to—you know, substantial evidence questions where there's a feeling by the agency that they're in an intractable position with the court. Is there something that from a fundamental structural standpoint we can do about that?

JUDGE POGUE: Well, clearly I'm going to have to spend more time on the phone with Dan, because if he's going to be making more filings on issues that may not be strategic, like the question on the mandatory respondent selection in any given case, then that's going to be a problem. It's going to be a problem because it may keep us from spending the time and the effort and the resources on the issues that are going to be key. We may end up spending time on issues that are going to have follow-on effect that is going to slow things down further in the process.

What I hoped to hear from Dan when he was answering your question was that the agencies turn to sampling might offer opportunities for improving the process. Now, he correctly in his paper has identified many of the weaknesses that may happen in the agency's approach. But what we all need to do if we're going to in fact use resources better is be more strategic in our thinking about the choices of the issues that we're going to be spending our time on and whether or not those issues can in fact bear fruit both for your clients and for us clarifying the law in the time before the first administrative review is determined when in fact it may matter

about that issue, and in a way that is not going then generate a lot more issues like do we have to change the separate rate and what's the country by weight going to be, but rather gets us focused where we need to be early in the litigation.

In preparation for this panel, I asked Scott to run the numbers for the last five years of cases for which we have complete data, so that's ending in 2012. And as has been our historic practice in fully briefed c cases, a little over 50 percent—53 percent—are remanded. So we are going to be identifying issues for remand, we're going to be sending them back to the agency to spend their time on, and we're going to have to do that better with less time and less money and we're going to have to get them focused better with less time and less money.

So we have a shared problem, and if I have to, I'll get on the phone and will try to talk about how to get them focused earlier in the litigation so that we know that we're going to do something useful with the time and money we've got.

MR. BELINE: So I guess what I hear you saying—and, you know, anybody else can jump in here though—is that there are some issues that are truly legal issues—threshold legal issues that will live through the life of the case? And there are some issues where it's a substantial evidence question that if the litigating party prevails, the order could go away? Are these the type of hard decisions that parties should be evaluating when they first bring the case or—

JUDGE POGUE: I think they need to but I think it's perhaps even more—you know, you heard earlier in one of the panel's discussion about so often the issue gets the focus is something that somebody feels is unfair. And, of course, you know, then you get—everybody gets riled up and gets charging on that issue.

And I think we all need to step back and say, you know, is this—as you just said—an issue that is being "teed up" appropriately now so that we're giving structure to the proceedings that are going to go forward. Or is it one that we really don't have to deal with now—we can wait til that first administrative review or how best to proceed.

MR. BELINE: So speaking of that, we heard from Deputy Assistant Secretary Marsh this morning about rule-making, and Dan and Judge Pogue, a little bit to the new respondent selection rulemaking on sampling, Kathy's paper refers to the statutory criteria for the application of AFA and why the agency might not go there and all of this fits into—is it the exception to the rule or is it the rule? And I guess what I'm wondering from the panel, and I'd be interested in hearing everybody's thoughts here, starting with Michele, is rulemaking actually getting us anywhere?

MS. LYNCH: I would have to say yes. I mean I think in the past two or three years, especially with our trade law enforcement initiative, we issued, I think, 14 separate rule-makings. Some of them were done as methodology; some of them were published in the Federal Register, some were just codifications of our general practice, right? All of this—a lot of it in an effort to, one would think, simplify the process going forward for the agency.

Tom's point seems to be that perhaps all the rulemaking really isn't leading to any simplification of the process. But I think if you were inside the agency trying to figure out, you know, when faced with 200 or 185 filings a day, how can we make this process work more simply inside, you start to see trends. So your rulemaking follows the trends and you're trying to figure out how can you have one—you know, the rule that applies generally—and then of course there's going to be exceptions on a case by case basis. Right? And that's just the nature of the beast.

MR. BELINE: Dan do you have any—

MR. PORTER: The whole issue of rulemaking versus case by case—there's a little bit of a tension. Our clients want to know what the rules are. I think every lawyer in the room would agree the clients get most annoyed when they ask for an answer and you write back, "It depends."

And so our clients would like to know the rules in advance, what they are, and therefore what the result is going to be. As a lawyer, I actually prefer the case by case, because it gives me an ability to argue that the rules shouldn't be applied as Chris mentioned this morning in a—my—or my client's particular situation.

The difficulty that I see that Commerce is sort of going through is they adopt a rule and, just from my view, there's someone at Commerce that says, "We have to apply this rule in all situations—no exceptions at all." And notwithstanding what Michele said, that's what we're seeing more and more. So then that requires us to go in very hard, try arguing exception, and then if not, go to the court and invariably the court will agree—I think it was Chris Marsh alluded this morning—that no, really the result was wrong here. I understand your rule, but the result was wrong.

So the question is if looking for efficiencies, I would just gently suggest maybe we can get Commerce to think a little bit more ahead of time about when it's appropriate to say the rule doesn't apply. We might save some same resources.

MS. LYNCH: Can I respond to that? Well, you know, I'm going to take a simple example, because this sounds like it should be so easy to deal with. Deadlines, okay? I mean how simple? Bright-line—it's due, you know—I know, for Commerce, at 5:00, right? You have to have it filed by 5:00—but it's due at 5:00. A hundred—and what was it—150 or 60 filings a day, and part of those are two minutes late, six minutes late, eight minutes late, four hours late, twelve hours late—really?

Do you know how many resources we have to devote to trying to figure out what to do with your six-minute late filing? Why? All right, why can't you—this is—to me that's something that's capable of being bright-lined, and it's capable of being followed, right? Dan's laughing at me because he's won a case recently when he was a few—more than a few hours late, I shall say, but not a whole day late, right?

So apparently he's the exception that proves the rule, right? So Dan and I are in a conference call and Dan's telling me, you know, "No, I mean, this was the right way—this was the independent thing. You decision makers should have done this." And I said to him, I said, "How do I do that all day long with 180 filings? Why can't you file on time?"

That's a very simple rule—file on time. And if you can't file on time, the rule permits you to file your motion, you know, for, you know, to extend on time. So file your motion on time. If you guys would simply do that, we could devote other resources to the substance and not so much to the process, right? And I mean, that's a simple fix I think.

MR. BELINE: I'll give Dan sort of a rebuttal and then I'm going to let you talk.

MR. PORTER: Sorry, just thirty seconds. But this very case that Michele's talking about—actually I think proves my point, okay? I admit—it was—it was—it was their first time in 30 years that our team was late on a filing. It was just the classic screw-up—we missed it. Realized it that night. Got in there early next morning. Had everything filed before 9:00—that, you know, the following day before Commerce got there.

And Commerce refused to allow an exception—assigned full facts—adverse facts—billed my client—so we had to go to court—spent all the time and energy going to court, only for the court to chastise Commerce for making this decision.

So, Michele, I understand what you're saying, you know, what's this—but the essence of being a decision-maker is making decision and recognizing there are some situations that don't—that don't—don't warrant an application of the rule.

MR. BELINE: I'm going to let Kathy try to—

MS. CANNON: Maybe I'm going to defend Michele so it'll be okay. I, you know—Michele and I had talked about this issue a while back, and, of course, there are going to be situations where somebody that's right, you know, and files 99% of the time and—take Dan at his word—is doing that, and something happens, okay? Yes, there are those instances.

However, we repeatedly see at Commerce often the same respondents and the same law firms asking over and over again, "I'm 10 minutes late—I'm one hour late—I'm two hours late. Oh, oops, it's two days later, and I forgot to ask you two days ago for an extension, and I need one again." And it wastes our time and it wastes your time.

We don't get the information. It delays the ability to develop the record. It really is something that has to be cracked down on. And I do think this is a great area for rule-making that would allow some very minor exceptions where there is something that's very aberrational, because something that's aberrational—a computer crash, you know, whatever, somebody gets hit by a car, a messenger going over to the ITC—I mean, things happen out of the ordinary, and you have to be reasonable and allow for that and not penalize a client for something unusual.

But we also are aware that there are patterns of behavior that are going on, and that's what's wasting a lot of the resources at the agency. And that's what I think at some point needs to be said, "No, we're not going to continue to accept your bids 12th request in multiple different cases for these extensions." Because it's dragging out the process and it's abusing—there aren't any deadlines once you get to that point after awhile.

JUDGE POGUE: This may actually be a situation where the process worked. That is, the agency appropriately used rulemaking to provide focus and to set the table and to set some limits. There were perhaps only one or two situations where it didn't anticipate they needed to provide a narrow exception that Kathy mentions. The court's adopted abuse of discretion standard for looking at those, which means it's going to be very high bar. So it's possible that this particular example is one that, you know, we're doing what we're supposed to be doing.

That doesn't mean that it's not important for us all to go back and look at the rules and say, okay, are these rules that are really still current, still providing the focus that we want them to provide, setting the table in a way that it should be, so that they are contributing to the efficiency of the process, and that we are winning in effect compliance in the vast majority of cases, and that the Court is providing the appropriate safety valve for when there were examples that need relief.

So it's possible, I think, that this process can contribute to the achievement of what we think we should collectively be doing which is making it—making us better—focusing our resources on what we ought to be doing.

MR. BELINE: So Kathy, this morning we heard from Commissioner Pinkert about ITC proceedings and how there is a general reluctance—and I don't want to speak for the Commissioner or misphrase what he was opining on—but that there's a general reluctance to apply adverse facts available in either original investigations or in some set proceedings because of the binary nature of the ITC's decision-making. It's either a yes or a no. And—as opposed to Commerce where you can have targeted focus, the AFA, the Commission is more reluctant, and it's also reluctant based on the collateral damage issue, right? So can you talk about that a little bit and what you see?

MS. CANNON: Sure. With all respect to Commissioner Pinkert, and this is not a view that Commissioner Pinkert holds alone—I know it's a view that a number of the Commission have held over the years—but the view has been that even though the statute has exactly the same terms, in terms of applying adverse facts available, when the Commission is looking at a void in the record as does Commerce, they face exactly the same language. While Commerce has used that statutory provision as a lever to address situations where the information is not obtained, it really hasn't been used by the ITC.

I cited my paper, you know, a couple of odd instances that are one "offs", and they're pretty dated as well, as to when the Commission has ever said that they should use that provision. And my understanding is generally that it's not as much the up and down nature of the vote but as the collateral effects—the effects on cooperating parties.

And to that I would say a couple of things. First, I don't see anything in the statutes that suggests that there's an exception for there being collateral effects. And the *KYD Case* of the Federal Circuit and some other cases of the Federal Circuit have basically sustained Commerce where Commerce has applied adverse facts available and there have been some effects on other parties.

So I don't read the law as limiting the Commission's ability to do that. It is a discretionary call, but the question has to be asked, you know, is the Commission proper to simply put the burden on the other parties—the cooperating parties, so effectively us—to come forward with that information?

And even if you take the Commission at the concern of collateral effects, what about in a case where you're only going against one country—say China—and nobody shows up? You really don't have anybody participating at all. So you don't have a cooperative party.

But adverse inferences still aren't used and, the consequence of that, going back to the theme of this panel, is the burden. So now, we have a burden on us, as petitioners. We have to go out and try to divine all the information on what's the foreign producers capacity, what are their volumes like—are they—capacity being unused? Are they likely to come here? Whether we're in an original investigation or a sunset review we have to, you know, satisfy those statutory tests.

And there's a burden on the Commission staff too. They're out trying to gather all of this type of information. So if you're trying to look at a place where you could save resources, it seems to me that an area where the law gives the Commission the ability to apply adverse inferences and save resources for them and for the parties that are cooperating, that would be a prime area that they might consider.

MR. BELINE: So, Dan, I'm going to "tee this up" a little bit differently for you in the sense that I have a feeling your initial instinct is going to be to say, "No the Commission's doing just fine not applying adverse facts available." However, let's say for the sake of this hypothetical that a company hires you and your skill team to defend the FBI to ITC. And their chief rival and competitor is not participating. And based on your ability to litigate, you're able to secure a favorable result. Is there any frustration with regard to your client as to expending resources when their competitor didn't have to?

MR. PORTER: I'm going to interpret your question as asking why—why respondents don't show up to ITC sunset. There are sort of two reasons: first is, everyone knows it is what it is. Trade cases generate winners and losers. And so you have after five years—you will have an exporter who has taken the time, devoted the resources, gone through the administrative review process, figured out all the sales, and has gotten the AD margin down to next to nothing. And then they—review after review, their doing— they're defending that, and that's fine. And then five years comes up, and so everyone else has a very high—let's call it 50 or 60%—and your client has a zero.

Well, your client—the U.S. Government has given your client a competitive advantage. Why would—why would the client want to say, "No, let's get rid of this and have all these other guys come in and compete for the sales that I've worked so hard to maintain over five years."

So, number one is, the people who have essentially, complied with everything, got their margin down—they don't want to turn around and get

rid of the competitive advantage the U.S. Government has given. So that's rule—why respondents don't show up.

The second reason is simply a matter of likelihood of success. I just went through this very exercise with a client. It's the largest exporter—what should we do? He's looking at a first sunset review. Simply go back and look at the numbers. When you look at the numbers though, look at the numbers of fully, sort of contested, sunset cases in which Kathy and her team are vigorously opposing sunset.

Well, if you look at the numbers, the likelihood of success—that is the likelihood that the Commission will terminate the order—is fairly low for a first sunset review. And it's even lower when it's against China. That's just the numbers are the numbers.

And so when you're—and the clients asking—they say, you know, "What's it going to cost?" And these proceedings are fact intensive so they take a lot of work—it's going to be somewhat expensive. What's the likelihood of success? Not great. The client opts not to go forward with the sunset review.

MR. BELINE: So Kathy, hearing Dan's perspective on the idea that some foreign exporters like the advantage in trade—how do you sort of manage your client and your client's expectations and your client's expenditure of resources to go through what could be a full sunset proceeding where no one else is on the other side of the ledger? How do clients deal with it?

MS. CANNON: It's a very frustrating exercise, let me tell you. I mean, when we have to show up at the ITC for a hearing, the time and money that goes into that is really incredible. Because, you know, regardless of the case we're in, if we are told we are in a full review, we're going to show up with industry witnesses. We're going to prep them very entirely. We usually go out and do a plant tour and meet with them so we can learn about their business. They've all had to fill out questionnaires. We've had to put in a brief that addresses every issue.

And there we show up at the Commission hearing and there's nobody on the other side of the room. There's nobody to argue against us. And so—sure, maybe we have an advantage there because we don't have anyone on the other side of the room, but, you know, how is that possibly worth the cost to us and to our clients to go through some kind of an exercise like that?

It's very frustrating. And, you know, they come back and they go, "Well, why did we have to do this? Why didn't we get an expedited review?" Because they know that those exist, and we tell them if nobody shows up, you know, hopefully we'll get an expedited review.

So this is another area where it really just seems to me that, you know, I can't imagine what circumstance would be extraordinary enough. It doesn't exist at Commerce. Commerce faces the same approach where it says if the responses of one side or the other are inadequate—well, if our side's inadequate, the orders are revoked. So that's the end of it. But if the respondent's side is inadequate—they haven't shown up at all—then Commerce does an expedited review. It's pretty automatic.

But at the ITC, there's a discussion, we have to file papers, and then sometimes we end up in a full review, and we're back at the full nine yards which is an incredibly expensive and frustrating process, even if at the end of the day, the order's retained.

JUDGE POGUE: Rather than focusing on the facts available question or the adverse inference question, would it be—I mean, because it's possible I'm sure that Commissioner Pinkert has it right—that in fact the context at the ITC is different than the context at the ITA. And that the effect of facts available, given the unitary nature of the Commission's determination, that the effects of using adverse facts would be much greater on cooperative parties than in the ITA's process.

I mean, this is possible. It's a factor. So might it make sense to separate out the two questions and say, "Could we agree between respondents and domestics that it makes sense at the ITC to have some kind of notice rule that allows us to make an early determination? No we're not going to go through the full-blown review. We're going to have an expedited proceeding." Rather than litigate the question of whether or not adverse facts ought to be a focus of the determination. I mean, might there not be a procedural solution that we can work on together?

MS. CANNON: Obviously, our ideal is that we would get the expedited approach upfront. And that's what we propose but—

JUDGE POGUE: Is that against his interest?

MR. PORTER: Let me—I want to make—I have to make a comment. I'm sorry, I'm sorry I have to make a comment about something Kathy said a little while ago. And she commented that in her view it was unfair that the Commission cares about collateral effect of adverse facts available and look, the Commerce doesn't, and that's unfair. Well, quite honestly, I see it the other way around. There are collateral effects on—

MS. CANNON: I said—I said unlawful.

MR. PORTER: Fine. I mean, the fact of the matter

is—

MS. CANNON: It's perfectly lawful.

MR. PORTER: The fact of the matter is the Commerce Department—if someone doesn't show up at Commerce Department, they find—do full facts available. Two-hundred and sixty percent. And what did they do? They take that and use the zero margin and apply that to everyone else. They're doing collateral effects of facts available on cooperating separate rate respondents—I think that's not fair.

And yet, you know—and so, that's the unfairness. I would be happy if the Commission took—adopted the Commerce Department's adverse inference approach and apply it equally to respondents and petitioners. Then we would have an equal field. But now you have the U.S. Government— when collateral effects affect domestic interests—we don't do anything. But when collateral effects affect the foreign interests, we apply facts available fully. I don't think that's right.

JUDGE POGUE: So it seems unfair to both of you. So is this a situation where it helps to take a deep breath and then see if maybe we can separate

out the issues and get some focus and move the thing forward? That's the question.

MR. BELINE: So, this is a fun colloquy. And I would be remiss if I didn't say that there are pads of paper on your tables and please feel free to use them and pose some questions. And we have a follow-up question from the audience now, which is: How many full sunset cases are actually done by Commerce and why do you think that number is so infinitesimal?

MS. LYNCH: You know, I have a lot of statistics.

MR. BELINE: There's a wager on who wrote the question. I'll take people's money after I quit or am done.

MS. LYNCH: I don't think—Kathy, I have no idea.

MS. CANNON: How many there are?

MS. LYNCH: Yeah.

MS. CANNON: Well, I don't have the number.

MR. PORTER: It is infinitesimal, I would agree with that.

MS. CANNON: Well, if you all choose to participate, they will—they will look at the facts.

MS. LYNCH: Yeah. I mean, if people participate, they participate. If they don't, they don't.

MR. PORTER: Excuse me—excuse me. Don, I have—Don, I have this—Don I can answer this by myself, don't worry, okay? Don't worry, I got this Don, I got this, okay?

MS. LYNCH: We have a heckler back there. Mr. Cameron, would you like to say something?

MR. PORTER: To make sure that Don's interests are—are fully addressed. Respondents do not show up at Commerce because there's absolutely no possibility—not even a likelihood—not even a possibility of prevailing—given that Commerce adopts the presumptions that they got.

Okay, Commerce basically says, "If your volume went down over five years or you have any sort of margin, game over." And that's essentially Commerce's—I think they actually put into a policy bulletin—and so why would respondents show up given that the game has been rigged ahead of time?

MR. BELINE: So people said—

MS. LYNCH: Well, I mean I—

MR. BELINE: Totally lost control here, so—I—I am going to move on, and I'd like to have a sort of repetitive dialog between Dan and Kathy. I'd like to have a dialogue between Judge Pogue and Michele on an interesting topic in Michele's paper and that is whether there are certain issues that could be certified for appeal.

Early on, in a case where it's clear that the agency has a view and the court has a view of the lawfulness of that view, and there's really no coming together. And when there is a coming together, it's the agency's sort of saying, "Well, you're right." And then the court then has to decide "Well is

that enough for me to affirm this decision for substantial evidence in accordance with the law with just the two word sentence of 'You're right.' "

I will commend Michele's paper on this, and I will also commend Judge Restani's publication in the Brooklyn Law Journal on this topic. But I'd like to start with Michele on her thoughts on this issue.

MS. LYNCH: Well, I think I forgot at the beginning to say these are my own thoughts. They're not the agency's thoughts. But, I think it's an interesting question. I mean I think the past few years we've certainly seen—not the numbers that I think that people assume that are out there. I mean with my limited research skills, I look to see third remand or three remands, right, in the past 2013/2014, and I only came up with six cases, one of which was the infamous *NSK Case* at the ITC, right? So, five Commerce cases where the word "third remand" comes up in Lexis.

So it's not as many cases as one might think where parties assume that the agency is being, you know, intractable, right? Perhaps from the court's point of view that might be what we're seen to be being, but it's, you know, we have a point of view—we're trying to get it across. I think the Fed Circuit has spoken in another one of the ITC's cases and said, you know, "If you think we got it wrong the first time, feel free to try to educate us again about why we got it wrong. And maybe, you know, maybe this time we'll understand what you're saying."

So we have a few cases like that, and I think that luckily for us, we have a pretty good track record on those cases. Once they get up to the Fed Circuit, more cases than not of those few cases that I'm looking at, we've actually prevailed at the Federal Circuit. So our intransigence, you know, has stood us in goodstead.

Of course, it's taken quite a bit of time to get to that point—to get to the Federal Circuit. So, you know, is there a way to get up on appeal quicker than how we've all been doing this. I mean, Judge Restani and Professor Bloom have a nice paper in the Brooklyn Law Journal on remands right now entitled the *Nippon Quagmire* where Judge Restani posits that we have to figure out a way to get finality or get to the final decision quicker so we can get up on appeal.

I don't disagree with the Judge at all, except how do you do that when you're an administrative agency and you have to have the opportunity to explain to everybody what your position is? Should it be after the first remand when it's clear there's a controlling interest of law that we see it one way, the court sees it another way? Obviously the judges get to be the arbiters of the controlling issues of law. Should we kick it up to the Fed Circuit as quickly as we can for decision?

I think in my paper I used the *GPX Case* just by way of example even though that was not an interlocutory appeal. But just to show that even when a controlling issue of law goes up to the Federal Circuit, it doesn't necessarily hasten the process. Because when that came back down from the Federal Circuit, we still had a number of issues at the CIT that had to be resolved. Right?

So I'm not sure there's a way that we can get out of this kind of weird, endless loop that we're in. But—

MR. BELINE: Judge Pogue, any thoughts?

JUDGE POGUE: I probably would draw a different lesson from *GPX* then Michele does. I think the problem was there that forces that operate didn't have confidence in the up bump process of the Federal Circuit. And I think after more recent experience, it's possible that the up bump process will be more available.

That said, I agree with Michele that our experience so far on trying to use certification for appeal hasn't been, you know, greatly successful. I've tried a number of times and it hasn't happened for the historical reasons that Michele reflects. But that too may be changing, now that we have a, you know, judges at that level who are more familiar with picking out the issues,

I think our responsibility in that process is probably to be clearer about when we're remanding or what determination we're making at the trial court level. If we're remanding just for additional or further explanation of it because we can't affirm something on the basis in which—for the reasons that are given—fine. You know, we do a remand, we get the record clear— that's not an occasion.

But if in fact we've made the determination that what the agency did was unlawful, as Judge Restani mentioned this morning—that based on this record, you can't reach this conclusion. Or as a matter of law, this is not a reasonable determination. Then we may be able to "tee it up" for a more immediate appeal, and I don't think there's anything in *Nippon* that says that we no longer have the ability to make the declaration that determination is unlawful.

Just the contrary. I mean *Nippon* had to do with weighing evidence. It didn't say that it wasn't in fact our continued responsibility to say when a legal issue or even substantial evidence determination based on a specific record was lawful or unlawful.

So there may be room going forward to use the certification process to expedite in a way and make more efficient determinations.

MS. LYNCH: Well, just to follow up with the end of your question—if that happens—I mean if as Judge Pogue posits—the court tells us that what we've done is unlawful and remands it back to us to do what is then deemed lawful, should it be up to us to supply the rationale for that? I mean, that's the last part of your question, right?

MR. BELINE: Uh-huh.

MS. LYNCH: I mean, we've been told it's unlawful, so what is it that we're supposed to now provide in our remand determination to demonstrate that it is in fact now lawful?

JUDGE POGUE: Well, it would depend on the context. If you have to then reopen the record because on that record you can't make that determination, then you reopen the record. Or if it's a legal question, obviously—then it's—it's another ballgame.

MR. BELINE: I think, you know, on this point though, it's important— you know, I'm thinking for the legal questions, it's going to be—you know, *Chevron* step 2—right—their reasonableness and on substantial evidence,

you know the agency can just throw out another theory as to how it's on substantial evidence. And it may not be apparent to everybody in the room, but the agency has to go through and enter agency process in order to appeal. And they need to make a compelling case to the Solicitor General when they go through the appellate process if they're going to appeal.

And oftentimes, it's folks like Dan and Kathy who are carrying the water for the agency on either the first or second remand. So, how do you deal with questions from the Federal Circuit at oral argument where we all have been which is—you know, the elephant in the room is—where's the agency?

MS. LYNCH: Well, actually we're sitting right there watching the argument right? Just might not be at the table but we're always there, right? I mean we're always there. But as Tom says, there are compelling reasons for why we cannot be in every case that we would like to be in. I mean, we have to go through the Department of Justice, we have to go through the SG's office, and occasionally, they thwart our efforts to appeal. You know, they have a more global or a higher examination of the government's cases than my office does, certainly.

And—but, you know, I would posit it to you that in those cases where we don't appear at the Federal Circuit, we have a much better victory rate than we do when we actually appear. Might seem shocking to some of you. I mean, I know it seems shocking to me, because I know the judges look out and they see the whole little line of Commerce lawyers sitting there, and they're wondering why isn't Justice sitting right here in front of us talking, right?

And then we go back and the next day, "Hey, guess what. It's Rule 36'd in our favor." We feel victorious. You know, we're not actually there, but—so I do think that's rather ironic.

MR. BELINE: Dan, would you—

MR. PORTER: Couple of comments—first, I happen to agree with— Judge Restani in her paper made a comment that the way the process sometimes is, it makes it seem that some of the court going after a trade decisions might appear to be hollow. And I agree that that is a problem. I don't know what to do about it given the Federal Circuit's sort of current state of how they want things done.

But on taking the invitation whether given or not from Judge Pogue about how do we go forward—I would propose—a little bit—and I haven't cleared this with any of my colleagues so this again is just me—is the idea that the agency gets one chance to essentially see if it can correct itself and explain to the court why it took the action, why the determination—if it's supported by substantial evidence.

And if it does not convince the court, that's it. I like the idea where Judge Restani says—just the court would issue a decision; agency you're wrong. You're determination's unlawful or it's not supported by evidence. Case over. Anyone wants to appeal, they can appeal.

And I think that would generate more efficiency than this back and forth which can be endless remand. Just to note, the *Nippon Steel* case which Judge Restani talked about—we did not get a Court of Appeals decision

which sort of ended the case until after the first sunset determination was issued.

And you know for clients who believe very strongly that the ITC's determination was wrong, they should—ADOR should not have been imposed—that's tough to sort of explain to them why it took so long when they have two commissioners disagree with the evidence, the Court of International Trade said they didn't think the determination was supported by substantial evidence, yet, the whole thing took more than five years to conclude, and I think that's a bit tough.

MS. LYNCH: Well, I guess we're all in agreement that this back and forth with the remand process is frustrating and that's an issue we've been talking about for a long time and struggling with how to deal with whether it's certification of issue or what have you. I think trying to move forward with that whether it be we may need a change in the law, I'm not sure, certainly a change in the practice. But I think the issue that you raise, Tom, about what do you do when the government has sort of been pushed to the side and now the parties in effect become arguing for the government.

I've been in that situation on both sides, and it's

very interesting. I think that the hardest part is for the appellate court to wrap its mind around it, because it's struggling with why the government isn't there. The government should be there defending it, and so part of the backdrop somehow has to be to get the Federal Circuit to understand why we've gotten where we've gotten and why the government is softer or not present at all on a particular issue simply because they were not in agreement with the result that was ultimately dictated by the court.

And it does raise questions about, you know, is this new remand decision possibly sustainable, because it's obviously a decision that's being issued under protest without some of the background to it. So it puts everything in a very difficult situation, and I think that probably the better alternative is to try to certify particularly if it's a legal issue and get that resolved rather than force everybody to have this artificial construct, and then try to wrap facts around it that were never really analyzed by the agency in the first place.

MR. BELINE: Okay, so any—I'll take a second to ask are there any questions from the audience? People can write them down and pass them up, but I'd like Judge Goldberg I'll give you—to ask without having to write it down, please? So, does anybody want to second that? Well, now that we've solved all those problems. So turning back to—very true. So turning back to respondent selection, a little bit, because I think that this is an interesting issue that could arise which is—Dan's paper discusses how Commerce is sort of wedded to the analysis of Customs and Border Protection entry information for its respondent selection, and for making determinations as to who is going to be examined. And Commerce has refused to conduct—what would be in Commerce's mind, a fact intense affiliation analysis to determine whether parties would be affiliated and therefore be the largest under the law to be selected.

What occurs to me with this though is, one, that's a very heavy substantial evidence question—the very beginning of the case. And two, let's say

that you don't convince Commerce to proceed with that. Now you're on appeal and it's after the initial review's been over, and it might have been extended, and it's 545 days later, and you're on appeal, and you have this issue now about—I want to argue that you should have filed us affiliated with somebody else and we should have been selected?

I think it really poses a question as to one, whether that's the right time to have that or whether we should have interlocutory appeals of respondent selection or, you know, on the court side of things for Judge Pogue, whether there's a real issue for the court in that sense to say, "You know, Commerce you did the whole review wrong even though we're, you know, halfway through year two, go back and do it all over again."

So Dan would you like to start with that since it's in your paper?

MR. PORTER: I'll start, but you have a lot of issues there, Tom, in one question. Let me take a step back—we need to distinguish two important issues first. Does Commerce have the obligation to go out and investigate affiliation before deciding mandatory respondents? And the second question is if Commerce is given the information before it makes its decision, does it have any obligation to look at that information before it makes its decision?

Quite honestly, Tom, because Commerce does not do the second, we don't even need to discuss the first. And where I have a little bit of an issue with Commerce is that in a couple of cases, where respondents have come in—dutifully—Commerce gives a process—they say, "Here's the customs information. Give me your suggestions on who should be a mandatory respondent."

Within the time that Commerce set—no extensions, no filing late—within the time, we go forward, we give all this information—we give corporate documents, we give sales documents, everything—showing there's an affiliation between Exporter A and Exporter B and Exporter C. And we say, "You've got to collapse all those, and when you collapse all those, it becomes one single entity and they're the largest and you should pick them."

And Commerce says, "No, we're not going to even look at information that was given to us on time." And I think—I think that's wrong. And I think that, quite honestly, it does not comply with Commerce obligation to base their determinations on substantial evidence at the time they make their decision.

So the other comment I just want to quickly make and do one past a hundred—this is definitely one of the few issues which I could say capable of repetition yet avoiding review. Why? Because it's just unlikely that they're going to be many exporters to take it all the way to the court under the normal court process just for the very reasons she said. By the time they get it, it's going to be 2/3, you know, into the third or second review.

MS. LYNCH: I think it's impractical in an original investigation to try to do an affiliation analysis upfront because you're running a time clock. I mean we're constantly frustrated in original investigations how long it takes for Commerce to get the questionnaires out to begin with, and then once they go out, there's your extension—everybody gets an extension for however many days. And so, we're waiting, waiting, waiting to get that

initial questionnaire response just if Commerce does nothing but picks the top two under the CBP data.

So even on that accelerated timeline, we're usually backed up and then we're starting with round one of the deficiency and round two of the deficiency. And—and if you tried to do an affiliation analysis at that point, I think it would spend—you would spend so much time because it's not—I mean, there may be a rare case where it was very straightforward, but it most cases, it's a hotly debated complex issue. And we're spending a lot of time going through the whole analysis whether two companies are affiliated, whether they should be collapsed. This could take, you know, months and months to go through.

So how you would get through that in time to actually have Commerce do the investigation that they need to do under the statutory deadlines that are set, I don't—I don't know. I don't think it's feasible. I do think though that if that kind of an issue comes up it's probably better to be raised maybe in an administrative review context, where you have a little more flexibility and where something could be starting to build on the record earlier in the case.

But I just don't think that under the time constraints that they're facing—they would be skipping over other critical information down the road if they're were to have wasted a lot of time upfront sorting out affiliation, I think Dan.

JUDGE POGUE: And it may be that they're really, once again, different issues involved here and that if you tease them out, they'll—at the preliminary level, we may only need to know whether or not Commerce has considered the effect of affiliation—sort of the possibly of the effect of affiliations—in making its data choice. You know, whether to use CBP data or whether to send out Q and B questionnaires. And if they have considered the importance of affiliation in that context, then they might have well made a perfectly reasonable decision and we can move forward.

It may be a very different question to ask them to conduct an affiliation analysis upfront, which of course would have a lot more consequences.

MR. BELINE: Michele, any comments from the agency?

MS. LYNCH: No, I'm going to stay away from the merits of this one.

MR. BELINE: Yeah, you're looking at—you're flying over there—you're sending signals.

UNIDENTIFIED SPEAKER: You can't just pick up (indiscernible) point of view. You've got to think of the other point of view (indiscernible)—

MR. PORTER: No.

UNIDENTIFIED SPEAKER:—come forward with the ones that want to be fixed, if you don't want to come forward and let the petitioner try to noodle that out and bring that information.

MR. PORTER: Chris; sorry. I'm going to have to—I have to—

UNIDENTIFIED SPEAKER: Nudge your mom and dad?

MR. PORTER: No. Chris; no. No, I'm—

UNIDENTIFIED SPEAKER: (Indiscernible) they have to excuse the world (indiscernible)—

MR. PORTER: Okay. Chris; no. I'm going to respond. Okay? And I'm going to tell you why I think—you know, it's one thing for Commerce to have this rule that we're not going to look at anything about affiliation, mandatory respondent selection. But quite honestly, what Commerce is doing is they're applying that rule when respondents want it and are giving an exception when a petitioner wants it. And I'll give you a *bona fide* example, and that's the *Sugar* case. Okay?

The *Sugar* case, if you just look at it, the top two were not FEESA Mills. Okay? And everyone knew petitioner filed the case against FEESA. Okay. And the basic petitioner—correctly, in my mind—went and said, "If you're not going to do FEESA, what's the point of the case?" And so then Commerce comes up. "Okay. Well, now we'll look at, you know, potential affiliations." And sure enough, you look at affiliations, FEESA is the largest exporter. So they did it in that case, but they refused to do it when respondent said, "Look it, we want to combine the three together so that the largest can actually be done."

So I'm sorry. I don't think this is an issue of me not seeing the other side. I see it as an issue of Commerce having a rule and applying it very originally when respondents want an exception, and when petitioners wanted an exception they seemed to somehow find an exception.

UNIDENTIFIED SPEAKER: I would refer you back to our memo (indiscernible).

MS. LYNCH: I'm going to advise Mr. Marsh to—

UNIDENTIFIED SPEAKER: Yeah; that's good. We made it a note to the file.

MS. LYNCH: That's what I was going to say. Let's—I think this case is still open, so let's just like not talk about it.

MR. BELINE: It is. And the respondent selection was right.

UNIDENTIFIED SPEAKER: No.

MR. BELINE: The respondent selection was right in the case. We're okay on that.

MR. PORTER: It was, Tom. In that case, it was right. It did make sense. It's the inconsistency that bothers us.

MR. BELINE: That's right. So we have another suggestion from the audience on speeding up judicial review. And I think this is one that's quite interesting, and I'd like to hear the panel's thoughts. "At the agencies, both Commerce and the ITC, parties file briefs, respond, and have hearings within a matter of days or weeks." Weeks on the long end, really. "Could we speed up judicial review by adopting similar deadlines?"

UNIDENTIFIED SPEAKER: Ooh.

MR. BELINE: So the workaholic among us, raise your hands.

Judge Pogue, do you want to take it first?

JUDGE POGUE: I don't know that I have an opinion on that question. I certainly do think and have tried to speed up review by getting more focus early in the proceeding, and I think we have to do that. Whether or not we need a hammer in the process to make that happen? I'd send that to the advisory committee.

MR. BELINE: Dan? Kathy? Any thoughts on this?

MS. CANNON: I mean, I'd love to speed up review. I think we'd be all for it, as petitioners. If we lose a case, especially if we lose at the ITC, we don't have an order, and our clients—we brought the case so that they could get an order, so whenever we're in that position we're working as hard as we can to get that corrected.

MR. PORTER: I would agree with Kathy. We all want speedy judicial review. There's no question. And unfortunately, the court also has limited resources and I think they're doing the best they can. But there's no question from the litigant standpoint, we want to go as quickly as possible.

Just note, though, that the question of whether we actually have limits in a given case is always driven by the court, not the parties. You know, when we negotiate a scheduling order, that's not going to be changeable except in exceptional circumstances. Virtually always, it's the court that has led to those negotiations. The parties prefer, in general, to keep the option of control over the timetable themselves, and so I'm happy to engage in the process and see if we can get a consensus on how to move things up, but—

MS. CANNON: Well, if nothing else, Judge Pogue and I have had conversations in the past about perhaps one of the most important aspects is perhaps speeding up litigation on investigations. Right? Because when the investigation litigation drags, by the time the court actually—for Commerce cases, right?—agrees that whatever the respondent party is, is above *de minimis*, is it's in the order, and comes up with a new number, we could be on the third review, the fourth review, the fifth review. What am I supposed to do with that number? Right? I mean, five years have passed and now you've agreed that what the cash deposit rate was from five years before. Right? Where does that number fit into the sequence of events, you know, now.

So I don't think there's any one cause for why the investigation litigation takes so long. I mean, some of it goes up to the Fed Circuit, comes back down. Some of its stayed pending legal issues at the Fed Circuit, right? But I think that, if nothing else, if we could establish deadlines for investigation litigation that maybe we're going to expedite—or, not expedite, that's the wrong word, but a little shorter than the time right now, I think that that would help everybody in the process especially, you know, when it gets to the first review and the second review and the third review.

MR. BELINE: Well, I guess in investigations and I'm only turning back to respondent selection because that's what the audience wants, and you go with the crowd in these sort of things because they come with apples and oranges. Turning back to original investigations and thinking about issues that might be resolved in the administrative process, is sampling and the selection of more respondents in an investigation an answer to stopping, you know, additional litigation down the line? Are some issues possible to

resolve? And are people then happy because they've been examined, they have had their day, and they've got their number?

MS. LYNCH: Well, I don't know if anything's going to stop additional litigation. I mean, for us to think that people aren't going to sue on sampling would be naive, at best. I think that we, at this point, have only sampled once under our new methodology. I'm not sure where that is in the process. I don't know whether it's ripe for litigation yet or not, but I'm sure that we'll—somebody yelling "not," at me. It's not. Okay.

But I'm sure that when it is, we will be seeing the complaints come fast and furious across my desk. So, you know, I don't really know, given the nature of what we do with, you know, petitioners and respondents, whether there's ever anything that's going to like sue the beast and make sure that nobody sues the agency. Right? I mean, that's really just not the nature of the beast.

But I mean, I think everybody is trying to work towards trying to figure out how you can make it easier for parties, how you can make it quicker for parties. You know, if there is some way to accomplish all of these things and still come up with, you know, results that work for the agency, then, you know, the agency is always happy to listen to different suggestions, you know.

MR. BELINE: So, Dan, in your mind what would have to happen in this sampling regime for it to work in the eyes of the respondents bar to work out?

MR. PORTER: Well, I did the—quite honestly, Tom, the trouble that you have is the Commerce Department has put out, I guess it's a rule that the sampling methodology will only result in three respondents. So we've gone from two to three. Essentially the Commerce Department has said, "We're going to have a small, medium, large strata, and we're going to pick one from each, using sampling techniques for the respondents in each one."

So you're not necessarily increasing the number of respondents. Arguably, you may be doing it more representative from petitioner's standpoint, and I actually don't fault petitioners saying, "It's not fair if we have 20 or 30 exporters each time and you only pick the top two." And I can see that. But to me, the trouble is, only doing three, are you really getting the sort of representativeness that I think everyone wants? And I do think the more you have represented, you will actually probably reduce litigation.

The trouble you have now is you have a very small number, in many cases, especially cases against China, a very small number of respondents dictating the rates applying to a lot. And so then all these people are going to feel, you know, aggrieved and they're going to start litigation. If you make it more representative, then ostensibly you're not going to have as many problems.

JUDGE POGUE: So, how would you write the change?

MR. PORTER: Well, to me, we just go back to the—so-called back to the future. Judge Pogue, I've been doing this long enough. There was a time when Commerce always selected major respondents more than 60 percent of exports. They actually had a informal practice of doing that. And sometimes in the—we heard today about the furniture case. There were six

mandatory respondents. And my other clients could tell you there are some cases there were, I think in lumber there was a number. And so when you have 20 or 30 exporters appearing at Commerce and saying, "Pick me," you can't just pick two, Judge Pogue. You know, two—

JUDGE POGUE: I wasn't arguing for picking two.

MR. PORTER: I know. But my answer is Commerce should go back and they should see if they can get more resources to do more mandatory respondents. And then, to me, the process is more fair.

JUDGE POGUE: Is there some way that they can use sampling to give sort of a guaranteed percentage or a big enough percentage or a representational—something that—a sample that would really represent a significant percentage, that would be also more efficient?

MR. PORTER: I happen to agree with Michele again. I agree. That there's got to be litigation about the sampling. And—

MS. LYNCH: My heart stopped for a moment that he agreed with me.

MR. PORTER: The reason is, is that the Commerce regulation says the sample has to be statistically valid. Now, what does that mean? I mean, there's actually—statistically valid means something in statistics, but this is a law. It's a legal term. So I think the parties and Commerce are not in entire agreement about whether Commerce's proposed a methodology that gets a statistically valid result. I think you will see litigation on that one.

MS. LYNCH: Well, my problem with all of this, Dan, is that you're focusing on your end result. I mean, you want a lot more companies represented, and I understand why. But you're not backing up from it and saying—we started off this panel saying we have scarce resources. We have scarce resources. What are we going to do to make us work—all of us—in an environment where we can manage cases, get to good results for everybody within the constraints that we have, saying, "Let's go to sampling."

I think sampling is going to be very complicated. It's going to engender litigation. I think adding companies is going to engender litigation. I don't see any way that it doesn't. You have four against four companies, we've got four different sets of facts, we got affiliation on one, and somebody else has, you know, some rebate issue, and I mean, it just multiplies enormously the data that we're dealing with. So I think the only way that you can start looking at a possibility of expanding your respondent pool is by then saying, "Okay, what's the converse of that? What are you going to do to start changing this process to make it more efficient for all of us?"

And one of the things I'd like to see, for example, is the time that we spend at Commerce, starting with original investigation questionnaires in every review that read almost identically to the questionnaire that we had in the prior review and the prior review and the prior review, and then we do a deficiency, and down the line and down the line. Rather than pooling our knowledge to where we've learned, after four reviews, X, Y, and Z, so we could start with a questionnaire that's asking X, Y, and Z rather than, you know, no offense, but we send you a questionnaire and you say the same thing you did three reviews ago, and then you get the same deficiency, and back and forth and back and forth, that this process is just ridiculous in

terms of the time it's spending for all of us to get to an end that I think we could get to much faster if we could shortcut some of that.

And I don't know whether—you know, Chris's idea this morning is something that we should consider, where we talk, but I do think that at least in a situation where you've gone through multiple proceedings and you've learned and isolated and defined the issues, that you should be starting there to start analyzing everything, as a way to shortcut the process. And if you start doing that, and you uphold these deadlines and don't have multiple extensions that go on and on and on ad nauseam, I mean, we were comparing notes actually earlier, and Dan and I were both involved in a case in Brazil last year, this past year, and the process there is extraordinarily different.

Mr. PORTER: D–COM (phonetic) does not do anything like—for good or bad—what Commerce does. I mean, for bad, it's not a transparent process. It's very difficult to know what's going on. But I'll tell you one thing that's very interesting there, and I was defending a U.S. company that was a respondent in the case, and they sent them the questionnaire, company filled out the questionnaire—this was before we were involved—and totally wrong, and they didn't answer what they needed, they didn't supply them, there was no deficiency, there was a nothing, there was a prelim AFA, total AFA, huge triple digit rate. That was it.

They wrote in the prelim, "Well, this is why you got hit with this. You did this wrong and this wrong, and all this stuff you messed up." And so then we said, so—

UNIDENTIFIED SPEAKER: So, how are they different in Commerce?

MR. PORTER: Well, I was going to say—

MS. CANNON: Oh, please. Oh, please. How many deficiencies would you have had?

MR. PORTER: So then we had one chance, one chance to fix it. That was it. And then we fixed it or we didn't fix it. But there was none of this back and forth, and there was immediate AFA. If you had respondents knowing that that's what Commerce was going to do and if the courts were to sustain Commerce doing that without this repeated back and forth game, I think we'd change the process enormously.

MR. BELINE: Thirty seconds.

MR. PORTER: No, I'm sorry. I—

MR. BELINE: No, no, no. I have to end this on a positive note, because we've abolished the Federal Circuit, we have now had briefing and hearings of the CIT to now two weeks, so look out for your scheduling orders.

What I'd like the panel to do is to just say, you know, let's say that there is a panel two years from now that is titled, "How we saved resources, colon." How was it done, Michele?

MS. LYNCH: I'd have to agree with Kathy. Eliminate all the deficiencies for AFA. You know? Liar, liar, pants on fire, if you're not going to play ball with us, AFA. You know, without all this back and forth.

MR. BELINE: Dan?

MR. PORTER: Let me say I think it starts with Commerce. Okay. And let me give you a bona fide example of why there are limited resource constraints, okay? In PEW R–7 (phonetic). PEW R–7, okay. Client has 7 percent of their sales are further manufactured. The client went through a complete verification in the United States the year before. We'd say, "Commerce look it, it's really burdensome, takes a long time, please can we avoid the further manufacturing questionnaire?" "Nope." Commerce sends us a Section (E), we acquiesce, we do all the information, we give it. Commerce has to look at it. Why? Why did Commerce need to send a Section (E) questionnaire for 7 percent of the sales when the client was verified the year before? Okay.

Commerce made that decision. Okay? And I think there are a lot of efficiencies that can take place during the proceeding without resorting to just throw—you know, throw facts available and have them all sink. I don't think we need to do that. I think there are efficiencies that Commerce can do to limit the cases so they have more resources to do more mandatory respondents.

MR. BELINE: Kathy?

MS. CANNON: Well, I think that you do want to establish deadlines, you do want to say these deadlines mean something. If you don't give us this information that we've asked for you are going to get a facts available call, and we mean it. We're not—we're not just saying it and we're not going to give you eight more bites at the apple. And then, when you have the parties, and I talk about this more in my paper, when you have the parties that come to Commerce and they're not cooperating, they're not giving anything. I'm not talking about a gray area where maybe we should or maybe we shouldn't. I'm talking about non-cooperation.

The time and money that is wasted trying to calculate a margin for a company that hasn't bothered to show up, whether it's too high, whether it's within commercial reality, whether it's whatever the other things are that the ports are now looking for, is wasting so many resources and I know I'm not even upsetting Dan because he's not participating in those kinds of cases. His companies are submitting questionnaire responses.

So this is a whole other animal, and really an area where I think, you know, if we get away from just trying to spend all the time and resources for parties that just aren't bothering, it really is—it's like a failure to exhaust. I mean, normally you'd say, "These persons did not exhaust their administrative remedies, so they can't argue this to the court." Well, I'm sorry. If you haven't submitted a questionnaire and you haven't provided any data, you haven't exhausted your resources and you shouldn't be able to come in and argue about what your rate should be.

MR. BELINE: Judge Pogue, the last word?

JUDGE POGUE: It sounds like early conferencing, both with D.S. Marsh and with the judges to try to avoid unnecessary questionnaires, unnecessary issues at both levels, offers the best hope, from what I've heard.

MR. BELINE: So I'd like to extend a warm thanks to our panel, please. A round of applause.

(Applause)

MR. BELINE: We'll be signing programs outside after this.

(Break in proceedings)

# THE JUDGES SPEAK TO THE BAR

MS. KIMBLE: And so, for our final panel of the day, I turn the podium over to Joe Dorn. Thank you very much.

MR. DORN: Hello, everybody. Nice to see you. I have the privilege of moderating this panel, and I'm not going to make any formal introductions. I will just say that if any of you do not know the judges on this panel you may be in the wrong room. Their bios, of course, are in the program, and one great thing about practicing in this area is that we do have a lot of interaction with the judges, and they are very gracious in doing lots of events like this, to give us an opportunity to interact with them socially and also to ask them questions.

So, to make this panel work, we're not going to have speeches today. We're going to have a Q and A format. And please pass up your questions. Keep in mind, however, that the judges are not inclined to talk about the likely outcome of a pending case or to discuss issues that are likely to be before their bench. So don't make my work too hard in terms of rejecting questions, but do keep the questions coming.

To get the ball rolling, Chief Judge Stanceu, you've been in your position since July 1, I believe.

JUDGE STANCEU: That's right.

MR. DORN: And I think it'd be interesting for the members of the bar to hear what does your new role entail; in particular, one thing I'd be interested in knowing is how do you assign cases, and is that different from chief judge to chief judge or is that sort of a tradition or practice?

UNIDENTIFIED SPEAKER: Do we get a rebuttal?

JUDGE STANCEU: Absolutely. Absolutely. No; I don't think it changes from chief judge to chief judge. Can everyone hear me? Okay.

The one part that is a matter of continuity is the terrific support that I get from our clerk, our deputy clerk, and case management. Tina and her people have been a terrific resource to me as I've assumed the duties of chief judge. Also, I'd be remiss if I didn't also say that my predecessor, Chief Judge Pogue did a terrific job in getting me oriented to be chief judge, and certainly was a great mentor to me in helping me. And also the other judges of the court have been a great help to me as well.

Let me start by saying that how do we assign cases? It is not strictly a wheel, because if it were that some judges would get too much of one kind of case and not enough of another. We do try to endeavor to make sure that judges get a balance, for example, of trade cases, of Customs cases, and we have cases, as you know, called (i) cases. Occasionally we'll get an (h) case, but not very often. So the idea would be to make sure that the burden is evenly distributed among the judges, but also that the mix of

cases is balanced. We don't want one judge to be, for example, the judge of all of these kinds of cases.

Now, that being said, there's another contrary principle, and that is that related cases really need to go, with minor exceptions, to the same judge. Those related cases are probably going to wind up either being consolidated or at least be the subject of a motion for consolidation. There may be one odd case that doesn't fit in with the others, that does not get consolidated, perhaps because its timing is different or it raises a completely different issue, but long and short, those are the principles that we are trying to adhere to in the case assignment process.

And then of course at some point what also can happen is because some cases take longer and are more complicated, there are times when one judge has too many cases and another judge may not have quite as many and may be willing to take on some more. You'll sometimes see cases getting transferred, and that is an attempt, very often, to equalize that caseload so that the caseload is more evenly distributed.

As you know right now, as far as regular judges, we are down to six. We have three vacancies. We are fortunate to have able senior judges, many of whom take a quite substantial caseload, and without that we would be in much worse shape than we are. But we are very busy right now and I think you know that there certainly has been growth in the area of the (c) cases, particularly cases involving non-market economy. I know we've been talking about those things here at this very informative and substantive conference here today.

So finally, the other thing that I would say is, you know, as chief judge you do have an additional job and that is, of course, you oversee the administration of the court. Without Tina and Mario and their people, their help, I could not do that.

One thing that the chief is not. He's not the chief of the other judges. No. Basically, I'm there to try to solve the problems when brought to me by other judges and by the bar and by our clerk of the court. I want to try to find a solution. So that's the way I envision the role, Joe.

MR. DORN: Thank you.

Judge Goldberg, can you tell us something about the role of a senior judge as opposed to a judge in active service? I know it probably varies from judge to judge, but you're in that category. What types of things do you do different than an active judge?

JUDGE GOLDBERG: You mean trying other cases in other courts?

MR. DORN: That would be one thing.

JUDGE GOLDBERG: Yeah; you get to meet a whole lot of different people. I've sat, I guess, over more than 20 years in federal district courts doing criminal jury work, which I really enjoy because I like the rapport between the judge and the jury which of course we don't have in our court, thank God. We have enough judges in courts that don't understand what we do. You can imagine what it would be like with a jury.

But, at any rate, I enjoy the rapport. I would say that the caliber of judges, I think, if they're sitting in appellate courts or trial courts other

than the CIT, you get good judges, competent guys, really good, and you get some that aren't so hot. The best thing that happens to a judge, whether you're presiding over a case in the CIT or in a federal district or appellate court, is to have really good lawyers on both sides. Then our job is very, very simple. You sit there and look like you understand what's going on, even if you don't, and things come out very well because you've got good lawyers. Regrettably, in both the district courts and the other courts, that doesn't always happen. But this outfit's the best.

MR. DORN: Thank you.

Judge Barnett, you're making the transition from the Commerce Department, and that must pose some issues in terms of when you can start reviewing decisions of the Commerce Department. Can you tell us how you're working through that transition, and the fact you haven't been able to do Commerce Department cases, what has that meant to your caseload?

JUDGE BARNETT: Well, having come out of Commerce about 16 months ago, 17 months ago now but who's counting, what I did was I sort of looked at the general timeline for the process for just about anything to get through Commerce. And for the most part, when you're looking at, with extensions, something along the lines of an 18 month time period, so—I mean, there aren't any hard and fast guidelines for somebody in this kind of position to make this kind of a transition.

But what I decided was I would recuse myself from any Commerce cases in the unfair trade area for a period of 18 months, which will be up in January. And by that time hopefully the pipeline will have been cleared out of any specific cases on which I would have been providing advice while I was at Commerce.

So what I have right now is an unbalanced caseload at the court, which is pretty much heavily weighted towards Customs cases as well as ITC injury cases, and then I've also got a designation to the Maryland court, where I have a civil docket down in Greenbelt, helping them out.

MR. DORN: Judge Kelly, you've been an observer of this court as a law professor for many years, and a friend of the court, and been very involved, among other things, in trade adjustment assistance appeals, on a pro bono basis, and you've held a position on CITBA on the Subcommittee on Trade Adjustment Assistance. Tell us about your transition to the court. Are things like you thought they'd be? And also if you'd say a few words about the status of trade adjustment appeals.

JUDGE KELLY: Sure. Well, the transition has been fantastic. There's actually quite a bit of similarity between the work that you do as a law professor and that you do as a judge. There's a certain solitary aspect to both positions. You sit as a law professor—aside from being in the classroom, you spend a lot of time trying to figure out the law and get it right, and write a very lengthy article on it. And so that's very much like opinion writing, except now people actually read what I write. So that's certainly an upside. And so the transition has been great. It's a fantastic job. It's a wonderful bar, and the work never ceases to be interesting.

In terms of TAA, I very much enjoyed that project that I did with CITPA, both in 2005 and I think we did it again in 2012. But, you know,

there are far fewer TAA cases. If there are two at the court right now I would be surprised. I have not seen one. And you know, that is in part because if you look at those two primers, the law changed in between. I think in 2009 and it changed an important component of the law which I think resulted in far fewer cases. And of course, we'll see what happens with TAA going forward.

MR. DORN: So now I'll read the one and only question I've received so far, so get those questions coming up. Here's the question. "Why did the court stop accepting the entire administrative record from Commerce in (c) cases? If the court must ensure substantial evidence based on the record, should it not have the complete record as opposed to excerpts provided by the parties?"

Would anybody like to take a stab at that?

JUDGE KELLY: I just want to say I didn't plant that question. Well, you know, maybe I could just take this opportunity, though, to say even though we're not getting the entire record it would be helpful to have as fulsome a record as possible so that sometimes parties cite a document that itself cites other documents. And it would be nice to have all of the documents.

That being said, I will tell you that I am not going to hesitate to ask for any part of the record that I think I need. And, since I may not know what I think I need, I'm going to err on the side, personally, I will err on the side of asking for more. So, but the more we get, the less I'll have to ask you for, and that's just my personal preference.

JUDGE BARNETT: One thing I would add to that. I mean, I can't explain why, in part because the decision was made prior to our joining the court, but I think the points that Judge Kelly makes are important ones in that especially with the background that we're bringing to the court. I mean, I think it's helpful for us to see as much as humanly possible and, I mean, one of the things that we've been thinking about and looking at, I know different folks, different judges have different approaches, and one thing you might do—I know Judge Pogue has a standing order that he issues in any of his (c) cases about how he expects to see appendices put together in terms of the completeness of documents and supporting documents that go with documents that are being cited. And I would encourage you all to take a look at that in terms of at least any case that might be coming my way down the road, because I think I'll be, at least as a first step, doing something along those lines. And what would be most helpful to me, I mean the theme of this conference has been about doing things with fewer resources, trying to expedite processes, *et cetera*.

One of the early frustrations that I have felt is just the need at various times in more than one case to have to go back and request documents virtually on the eve of oral argument because as we're going through the record, trying to put things together what I want to look at, what I want to be prepared to discuss at argument, to find out that certain documents that are clearly relevant to the issues that are before me aren't there, haven't been provided in the appendices. And that's a frustration that I've felt, and so I would encourage you all to err on the side of completeness. Because, as the question intimates, I mean, the entire record is before us. Anything

that hasn't been provided in an appendix certainly is there and can be called up at any moment by us, and speed the process up by providing it in the first place.

JUDGE GOLDBERG: I have one comment. There is a trade-off. You know, either the inadequacy of the record or the more—goes to the Fed Circuit. They're not going to look at anything more than we've looked at. So depending upon which side you're on, you can decide which way to go with that issue.

JUDGE STANCEU: Could I add just a little bit. One of the considerations that has come up recently is the goal of getting the record on CM/ECF. Now that we have the ability to protect confidential information on CM/ECF, basically the record can come to us in that format. That's not to say that outside of CM/ECF I haven't, in some cases, asked for example the Department of Commerce, the ITA, to give me the CD–ROMs, the CDs, with the entire record. I've been very pleased that in the times in which I have needed to do that and also needed conversion of documents, some of the documents maybe that are on the CDs, some of the files, you may need special software to convert. And the Department has been willing to do that for me within a very short timeframe, as short as 24 hours.

When I request something I usually request it through the clerk of the court. So one thing that does help is the knowledge that if I do need more I can get it in a way that will not cause delay. That's very important. Because if it's a couple of weeks away, that's going to delay the whole proceeding. And as we know, in the 1581(c) cases, time really is of the essence. These cases have to move relatively quickly.

And the importance of being able to get the whole record is indeed reflected in the standard of review. In other words, it isn't, strictly speaking, the job of the agency, be it ITA or ITC, to support its decision by citing to record evidence. No. It is the job of the court to go through the record as a whole and determine if the record as a whole contains substantial information—contains substantial evidence for a particular finding of fact, or does not contain substantial evidence for that particular finding of fact. And if it is a fact that is integral to that overall, ultimate decision, then we really have to give the entire record a close look to determine what may be out there.

You can help yourself—as some of these comments illustrate, you can help yourself by helping the court become familiar with the record. In other words, it doesn't help you at all to be selective in characterizing what is on that record. Nothing makes judges more upset than to find that the record isn't exactly the way it was characterized to them. You do yourself no favors if you do that. So the ultimate—the best way to do it is if you're doing it with appendices, which is a very good way to go, and in your citations in your brief, err on the side of over-inclusion. It will help in the long run. Thank you.

MR. DORN: So, in a hypothetical situation, where let's say a party is defending the government on appeal, and it's a substantial evidence challenge. And the agency made a factual finding and cited three pieces of evidence, I'll call it A, B, and C. Is the intervenor's counsel supporting the government better off focusing on those three pieces of evidence, explaining

why that's sufficient? Or should it be also explaining why pieces of evidence D, E, and F also support the same factual finding?

JUDGE BARNETT: I mean, in some ways it's not necessary for intervenors to limit themselves to repeating the reasoning that the agency is using to defend its determination. I mean, one of the things that an intervenor can add to the process is their commentary on additional facts or information that's supportive of the agency determination that, for whatever reason, may not have made it into the Justice brief that was filed. So, there's certainly no—from my perspective, at least, no reason not to cite to that additional evidence. It's certainly evidence that I could look at in deciding whether to affirm or not.

JUDGE STANCEU: I would add to that, Joe, in that there is a flip side to that coin, too. Because as the Supreme Court and our court of appeals has repeatedly told us, you also have to look at the evidence that fairly detracts from the cumulative weight. So you have to look at the evidence on both sides. It's true, it's not a preponderance of the evidence standard. It's something less than that. Nevertheless, the agency and, of course, then the court has the obligation to look at the evidence, the record considered as a whole. So that certainly I would certainly agree with what Judge Barnett has said here, both for those who are in support of the agency's decision and those who are contesting it.

JUDGE KELLY: Well, I was just going to add that—and so the intervenors don't always get a copy of the government's brief in advance so, you know, if you have a case where you could have staggered briefing, if the parties set up a briefing schedule with staggered briefing, maybe then you have that opportunity to do that. But I'm assuming that the intervenors don't get the government's brief, so then they're better off putting everything that they can in there.

MR. DORN: It's, you know, frankly, sometimes very frustrating for intervenor's counsel where you're supporting the government. You want the same outcome as the Government, but then you really—you can't see the draft of the Government's brief. Often government counsel are very wed to three pieces of evidence, A, B, and C, that were cited in the decision. They're not going to go off and talk about other pieces of evidence because, in their view, the decision-maker, maybe the ITC, didn't cite those three pieces of evidence so they're reluctant to talk about those three pieces of evidence. But I think intervenor's counsel certainly has an important role to play there in amplifying the defense of the government.

JUDGE GOLDBERG: Let me add something, if I might. I tell intervenors in all of the cases that I have that if they've got something to add, but if they're only going to talk to me about what the government has already said, then sit still. But my experience has been that, in all fairness to the government, the intervenor lawyers have probably lived with the case considerably longer and they do know facts that are either unavailable to the government or the government has not focused on. And so I've had cases where I got a lot more for the government side from the intervenor than I did from the government lawyers.

So I like to do that because my purpose in oral argument is to educate me. I mean, if everything in the brief was super perfect I don't need oral

argument. But usually it's not super perfect, so I've got all these little things because I'm a slow learner, so I have to find out from what's going on as to how we get from A, B, and C.

And I might say, from my experience in sitting in appellate courts around the country, appellate courts in the regular courts, as we call them, or whatever, they know that when people appear in, say, the Second Circuit Court of Appeals, that's the end of the line. It ain't going anywhere else. And they cut through—a lot of them do, anyway—all of this stuff, and figure out which issues are the ones that they have to get to, and how to get to A and B in order to get the decision that they really want to get for them.

More difficult in our practice, but I try to do that too.

MR. DORN: I have a good follow-up question to this discussion. If a judge relies on evidence not cited by anyone, how does the judge know that that evidence isn't contradicted? In other words, if you come up with a piece of evidence that the parties haven't briefed, and you found that persuasive in support of one side or the other, are you taking a risk in relying on that without the other side having an opportunity to say, "Well, Your Honor, there's contradictory evidence in the record."

JUDGE KELLY: Well, one way you could deal with that, and certainly what I would do, is if I did find something that was not cited by the parties is I would ask in oral argument, and I send written questions ahead of time in oral argument and try to send them with enough time for the parties to look into them, because I want the answer. So if I saw a piece of evidence on the record that I think supported a particular finding or detracted from it, I would write a letter and say, "This is what I'm going to ask you." And I feel like the notice issue would be taken care of then. Then they can tell me why that's irrelevant or there's something that contradicts that.

JUDGE STANCEU: I would add to that, to Judge Kelly's comment, show that there's another way to do that as well, and that is if this issue is raised at oral argument—for example, by me—normally what's going to happen is the parties are going to—the counsel for the parties are going to realize that. At the end of an oral argument in an agency record case, I will normally ask, "Do all parties believe that this case should properly now be considered under submission, or is there any other matter, for example, an additional round of briefing, post-argument briefing, that the parties would like to do?"

And I normally try to limit that, of course, and do it on an expedited basis so as not to delay the case, but I've found that that is a very handy tool, a very productive way of alleviating that problem. That does give the counsel a chance to go back, look at the record again, possibly with the benefit of the oral argument transcript, and allay the court's concerns on that point.

MR. DORN: While we're on the question of substantial evidence reviews, do you think it would make any difference if *Atlantic Sugar* were overruled in terms of how the Federal Circuit would review your decisions? It seems to me it might not make that much difference because when the Federal Circuit agrees with you they state that they always begin their analysis with the informed decision of the Court of International Trade. When they

disagree with you, they delete that phrase and say, "it's all de novo review." Any reactions to that?

All right. Moving on.

Here's a couple of questions. These are two separate questions, but it's the same theme, and I'm going to do both of them at the same time.

I've been asked to examine each judge on this. What one word or phrase do you hate to see in a brief. And then what is your pet peeve in briefing? What really irritates you?

JUDGE GOLDBERG: I have a pet peeve in briefing. And I understand why it's done, and if I were, I suppose, the lawyers involved, I'd do the same thing.

There's too much—if the one side or the other feels that they have a moderately weak case, if you have a moderately weak case and select the one or two issues that you think you have a chance of winning on and forget about the others, because there's too many lawyers that put in all the other issues, which is throwing as much mud on the wall and seeing what will stick, and that's testing us to find out if we're smart enough to figure out which is which. Maybe I'm not smart enough to figure out which is which, but I think I can.

But that's a pet peeve for me. There's just too much stuff in there that really doesn't belong. And you need more focus on what counts. You have to sit down and look at the case and figure, "What's my best shot of winning?" And if you don't have any hope of winning, for lord's sakes, tell your client. Don't spend all this unnecessary money. Of course, the government doesn't have that problem, but I mean—but that's my peeve.

JUDGE STANCEU: Let me add a little bit to that. One of the pet peeves I have is the overreliance on precedent. To be persuasive, the precedent has to be, of course, a controlling precedent. Otherwise, it doesn't help me that much. So that normally means it's going to be Supreme Court or the Court of Appeals for the Federal Circuit, other words binding. And is it also binding and controlling, and is it controlling on the problem that I have to solve.

Before you do the string cites and start throwing all the cases at me and the language out of the cases, remember that I'm not bound by *dicta* in the cases. I'm bound by the holdings of the cases, and I'm only bound by those holdings that are on point. In other words, when you're looking at this, try to understand the narrow problem that the court has to solve to decide the case.

You can help a lot there when you're framing your oral argument in the first paragraph of your brief, to tell me not simply why you want me to rule in your favor. I know you want me to rule in your favor. Everybody does. Tell me why the law requires me to rule in your favor; solve the problem for me. As you're speaking, I'm writing the brief in my head.

So if you do that, and you do it in the first paragraph or two of your brief and you have that in mind at oral argument you're either going to win a lot of cases—as Judge Goldberg said, the cases you deserve to win. Or, you're going to talk your client out of bringing the case in the first place, because

the time to realize that there is a major hole in your logic and your reasoning, the time to learn that is not when you're in front of the court. It's when you're meeting with your client.

So if you keep that in mind, that the judge has a problem, every case presents a problem, every claim in every case presents a problem to be solved. The claim in the defense. And look at a lawsuit as a collection of claims. Every claim is a problem to be solved. Help the judge solve that problem, and then do that in your brief and your oral argument only after that. Only after you're all done with that, do you say, "My learned opponent is not correct on this point because of this, this, and this."

It's not a war of who has the best brief. Sometimes the party with the worst brief wins the case because there's merit in the claim. And you do yourself a great favor if you help the court see why there's merit in your claim and why the law requires a remedy. And this is true in every kind of case, not just the (c) case. If you keep that in mind, you'll be way ahead of the game and, of course, you won't aggravate Judge Goldberg.

MR. DORN: Following up on that, could plaintiffs in trade remedy cases do a better job of identifying the claim as being contrary to law or based on a lack of substantial evidence? Or are litigants generally getting that right?

JUDGE BARNETT: I think certainly a lot more could be done to help focus the issues as they're presented, whether—if they're talking about a substantial evidence issue or talking about a legal issue. To go back to the prior question a little bit, as it relates to this as well, I mean, the pet peeve I've had—and I don't know that there's a solution to it; I think it's just the way the system is set up—is really how ITC litigation has sort of evolved.

And I separate it out from some of the other areas, just because of—I think that it's the nature of the Commission and how it all is set up that just makes it so, and that is, you know, in Customs cases people argue whatever the evidence is, they're going to argue the classification, the valuation, et cetera. I mean, it tends to be a fairly focused briefing, fairly focused argument. On the Commerce side, it tends to be largely the same thing. You've got issues that are either going to move the number one way or they're going to move the number another way, and I think that's how they all fall out.

What it seems to me—and I think it goes back to the point that Judge Goldberg made—is particularly with regard to ITC cases, you get a lot more spaghetti against the wall argument. And that's where I think people are particularly unclear in terms of really talking about substantial evidence or you're talking about not in accordance with law or you're challenging a methodology, and have you gone and addressed what's wrong with the Commission's methodology before you've argued why your methodology is better.

But at the end of it all, I mean, for me having seen the process over 25, 30 years, it seems a lot more of it tends to be, "Well, I'm going to throw every last little issue in there because, frankly, it's been, you know, taken a year to get to court," a year and a half or—you know, we've got however much time has gone by, and it's not really about the information anymore. It's not about the explanation that the Commission provided. It's not about any

of the particulars of the case. It's about the fact that one or two commissioners have changed.

And if you get something to stick, it doesn't matter if it was, you know, enough in and of itself before the original Commission to potentially change the result. When you have a different Commission you necessarily have the possibility of a different result, depending on who participates or chooses not to participate. And I think—I'm a little frustrated by that reality, but I think that it's simply the reality and I think it's just the way the process is set up with the decision-making, and so I don't know that there's anything to do with it, but the question was about pet peeves, and that's a peeve, at least.

MR. DORN: All right. Any other peeves?

JUDGE KELLY: Well, I mean, I have a slight pet peeve with the contrary to law and substantial evidence. I don't think it's a rampant problem, but there is some conflation of the two. I think sometimes folks just don't focus on separating it out. Once or twice I think I've seen an instance where I think the person writing the brief wasn't actually sure what they were saying, and so that's obviously a problem if they are not sure and I need to figure it out. And it might be helpful if, after the introductory thesis paragraph you just don't put those two phrases in the same paragraph. When you want to talk about substantial evidence, talk about substantial evidence. And you want to talk about contrary to law, do that. Maybe that would be helpful.

And the other small pet peeve I have, but I think people would have it if they read it in my writing, is when you have conclusory statements, right? So you just say it's substantial evidence because it's substantial evidence, it's a widget because it's a widget. And you don't always see it when you're in the case because you get so immersed and you actually do know it's a widget so it should be obvious to everyone, and so you wind up writing something, but hopefully somebody else in your office reads it and says, you know, "This is conclusory." I need to show why this isn't substantial evidence. What evidence detracted from the finding? You know, spell it out.

But I think we all fall into that sometimes, and you know, hopefully I won't, but if you could check on that, that would be helpful.

MR. DORN: And we have a Part B to the pet peeves question, and that is, what are your pet peeves at oral argument with counsel?

JUDGE GOLDBERG: I hate to compare the appellate procedure, but in appellate procedure, you know, they get anywhere from five to a max of maybe 20 minutes. In the United States Supreme Court you get 30 minutes and you can count on 15 minutes of that having eight of the nine justices—one doesn't say anything; he's there—but you'll have eight of the nine justices peppering you when you get going. My friend, Ted Olson, said that the all-time thing was that they asked a question before he even got to the podium. He hadn't even started his argument.

But I realize that our cases are complex. I realize they're tougher than most cases that appear in the regular appellate courts. But I also realize that it takes too darn long for people to explain what it is they're trying to

explain. You have to realize that the judges, at least most of us, have a pretty good idea of what the case is all about and there's too much regurgitation of what's in the brief and all the stuff. We'd rather hear right at the outset about the real issues that you really want to talk about in a particular case. So I would say that my peeve is that sometimes oral argument is too long.

Now, I try to do it informally. I take it issue by issue and then let the other side do it so I don't lose my way. But that's a good way, I think a good way to do it, and then if they want to sum it up they can. If they don't want to sum it up that's all right, too. But that's a peeve. Because I think a lot of lawyers get up there and say, "Oh boy, I gotta say this, I gotta say that. Oh yeah, there's another little issue, I didn't mention that, we gotta go through all this." It's just confusing.

JUDGE KELLY: I don't have any pet peeves. Oral argument so far has been absolutely delightful. So thank you, all who have appeared before me. It's been fine. I send out my questions ahead of time, and people have been answering them, and I find that very helpful.

JUDGE GOLDBERG: I do the same.

JUDGE BARNETT: I think the one thing I—yeah, the one thing I would add, and it's not a pet peeve necessarily, it's just I think one of the things that we've talked about is trying to get more information out, maybe through the advisory committee and other folks, about the technology that's available in the courtroom and making sure that you all are aware of its availability and know how to use it so that you can put it to its best use.

And so, I mean for me at least, I know if you're going to come up and argue and you plan, for example, to reference, you've got some table or chart, whatever it might happen to be, that you provided in an appendix, make things easy. Bring a copy of it along. We've got the projector thing and you can stick it on there, and we can all—instead of fumbling through papers, a very quick process, you have it there, projected, we can all be referring to the same document, the same set of numbers, whatever the case may be. And that's something I think, from my perspective would make things easier.

MR. DORN: Anything to add?

JUDGE STANCEU: I also need to extend my thanks to the bar as a whole. As a general rule, the oral arguments have really helped me. They've been excellent. Counsel are prepared, and if they don't know an answer what they will do is suggest that they—another round of briefing or some other way to get—to assist the court in finding an answer to the problem.

I would say that the guideline for an oral argument is the same as the guideline for a brief. Again, give the court the roadmap. As you're talking I'm writing the opinion in my head. Bear that in mind. And if I'm stuck on a point, that's the point you're going to get questions on. And realize I'm not just asking the question to be the devil's advocate. I'm asking the question because I have a sincere problem in that the logic is broken somewhere, the chain of logic is broken, and I'm trying to understand how it is I can reach the conclusion that you want me to reach.

As far as the other thing in oral argument, where you're talking about findings of fact and conclusions of law, it's good to keep that in mind. And keep in mind that when you're planning your argument, that you might want to do what appellate—and maybe you all do this, I don't know—appellate advocates do. It's good to be mooted. Moot the case with your colleagues. I do that with my fellow judges and with my law clerks. I find that I see things a lot better in the back and forth of argument. Sometimes you'll see perspectives you don't see otherwise.

So I know you all work very hard to prepare and come to court, but if you can really, really master a case, it's when you can lay that whole case out in a few sentences or a paragraph. If you can do that—and it's hard to do because sometimes, you know, you want to leaf through your outlines and leaf through your briefs and go through the record, but if you have all the salient points in your head and you've mastered it, you're going to do extremely well at oral argument and you're going to make your points as effectively as possible.

MR. DORN: Judge Stanceu, you've suggested collaboration in reaching decisions to some extent. How common is that? Do the judges generally take the record, hear the arguments, make the decision, without consulting others in the courthouse or is it fairly common to reach out and get second opinions and thoughts and discuss issues?

JUDGE STANCEU: It's very common in our court, and I think in other courts as well. Many of our judges as a rule circulate their opinions to the other judges. Even those who don't do it routinely will do it in a case where they are uncertain about a point and would like to hear the views of their colleagues. I think it's a very good thing.

Many times I have benefited from comments from my colleagues on a draft opinion. Sometimes changing the opinion, sometimes addressing a point that maybe wasn't so clear to a reader. We're always trying to gauge who is our audience here. An intelligent layperson has to be able to understand this stuff.

Albert Einstein was able to explain his general theory of relativity in a paperback book that he wrote. If he can do that, then all of us can make the intricacies of Title 7 of the Tariff Act of 1930 come to life in terms that anyone can—any intelligent layperson, especially—or a lawyer who isn't familiar with our area, that they could understand.

MR. DORN: Well, speaking of collaboration, this Article III court is unique, I believe, in that by statute the President shall appoint, with the advice and consent of the Senate, nine judges to serve on this court with no more than five of such judges to be from the same political party. So that's fairly important in a time like now, when you have three vacancies and—one Republican seat, I believe, and two Democratic seats that are being talked about.

But as a practitioner, I don't think many of us think about, "Well, gee, do we draw Republican or do we draw a Democrat for this particular case." But I'm just curious. Does party affiliation or being an Independent have any impact on the way you interact with each other, the way you view cases, and so forth?

JUDGE GOLDBERG: To me, if it isn't the most embarrassing thing about this court, it's right up there at the top. If you've read Article III of the Constitution, that provision to the law is not defensible. It is clearly unconstitutional.

For example, only the judges on this court are the only ones I know in America that have to declare at some point in time that they're one of three things, and they may lie about that. That they're an Independent, they're a Republican, or they're Democrat. Now, we don't have other splinter parties. There's no Tea Party people or anything like that.

But my point is that on our court, for example, in the current administration, suppose you have five judges who admit to being a Democrat. Somewhere along the line they were filling a so-called Democrat slot. That would mean that President Obama, if there were a vacancy and he wants to appoint another Democrat, he can't do it. According to the law. Now, that's all right for the ITC and Commissions. But those aren't Article III courts. As a matter of fact, even the Article I courts don't have a ridiculous provision in the law like that.

And so people say to me—I've had this discussion. They say, "Well, how do you get standing?" I said, "Well, like Joe says, you get into the court, you say well, you're going to get a right-wing maniac like Goldberg or you're going to get somebody on the other side." Will that change? I don't think in our business it would. But it could in other courts, in appellate courts across the country.

The other part of it is that I just think, you know, the fact that a president, for example—well, taking President Obama. I happen to know that two friends of mine have been appointed to appellate courts in different circuits, and they've both happened to be Republicans. That means that some kind of a deal was made or something, where a Democrat got in or didn't get—anyway, something like that. So it doesn't necessarily mean that just because Ronald Reagan appointed them or H.W. Bush or Bill Clinton, that they belong to that party.

Now, from a practical standpoint most judges on the federal courts did belong to one or more of the political parties that they were appointed—that was a necessary requisite. But I just think that it's unconstitutional, inhibits the power of the president, and if I were appearing in the court, it's the only court in the country where you have to know what kind of a political slot the judge is filling.

MR. DORN: Any other comments on that one?

JUDGE GOLDBERG: Well, as you could kind of imagine, I think it ought to be repealed, of course, because it's a ridiculous idea for a court and it's embarrassing to talk to other judges in other courts and explain to them that we actually have that on the books. In fact, I won a bet with a former chief judge of the Southern District of Florida, he says, "I can't believe anybody'd be stupid enough to put that in for the court." I said, "They have, in our court."

MR. DORN: All right. Moving on.

JUDGE RESTANI: I can't remember what anybody's party is.

UNIDENTIFIED SPEAKER: What did she say?

JUDGE KELLY: She said, "Except for Judge Goldberg, I can't remember what anybody's party is."

I don't think you could figure out who's what on the court, so. Because it's not necessarily by who appointed you, so.

MR. DORN: For most of us practicing before the International Trade Commission, we're very familiar with the party affiliation of each member of the agency, and we might think that's good or bad, depending on whether you're a petitioner or a respondent. Over time there's lots of exceptions and different viewpoints that aren't related to party. But I just don't think any of us really think about that when we come to the Court of International Trade, "Well, I drew a Republican or an Independent or a Democrat," which is the way it should be.

JUDGE GOLDBERG: I think the difference, Joe, is that it's a prerequisite on our court. I mean, we all take the same oath of office, all the federal judges. And that what they really tell you is, you leave your politics off the bench and don't pull them up on the bench with you. Now, that isn't going to happen in our court. I've never seen it in over 20 years that I've been on the court. Everybody calls it the way they feel it ought to be, and I think that that's always been true.

Unfortunately, on some of the other courts in the country that's not always true. But I would say that the idea that that's a prerequisite on our court, whether you know who's who or don't know who's who, is very wrong and it is unconstitutional, in my view.

MR. DORN: Hearing your remarks at lunch today, Judge Stanceu, you mentioned Rule 1. And what are some things the court is doing and what are some things the litigants that are appearing before the court could do better to achieve a just, speedy, and inexpensive determination of actions?

JUDGE STANCEU: Okay. Two questions there. What things is the Court doing. Well, we try very hard, in terms of speedy, to manage the dockets. We like to get decisions out when—our goal is within 90 days of submission. We don't always achieve that goal, but that is certainly what we're endeavoring to do.

The other thing is, if matters are taking too long there may be some reason. Some of the cases I've had, there have been problems in sorting out—getting the right record and getting the record in the right form to the court. That has delayed some cases. And other cases just have lots and lots of issues. That can happen. But as a general matter, we have a culture in the court of trying to move them expeditiously.

Now, what can you all do to help us with that? There are plenty of tools available to enlist the help of the court. I want to direct my comments specifically to (a) cases because we had an excellent panel earlier today on how to do this, in the Customs cases. And many good suggestions came out of that panel. But let me add another one.

It may be that as cases drag on through discovery, it may be that the parties are planning to go to war on issues of fact that I don't think are material. I hate to see the situation where a case comes to trial and the

parties are at loggerheads, either in discovery or at trial, on some factual issue that doesn't matter to me because of the way I construe the terms, for example, of a heading or a legal note in the harmonized tariff schedule of the United States. What can you do? Well, conferences. Scheduling conferences, discovery conferences, any sort of conference. Rule 16 is very flexible. I may be able to explain to you or even allow some sort of bifurcated partial summary judgment proceeding. We may be able to achieve a situation where both sides understand what my view of the law is, to guide them.

Now, they're not waiving anything. If they disagree with me, then I'm going to get—and I'm wrong, I'm going to get reversed on appeal and you're probably going to get a remand. And if it's appropriate, then you'll get another shot at discovery to explore an issue that was not explored in my decision because I didn't think that particular finding of fact was a material finding of fact to entering a judgment.

There's another thing that can happen. We have this other provision in our statute, which says that we can, in aid of judgment, order an administrative proceeding. I have actually done this, and I know some of my colleagues have done this, in certain cases. We can direct a specific sort of examination of merchandise, for example, that may not have been done when the goods were in Customs custody. We can do these things.

In other words, if you look at the rules and see them through the broad prism of Rule 1—as I say, that's why it's Rule 1. It's the most important. You construe every other rule in order to get the just, speedy, and inexpensive determination. If you're at loggerheads with your opponent on a discovery or similar such issue, don't be afraid to come to the court.

Normally, I don't bother the parties until there's something in front of me. After the Rule 16 letters go out, I'm not going to be the mother hen that's going to be dragging you in for conferences when you don't want to be there. I realize lawyers are very busy. Their time is expensive to their clients. But if things aren't going well, that's possibly a time when I can be of some benefit.

Come on in, we'll have the conference, we'll hash it out, we'll see where we are. And sometimes we can achieve, if nothing else, an agreement on procedure on how we're going to move the case forward. So that's one way I would look at trying to solve that problem to achieve Rule 1's goals. Be creative. Don't feel you're bound by just doing it the same way that it's always been done in the past.

MR. DORN: And we had a follow-up question that says, "And what is the best way to signal to the court that more active management of the case is needed?" I think you've suggested that the litigants should be proactive, but—

JUDGE STANCEU: Be proactive. Get in touch. Get in touch with the judge's courtroom deputy and we'll get a conference call going, and then after that perhaps an in-court conference. And by the way, you know, we have video equipment too, so if you're worried about all the costs, Courtroom Number 1, and we have a mobile unit as well, we're happy to do videoconferencing. It saves a lot of time and money and travel expense.

Maybe my colleagues here would have further views on this.

JUDGE KELLY: Well, I mean, I would add in terms of judicial philosophy, some people are more hands-on. I tend to fall closer on the continuum to Judge Stanceu, and my feeling is people hire their lawyer and their lawyer has a strategy and they're going to work that out, and I'm going to wait until they tell me I'm needed or if the case is ready for me.

But that being said, I was listening to the trade panel right before this one and something came up where they were talking about the need to hurry up these cases because it takes so long to get from beginning to end with multiple remands, and one issue came up where they said, "Well, maybe we could speed up litigation at the CIT. And, you know, would that be something we would want to do?" And every lawyer said, "Yes. Yes. We want to do that. Yes; we want to do that."

And I thought, well, I have not had a case yet where I haven't had multiple consented-to extensions. Right? And not just one. I mean, not— it wasn't just the government, you know. And it's funny because you're waiting to see which party is going to ask for the extension next. So it's this guy's turn. He hasn't asked for one. So he could say, "I haven't asked for one." And you know, and my feeling is, okay, you consent to it, you're all busy, you give me good reasons, "I have to go here or there." Understood. So okay, good.

But if there's a concern about managing the case for time reasons or other issues or, you know, some process issues, then you should bring it to my attention, at least for me, because if not I'm going to assume that you were hired to do your job, you're doing the best job you can in the interest of your client, and I'm going to stay out of it until it's my turn to do something.

So if you need me in there sooner, just ask. And a conference would be terrific, where we could figure out what the problems seem to be and what we could work out.

JUDGE BARNETT: I think the only thing I would add is just, in my case, particularly as we talked about earlier, I'm still very much in transition. I mean, I don't know that I'd sort of put myself in any particular camp just yet except sort of an experimental one. I think the nice thing about the designation work that I've got in Maryland is it's, you know, giving me a chance to see different styles, different approaches, additional different approaches from other colleagues down there, and I mean, I'm appreciative of that, trying very hard to learn from that, and am very open to experimenting.

So don't be surprised in terms of, you know, trying different approaches, I may try some cases to be a little more active in terms of management, other cases I may be less active. It's really just seeing what I can learn from the process and where I might come up with some best practices of my own.

JUDGE GOLDBERG: It's drink time.

MR. DORN: All right.

JUDGE KELLY: That's case management.

MR. DORN: Well, I think our time has expired. I want to thank the audience for your participation and your good questions. I'm sorry we couldn't get to all of them. And I particularly want to thank our judges for participating in this. It's a favorite event. Thank you.

(Applause)

# CLOSING REMARKS

MS. KIMBLE: And now I call Chief Judge Timothy Stanceu.

JUDGE STANCEU: Tina has asked me to say a few words in conclusion, so I'm going to do just that. Very few. Because I'm standing between all of us and the cocktail party, which I don't want to do.

But let me again say that I, for one, learned a great deal here today, thanks to all of you, thanks to our planning committee, thanks to the moderators and the panel participants. I thought today's conference, from beginning to end, had a terrific amount of substance to it. In other words, these were real issues, people debating things that can really help us in solving problems that we all need to look at together in terms of improving the administration of justice.

So, with that, let me thank you all for coming. Let me thank you all for participating. And wish you good travels wherever you may be going, and hopefully we'll see you at the cocktail event which starts when, Tina?

MS. KIMBLE: Now.

JUDGE STANCEU: Right now. Okay. Right out here. Thank you all.

(Proceedings concluded)